No. 24-11996

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

◆

JANE DOE et al.,
*Plaintiffs-Appellees*,

v.

SURGEON GENERAL, STATE OF FLORIDA, et al.,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court for the
Northern District of Florida, No. 4:23-cv-00114-RH

### BRIEF OF ALABAMA AND 21 OTHER STATES AS
### *AMICI CURIAE* SUPPORTING APPELLANTS'
### MOTION FOR STAY

Steve Marshall
 *Attorney General*
Edmund G. LaCour Jr.
 *Solicitor General*
A. Barrett Bowdre
 *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for* Amici Curiae

*(additional counsel listed after signature page)*

*Doe v. Surgeon General, State of Florida*, No. 24-11996

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3) and 26.1-2(b), the undersigned counsel certifies that the following listed persons and parties, in addition to those listed in Appellants' stay motion, may have an interest in the outcome of this case:

1. Bailey, Andrew – *Counsel for Amicus Curiae*;

2. Bird, Brenna – *Counsel for Amicus Curiae*;

3. Bowdre, A. Barrett – *Counsel for Amicus Curiae*;

4. Carr, Chris – *Counsel for Amicus Curiae*;

5. Coleman, Russell – *Counsel for Amicus Curiae*;

6. Commonwealth of Kentucky – *Amicus Curiae*;

7. Drummond, Gentner – *Counsel for Amicus Curiae*;

8. Fitch, Lynn – *Counsel for Amicus Curiae*;

9. Griffin, Tim – *Counsel for Amicus Curiae*;

10. Hilgers, Michael T. – *Counsel for Amicus Curiae*;

11. Jackley, Marty – *Counsel for Amicus Curiae*;

12. Knudsen, Austin – *Counsel for Amicus Curiae*;

13. Kobach, Kris W. – *Counsel for Amicus Curiae*;

14. Labrador, Raúl R. – *Counsel for Amicus Curiae*;

15. LaCour Jr., Edmund G. – *Counsel for Amicus Curiae*;

*Doe v. Surgeon General, State of Florida*, No. 24-11996

16. Marshall, Steve – *Counsel for Amicus Curiae*;

17. Morrissey, Patrick – *Counsel for Amicus Curiae*;

18. Murrill, Liz – *Counsel for Amicus Curiae*;

19. Paxton, Ken – *Counsel for Amicus Curiae*;

20. Rokita, Thedore E. – *Counsel for Amicus Curiae*;

21. Skrmetti, Jonathan – *Counsel for Amicus Curiae*;

22. State of Alabama – *Amicus Curiae*;

23. State of Arkansas – *Amicus Curiae*;

24. State of Georgia – *Amicus Curiae*;

25. State of Idaho – *Amicus Curiae*;

26. State of Indiana – *Amicus Curiae*;

27. State of Iowa – *Amicus Curiae*;

28. State of Kansas – *Amicus Curiae*;

29. State of Louisiana – *Amicus Curiae*;

30. State of Mississippi – *Amicus Curiae*;

31. State of Missouri – *Amicus Curiae*;

32. State of Montana – *Amicus Curiae*;

33. State of Nebraska – *Amicus Curiae*;

34. State of North Dakota – *Amicus Curiae*;

35. State of Ohio – *Amicus Curiae*;

*Doe v. Surgeon General, State of Florida*, No. 24-11996

36. State of Oklahoma – *Amicus Curiae*;

37. State of South Carolina – *Amicus Curiae*;

38. State of South Dakota – *Amicus Curiae*;

39. State of Tennessee – *Amicus Curiae*;

40. State of Texas – *Amicus Curiae*;

41. State of Utah – *Amicus Curiae*;

42. State of West Virginia – *Amicus Curiae*;

43. Reyes, Sean D. – *Counsel for Amicus Curiae*;

44. Wilson, Alan – *Counsel for Amicus Curiae*;

45. Wrigley, Drew H. – *Counsel for Amicus Curiae*;

46. Yost, Dave – *Counsel for Amicus Curiae*.


Respectfully submitted this 19th day of July, 2024.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for* Amici Curiae

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................. C-1

Table of Contents ...................................................................................... i

Table of Authorities ................................................................................. ii

Interests of *Amici Curiae* and Summary of Argument ........................... 1

Argument.................................................................................................. 4

    I.    The Presumption Of Legislative Good Faith Applies To Laws Protecting Children From Sex-Change Procedures................................... 4

    II.   The District Court Misapplied The Presumption Of Good Faith .............. 6

Conclusion .............................................................................................. 11

Certificate of Compliance ...................................................................... 14

Certificate of Service ............................................................................. 15

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
   585 U.S. 579 (2018) ........................................................................... 4, 5

*Adams v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022) (en banc) ............................................. 8

*Alexander v. S.C. State Conf. of the NAACP*,
   144 S. Ct. 1221 (2024) ....................................................... 3-5, 7, 8, 11

*Boe v. Marshall*,
   2:22-cv-184-LCB (M.D. Ala. May 27, 2024) ................................... 9, 10

*Brnovich v. Democratic Nat'l Comm.*,
   594 U.S. 647 (2021) ........................................................................... 5, 6

*City of Renton v. Playtime Theatres, Inc.*,
   475 U.S. 41 (1986) .................................................................................. 1

*Easley v. Cromartie*,
   532 U.S. 234 (2001) ................................................................................ 5

*Eknes-Tucker v. Governor of Ala.*,
   80 F.4th 1205 (11th Cir. 2023) ............................................................. 7

*Fletcher v. Peck*,
   10 U.S. 87 (1810) .................................................................................... 2

*Geduldig v. Aiello*,
   417 U.S. 484 (1974) ................................................................................ 7

*Gonzales v. Carhart*,
   550 U.S. 124 (2007) ................................................................................ 6

*Gonzales v. Oregon*,
   546 U.S. 243 (2006) ................................................................................ 6

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
  992 F.3d 1299 (11th Cir. 2021) ........................................................4, 6

*Hunter v. Underwood*,
  471 U.S. 222 (1985)...........................................................................5

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
  32 F.4th 1363 (11th Cir. 2022) ...........................................................4

*Marshall v. United States*,
  414 U.S. 417 (1974)...........................................................................6

*McCleskey v. Kemp*,
  481 U.S. 279 (1987)...........................................................................2

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979)...........................................................................4

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020)............................................................................1

*Tenney v. Brandhove*,
  341 U.S. 367 (1951)............................................................................1

## Other Authorities

Azeen Ghorayshi, *Biden Officials Pushed to Remove Age Limits for Trans
  Surgery, Documents Show*, N.Y. TIMES (June 25, 2024),
  https://www.nytimes.com/2024/06/25/health/
  transgender-minors-surgeries.html .......................................................2

Azeen Ghorayshi, *More Trans Teens are Choosing 'Top Surgery'*, N.Y. TIMES
  (Sept. 26, 2022), https://perma.cc/2K79-A7S8 ...................................9

Roni Rabin et al., *Biden Administration Opposes Surgery for Transgender Minors*,
  N.Y. TIMES (June 28, 2024),
  https://www.nytimes.com/2024/06/28/health/transgender-surgery-biden.html...2

## INTERESTS OF *AMICI CURIAE* AND
## SUMMARY OF ARGUMENT

The States of Alabama, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia respectfully submit this brief as *amici curiae* in support of Florida.

"The Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 29 (2020) (Kavanaugh, J., concurring) (cleaned up). These officials "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986) (citation omitted). "[I]t is not" the "function" of federal courts "to appraise the wisdom" of those decisions. *Id.* (citation omitted).

Those who lose in the statehouse nonetheless often bring their policy fights to the courthouse. To get in the door, they must allege that the state law they could not block politically was not only bad policy but pressed in bad faith. Unfortunately, as here, they are sometimes successful even when all they can show is a deep policy disagreement. "In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed." *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951).

1

Because "[c]ourts are not the place for such controversies," *id.*, they should never be eager to find a hidden, unlawful purpose lurking behind a facially valid law. As Chief Justice Marshall declared, "it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void." *Fletcher v. Peck*, 10 U.S. 87, 128 (1810). If a court is to undo the work of the people's representatives, "[t]he opposition between the constitution and the law" must be "clear." *Id.* When there are "legitimate reasons" for a legislature to enact a particular law, courts should "not infer a discriminatory purpose on the part of the State." *McCleskey v. Kemp*, 481 U.S. 279, 298-99 (1987).

The district court here unabashedly flouted these principles, providing a textbook example of why the presumption of legislative good faith exists. Until a few years ago, the notion of providing sex-change treatments to children was practically unthinkable. But it has recently become a booming business, with devastating consequences for many. Twenty-five States and many European countries have responded with age limits on these treatments, and the Biden Administration last month came out in favor of age limits on surgeries.[1] The district court admitted that

---

[1] *See* Roni Rabin et al., *Biden Administration Opposes Surgery for Transgender Minors*, N.Y. TIMES (June 28, 2024), https://www.ny-times.com/2024/06/28/health/transgender-surgery-biden.html; *but see* Azeen Ghorayshi, *Biden Officials Pushed to Remove Age Limits for Trans Surgery, Documents Show*, N.Y. TIMES (June 25, 2024), https://www.ny-times.com/2024/06/25/health/transgender-minors-surgeries.html.

legislators could conclude that these novel treatments are "experimental—perhaps even that [they] should be prohibited altogether for minors." Op.49. But when Florida enacted a law doing just that, the court enjoined it. Why? Because "[g]ender identity is real," Op.7, "the arc of the moral universe is long, but it bends toward justice," Op.10, and "well-established standards of care" from "the World Professional Association for Transgender Health ('WPATH')" have been endorsed by the U.S. government and other "reputable" medical associations, Op.11-12, 49. Only the "bigotry" of Florida's legislators could explain how they parted ways with the district court's convictions about the moral universe. Op.89.

Beyond platitudes, the decision below rests on myriad factual and legal errors. But it can be stayed quickly because it so obviously conflicts with the "presumption of legislative good faith direct[ing] district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1235-36 (2024). The district court did just the opposite. When a legislature has admittedly "legitimate concerns" (Op.86) about "substantial harm" (Op.48) that sterilizing treatments are having on children, there is no ground for assuming that bigotry is the real reason the State acted. The Court should stay the district court's order.

## ARGUMENT

### I.    The Presumption Of Legislative Good Faith Applies To Laws Protecting Children From Sex-Change Procedures.

Any "successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). The plaintiff must prove that "the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Crucially, "when a court assesses whether a duly enacted statute is tainted by discriminatory intent, 'the good faith of the state legislature must be presumed.'" *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (per curiam) (quoting *Abbott v. Perez*, 585 U.S. 579, 603 (2018)). The presumption is rightfully daunting for plaintiffs pressing an animus claim. If their evidence fails to "rule[] out" the "possibility" that the legislature acted for a permissible purpose, "that possibility is dispositive," *Alexander*, 144 S. Ct. at 1241, and the presumptively lawful act is deemed lawful.

The Supreme Court in *Alexander* recently provided additional guidance regarding how the presumption should be given effect. The Court explained that at least three "constitutional interests" "justify this presumption": (1) "due respect for

4

the judgment of state legislators"; (2) reluctance in "declaring that the legislature engaged in offensive and demeaning conduct"; and (3) wariness toward "plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Id.* at 1236 (cleaned up). The presumption "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Id.* at 1235-36 (citing *Abbott*, 585 U.S. at 610-12). Thus, "the presumption of legislative good faith" requires that courts give "dispositive" weight to any "possibility" that a disparate impact on a group "was simply a side effect of the legislature's" legitimate goals, rather than the goal itself. *Id.* at 1241.

Compounding the "demanding" "burden of proof," *Easley v. Cromartie*, 532 U.S. 234, 241 (2001), is the fact that even when dealing with a small number of decisionmakers, "[p]roving the motivation behind official action is often a problematic undertaking," *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). In trying to prove the intent of a body the size of Florida's Legislature (composed of 120 House members and 40 Senators), "the difficulties in determining the actual motivations of the various legislators that produced a given decision increase." *Id.* It is not enough to prove the motives of only a handful of the bill's backers, for "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021). Instead, a plaintiff must show

"that the legislature as a whole was imbued with [improper] motives." *Id.* Making that showing is not merely difficult, it's "near-impossible." *GBM*, 992 F.3d at 1324.

The presumption applies in spades for health and welfare laws. "[T]he structure and limitations of federalism … allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotation marks omitted). "Medical uncertainty does not foreclose the exercise of legislative power," or empower federal courts "to serve as the country's *ex officio* medical board with powers to approve or disapprove medical and operative practices and standards." *Gonzales v. Carhart*, 550 U.S. 124, 164 (2007). To the contrary, "in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation, even assuming, arguendo, that judges with more direct exposure to the problem might make wiser choices." *Marshall v. United States*, 414 U.S. 417, 427 (1974).

## II.    The District Court Misapplied The Presumption Of Good Faith.

While the district court mentioned the presumption of good faith, it utterly failed to apply it. To begin, the court erred in finding that the law requiring children to wait until adulthood to obtain sex-change procedures "target[s] transgenders" rather than "specific medical procedures." Op.40. The court seemed to think that "[t]ransgender and cisgender individuals are not treated the same" because a boy can

get testosterone to correct his hormone imbalance and promote fertility while a girl cannot receive testosterone to *create* a hormone imbalance and *inhibit* or *destroy* fertility. Op.37. But those are obviously not the same treatments. And this Court in *Eknes-Tucker* and the Supreme Court more than 50 years ago in *Geduldig* made clear that regulating a treatment only one sex (or gender identity) might undergo is not sex-based discrimination. *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023) (discussing *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). Such neutral regulations, standing alone, cannot count as "animus."

To find that Florida's neutral regulations did *not* stand alone, the district court inverted the presumption. Though acknowledging evidence that "legislators and Board members act[ed]" not "from animus against transgenders" but from the belief "that the treatments at issue are harmful, should be banned for minors, and should be prescribed with greater care for adults," Op.41, the district court *still* went looking for animus—precisely the opposite of the Supreme Court's instruction that if there are two possible explanations for a legislature's action, courts "err[] in crediting the less charitable conclusion." *Alexander*, 144 S. Ct. at 1242.

So it is the district court resorted to slogans like "[g]ender identity is real" to settle the case. Op.7. A sponsor of Florida's law said that people cannot "change their sex," which the court seized on as evidence "that the sponsor does not believe gender identity is real." Op.44. But the statement—in addition to being biological

fact—could also reflect "concerns about fertility and sexuality that a child entering puberty is not well-equipped to evaluate." Op.86. After all, even if the court were right that the Constitution brooks no dissent from its view of "gender identity," there is currently no way to know which children who identify as transgender will continue to do so. At least for *them*, so-called "gender-affirming care" is only temporarily "affirming" and can "go terribly wrong and cause substantial harm." Op.47-48. "[C]ertainly nothing rules out th[e] possibility" that saving kids from lifelong harms was the sponsor's motive, and "that possibility is dispositive." *Alexander*, 144 S. Ct. at 1241.

Still the district court seemed determined to find bigotry. Thus, in its view, the real radical was the legislator complaining about doctors taking children and "'cut[ting] off their breasts.'" Op.46. The court deemed this "[p]robably about as far removed from reality as any statement by any legislator ever." Op.46. But the court's pronouncement merely underscored the court's unfamiliarity with this Court's precedents. Not even two years ago, this Court decided the case of Drew Adams, a female student *from Florida* who "began taking birth control to stop menstruation and testosterone to appear more masculine and underwent a 'double-incision mastectomy' to remove breast tissue." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 798 (11th Cir. 2022) (en banc). And in 2022, the *New York Times* wrote about a Miami doctor using "platforms like TikTok" to advertise "gender-affirming" surgeries to

8

troubled teens.[2] The doctor boasted that she performed "13 top surgeries on minors" in 2021.[3] Perhaps that is why "[n]obody who voted for the bill expressed disagreement or called these speakers out" for sharing these tragic truths. Op.46.

Next, the court relied on WPATH's Standards of Care, version 8 ("SOC-8"), to find that legislators who disagreed with the standards could be animated only by animus. Op.11-12. Although it shouldn't matter—the presumption of good faith exists so that challenges to rational state laws are not determined by a party's success in discovery—third-party discovery in Alabama's defense of its similar law reveals that the district court's reliance was wholly misplaced. For instance, WPATH hired a team from Johns Hopkins University to conduct "dozens" of systematic evidence reviews for SOC-8 authors to use.[4] The team lead privately reported the results to the Agency for Healthcare Research and Quality at HHS: "[W]e found little to no evidence about children and adolescents."[5] She also told HHS that she was "having issues with this sponsor"—WPATH—"trying to restrict our ability to publish."[6] Among other things, WPATH required the team to seek "final approval" of proposed articles from an SOC-8 leader and "at least one member of the transgender

---

[2] Azeen Ghorayshi, *More Trans Teens are Choosing 'Top Surgery'*, N.Y. TIMES (Sept. 26, 2022), https://perma.cc/2K79-A7S8.

[3] *Id.*

[4] *See* Defendants' Exhibit 173, *Boe v. Marshall*, 2:22-cv-184-LCB (M.D. Ala. May 27, 2024), ECF 560-23 at 25. (Page citation refers to the ECF-stamped pagination.)

[5] *Id.* at 23.

[6] *Id.*

9

community."[7] WPATH explained that it was of "paramount" importance "that any publication based on WPATH SOC8 data [be] thoroughly scrutinized and reviewed to ensure that publication does not negatively affect the provision of transgender healthcare in the broadest sense"—as WPATH defined it.[8]

Even more shocking, acting on the advice of "social justice lawyers," some WPATH authors intentionally chose *not* to seek evidence reviews so they wouldn't have to report the paltry results. As one author explained: "Our concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits."[9] Sure enough, plaintiffs' lawyers here told the district court that "WPATH's treatment protocols … provide an *evidence-based*, safe and effective treatment approach for gender dysphoria." Doc.30-6 at 19 (emphasis added). The court bought it, unable to imagine that WPATH or other "reputable" groups could "have so readily sold their patients down the river." Op.89. The court thus extended a presumption of good faith to *WPATH*, not the Florida Legislature, giving regulated parties authority to dictate to the State how they will be regulated.

\* \* \*

---

[7] *See* Defendants' Exhibit 167, *Boe v. Marshall*, 2:22-cv-184-LCB (M.D. Ala. May 27, 2024), ECF 560-17 at 76-82.

[8] *Id.* at 92.

[9] *See* Defendants' Exhibit 174, *Boe v. Marshall*, 2:22-cv-184-LCB (M.D. Ala. May 27, 2024), ECF 560-24 at 2.

Much more can and will be said about the shocking politicization of WPATH's SOC-8 and the district court's many errors. But for now, it suffices to note that the presumption of legislative good faith exists precisely to spare courts from being transformed into "weapons of political warfare," ad hoc medical boards, and gender theorists. *Alexander*, 144 S. Ct. at 1236. It is a doctrine of judicial humility, recognizing the limited authority assigned to courts and their limited ability to gather every fact needed to settle novel policy questions. Maybe WPATH and the district court are on the "right side of history," with "the arc of the moral universe" bending toward sterilizing children. Or maybe history is repeating itself in grim fashion, and we'll one day wonder how this medical scandal spread so far before being reined in. In any event, because "nothing rules out th[e] possibility" that Florida acted to protect kids from sterilizing treatments, the district court grievously erred. *Id.* at 1241.

## CONCLUSION

The Court should stay the district court's injunction.

11

Respectfully submitted,

Steve Marshall
  *Attorney General*
s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for* Amici Curiae

JULY 19, 2024

*(additional counsel listed below)*

12

## ADDITIONAL COUNSEL

TIM GRIFFIN
Attorney General
State of Arkansas

MICHAEL T. HILGERS
Attorney General
State of Nebraska

CHRISTOPHER M. CARR
Attorney General
State of Georgia

DREW H. WRIGLEY
Attorney General
State of North Dakota

RAÚL R. LABRADOR
Attorney General
State of Idaho

DAVE YOST
Attorney General
State of Ohio

THEODORE E. ROKITA
Attorney General
State of Indiana

GENTNER DRUMMOND
Attorney General
State of Oklahoma

BRENNA BIRD
Attorney General
State of Iowa

ALAN WILSON
Attorney General
State of South Carolina

KRIS W. KOBACH
Attorney General
State of Kansas

MARTY JACKLEY
Attorney General
State of South Dakota

RUSSELL COLEMAN
Attorney General
Commonwealth of Kentucky

JONATHAN SKRMETTI
Attorney General & Reporter
State of Tennessee

LIZ MURRILL
Attorney General
State of Louisiana

KEN PAXTON
Attorney General
State of Texas

LYNN FITCH
Attorney General
State of Mississippi

SEAN D. REYES
Attorney General
State of Utah

ANDREW BAILEY
Attorney General
State of Missouri

PATRICK MORRISEY
Attorney General
State of West Virginia

AUSTIN KNUDSEN
Attorney General
State of Montana

13

## CERTIFICATE OF COMPLIANCE

1.      I certify that this brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 29(a)(5) and 27(d)(2)(A). This brief contains 2,592 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Rule 32(f).

2.      In addition, this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: July 19, 2024

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.

14

**CERTIFICATE OF SERVICE**

I certify that on July 19, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve all counsel of record.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amici Curiae*