# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 24-11996

_____

JANE DOE,
Individually and on Behalf of Her
Minor Daughter,
SUSAN DOE,
GLORIA GOE,
Individually and on Behalf of Her
Minor Son,
LUCIEN HAMEL,

                                            Plaintiffs-Appellees,

BRENDA BOE,
Individually and on Behalf of Her
Minor Son, et al.,

                                                         Plaintiffs,

*versus*

SURGEON GENERAL, STATE OF FLORIDA,
STATE ATTORNEY FIFTH JUDICIAL CIRCUIT
OF FLORIDA,
SCOT ACKERMAN,
In His Official Capacity as Member of the Florida
Board of Medicine,
NICHOLAS WILLIAM ROMANELLO,
In His Official Capacity as Member of the Florida
Board of Medicine,
MATTHEW R. BENSON,
In His Official Capacity as Member of the Florida
Board of Medicine, et al.,

                                                  Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:23-cv-00114-RH-MAF

_____

Before WILSON, GRANT, and LUCK, Circuit Judges.

BY THE COURT:

      In May 2023, the Florida legislature enacted a law "prohibiting sex-reassignment prescriptions and procedures for patients younger than 18 years of age." 2023-90, Title, Laws of Fla. Two

provisions of the law are at issue here—the prohibition provision and the regulation provision. The prohibition provision makes it unlawful to prescribe and administer puberty blockers and hormones to minors "for the purpose of attempting to stop or delay normal puberty in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's" biological "sex." Fla. Stat. §§ 456.001(9)(a)1.–2., 456.52(1). The regulation provision allows the prescription and administration of puberty blockers and hormones to adults, and minors who are already taking the drugs, but only "by a physician" and only after the patient (or the patient's guardian) signs a written consent while in the same room with the physician. *Id.* § 456.52(2)–(3). The legislature directed the board of medicine and the board of osteopathic medicine to "adopt emergency rules to implement" the prohibition and regulation provisions, *id.* § 456.52(6)(a), which the boards did.

Two parents of minors who are not currently on puberty blockers and hormones, and one adult who is, sued on behalf of a class of transgender minors and adults to enjoin the prohibition and regulation provisions and the rules implementing them. The plaintiffs claim that the prohibition and regulation provisions, and the rules, violate the Fourteenth Amendment's Equal Protection Clause.

After a bench trial, the district court recognized that this Court's recent decision in *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023) blocked the plaintiffs' claim that the provisions and the rules unconstitutionally discriminated based on sex.

Next was the claim that the prohibition and regulation provisions, and the rules implementing them, unconstitutionally discriminated based on gender nonconformity, but again the way was blocked by *Eknes-Tucker*. The third claim that ran up against *Eknes-Tucker* was that transgender individuals were a discrete and insular minority entitled to strict scrutiny. The district court was clear that, but for this Court's decision in *Eknes-Tucker*, it would have enjoined Florida's law and rules on all three of these bases.

With every other way closed by our case law, the district court did identify one equal protection violation left open by our earlier decision on the same set of issues—whether the prohibition and regulation provisions and the rules were a pretext for, and were based on, an invidious discriminatory purpose. Finding that they were, the district court applied intermediate scrutiny to the provisions and rules, concluding that they were not substantially related to a sufficiently important, legitimate state interest. As relief, the district court enjoined the defendants—the state surgeon general, the members of the two medical boards, and the state attorney for the Ocala area—from enforcing the prohibition and regulation provisions and the rules implementing them.

The defendants have applied for a stay of the injunction pending appeal. "A court considering whether to issue a stay 'considers four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested

in the proceeding; and (4) where the public interest lies.'" *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (quotation marks omitted) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)). "The first two factors are 'the most critical.'" *Id.* (quoting *Nken*, 556 U.S. at 434).[1]

For two reasons, we believe the defendants have made a strong showing that they are likely to succeed on the merits. First, the district court likely misapplied the presumption that the legislature acted in good faith when it concluded that the prohibition and regulation provisions, and the implementing rules, were based on invidious discrimination against transgender minors and adults. The district court properly recognized that "[s]tatutes come to federal court with a 'presumption of legislative good faith.'" And it asked the right question: "Did the legislators and [b]oard members act from animus against transgender [people], or did they act from a belief—whether or not correct—that the treatments at issue are harmful, should be banned for minors, and should be prescribed with greater care for adults." But it concluded that there was "evidence on each side," and even that "once the issue came up, a significant number of legislators—more likely than not a majority—

---

[1] The dissent is correct that we must "consider whether the defendants are likely to show that the district court abused its discretion in granting the injunction." We've done so below by pointing to two legal errors the district court likely made. "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

were also motivated by their desire to ensure that patients receive only proper medical care."[2]

That should have been the end of it. Instead, the district court attempted to determine whether some number of legislators who had not made statements that it attributed to animus were silently motivated by such animus in addition to their sincere (if, in the district court's view, misguided) desire to ensure safe medical care. This analysis is similar to the mixed-motive analysis that can lead to liability in a Title VII discrimination case, when an adverse employment action is motivated by some combination of legitimate and illegitimate reasons, *see* 42 U.S.C. § 2000e-2(m), but nothing in *Arlington Heights* suggests that it is appropriate in this context. Indeed, for each of the two cases the district court cited to support its impermissible motive holding—*Hunter v. Underwood*, 471 U.S.

---

[2] From the inappropriate comments of a few state representatives and senators, the dissent concludes that the Florida legislature, *as a whole*, enacted the provisions and rules as a pretext for, and based on, an invidious discriminatory purpose. But, "[a]s a general matter, determining the intent of the legislature is a problematic and near-impossible challenge," partly because it is "questionable" whether one representative or senator—even the legislation's sponsor—"speaks for all legislators." *See Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1324 (11th Cir. 2021). "It stretches logic to deem" one representative or senator's "intent"—including the sponsor—"as *the* legally dispositive intent of the entire body of the [state] legislature on that law." *Id.* at 1324–25; *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 932 (11th Cir. 2023) ("[T]he explanatory value of an isolated statement would be limited."). That's because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968).

222 (1985) and *Romer v. Evans*, 517 U.S. 620 (1996)—no legitimate interest at all supported the legislative action.

For that reason, the district court likely misapplied intermediate scrutiny to the provisions and rules. As we have explained, this Court already held in *Eknes-Turner* that rational basis review applied when considering a law very similar to this one. The dissent says that the district court properly reviewed the provisions and rules here for intermediate scrutiny, but (as the district court also recognized) this Court already rejected the rationales the dissent cites in a binding decision. 80 F.4th at 1227–30. What's more, even if the district court were correct in its animus decision, heightened scrutiny under the Equal Protection Clause does not apply to invidious discrimination based on a non-suspect class, and "[n]either the Supreme Court nor this court has recognized transgender status as a quasi-suspect class."[3] *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023); *see also Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 (11th Cir. 2022) (en banc); *Eknes-Tucker*, 80 F.4th at 1220 ("[L]aws that do not burden the exercise of a fundamental right (and do not discriminate against a suspect class under the Equal Protection Clause) are subject to rational basis

---

[3] Just to be clear, this addresses the dissent's point (citing *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938)) that discrete and insular minorities are deserving of explicit protections. *Eknes-Tucker*, as the district court acknowledged, bound it to conclude that heightened scrutiny under the "*Carolene Products* construct" did not apply here. And we, like the district court, are also bound by *Eknes-Tucker* to conclude that heightened scrutiny does not apply under footnote four of *Carolene Products*.

review . . . ."). Discrimination based on age, for example, is subject only to rational basis review. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000) ("States may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest.").

The other stay factors also weigh in favor of the defendants. Florida "will suffer irreparable harm from its inability to enforce the will of its legislature, to further the public-health considerations undergirding the law, and to avoid irreversible health risks to its children." *L.W. ex rel. Williams*, 73 F.4th at 421; *see also Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State."). As to harm to others, even with the law in effect, physicians may continue to prescribe and administer puberty blockers and hormones to adults. And minors who were already receiving them may continue to do so. "That feature of the law lessens the harm to those minors who wish to continue receiving treatment." *L.W. ex rel. Williams*, 73 F.4th at 421.[4] "As for the public interest," Florida's "interests in applying the law to its residents and in being permitted to protect its children from health risks weigh heavily in favor of the State at this juncture." *Id.* at 421–22. The district court itself recognized that there were "legitimate concerns" about some of the treatments' effects, as well as a "risk of misdiagnosis," "risks attendant to treatment," and the potential for "additional medical

---

[4] We also note that the medical providers for the minor children of the named class members have not yet recommended puberty blockers or hormones.

risks." Considering these factual conclusions, we think Florida has satisfied its burden to show that the fourth factor favors a stay.

★   ★   ★   ★

As the district court acknowledged, "[t]he stay issue is close." In our view, when weighed together, the four factors tip in favor of staying the injunction pending appeal. The defendants' motion is granted, and the injunction is stayed pending the issuance of the mandate. The clerk's office is directed to set an expedited briefing schedule and to place this appeal on the next available oral argument calendar. *See Dep't of Educ. v. Louisiana*, No. 24A78, 2024 WL 3841071, at *1 (U.S. Aug. 16, 2024) ("Moreover, related to the equities, the Sixth Circuit has already expedited its consideration of the case and scheduled oral argument for October.").

WILSON, Circuit Judge, dissenting from the order granting a stay pending appeal:

The Supreme Court has repeatedly held that "[a] stay is not a matter of right." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). Instead, the question of whether to grant this relief is an "exercise of judicial discretion." *Nken*, 556 U.S. at 433 (quotation omitted). Here, on review of a thorough and well-reasoned decision, I would defer to the judgment of the district court. Thus, I dissent from the majority's grant of the defendants' motion to stay pending appeal.

I.

As stated by the majority, courts must consider the following in deciding whether to grant a stay of an injunction pending appeal: (1) "whether the stay applicant has made a strong showing that [they are] likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken,* 556 U.S. at 434 (quotation omitted). The majority then goes on to explain that contrary to the district court's findings, the defendants have made a strong showing that they are likely to succeed on the merits. However, on appeal, our review isn't simply limited to whether the moving party has made such a showing.

Here, when reviewing whether the defendants can show a likelihood of success on the merits, we consider whether the defendants are likely to show that the district court abused its

discretion in granting the injunction. *See State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1279 (11th Cir. 2021). In reviewing for an abuse of discretion, we review conclusions of law and the application of the law de novo, whereas factual findings are reviewed for clear error. *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State,* 66 F.4th 905, 921 (11th Cir. 2023). We may only overturn a district court's factual conclusions where "the record leaves us with the definite and firm conviction that a mistake had been committed." *Id.* (quotation omitted). The majority bases its decision to grant the stay on two beliefs: (1) the district court likely misapplied the presumption that the legislature acted in good faith; and (2) the district court likely misapplied intermediate scrutiny to the provisions and rules. Upon review, I would not find that the district court misapplied the law nor abused its discretion.

A.

First, the district court appropriately recognized the presumption of legislative good faith, but identified sufficient record evidence to support concluding that the act's passage was based on invidious discrimination against transgender adults and minors. Courts may find that a statute was enacted with a discriminatory purpose if the record includes evidence that a "state legislature[] selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). A review for discriminatory purpose entails examining, among other relevant evidence, the following: the "historical

background of the decision," the "specific sequence of events leading up to the challenged decision," as well as "legislative [and] administrative history," including meeting minutes and reports. *Vill. of Arlington Heights v. Metr. Hous. Dev. Corp.*, 429 U.S. 252, 267–68 (1977).

In making its decision, the district court relied on record evidence of animus-driven remarks found throughout the record of the statute's enactment—remarks made by legislators and high-ranking members of Florida's administration.[1] Gender-affirming care and identifying as transgender were referred to or described at various points as "evil." *See Dekker* Dist. Ct. Doc. 239 at 129; *Doe* Dist. Ct. Doc. 179-5 at 37. One sponsor, in reference to individuals leaving the state of Florida because of the bill's passage tweeted, "good riddance." *Doe* Dist. Ct. Doc. 186-1 at 9. Other sponsors made statements reflecting a lack of belief in transgender identities and a desire to prevent[2] transgender persons from living in their transgender identities. *See Doe* Dist. Ct. Docs. at 178-8 at 86; 179-5

---

[1] As noted in the district court's order on the merits, the parties stipulated to evidence presented at the bench trial for this case in addition to evidence presented during the bench trial of a separate case. *See generally Dekker v. Weida*, 679 F. Supp. 3d 1271 (N.D. Fla. 2023). *Dekker* addressed Medicaid coverage for the same types of health coverage and services at issue in this case. Citations to the record in *Dekker* will be noted as *"Dekker* Dist. Ct. Doc." and citations to the record in *Doe* will be noted as *"Doe* Dist. Ct. Doc."

[2] During a subcommittee hearing on HB 1421, the House version of SB 254, a member stated that "gender transition actually kills" and therefore the bill "saves lives" because "it recognizes who [people] are in the eyes of God." *Doe* Dist. Ct. Docs. at 178-8 at 86.

at 38–40. The Governor and Surgeon General made similar statements denying transgender identity. *See Doe* Dist. Ct. Doc. 177-5; 180-10 at 14–15; 181-7 at 6; 182-9 at 3. Another legislator, during a committee hearing on a related bill, referred to transgender individuals and witnesses as "mutants living among us on Planet Earth," "demons" and "imps.[3] The majority fails to credit these specific factual findings.[4] I do not read the district court's decision as one imputing the remarks of a few legislators to the whole. Rather, it reads as recognizing animus as the driving factor for the bill's consideration at all.

Further, the majority mischaracterizes the district court's discussion of the "same-decision defense" as an injection of Title VII mixed-motive theory. Contrary to the majority's representations, the district court said that defendants held the burden of establishing that a legitimate goal motivated the majority. According

---

[3] This legislator went so far as to directly address transgender individuals present at the hearing, stating: "That's right. I called you demons and imps." Hearing on Facility Requirements Based on Sex, CS/HB 1521 2023 Session (Fla. Apr. 10, 2023), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8804 (time stamp 2:30:35 to 2:34:10).

[4] In its order denying the motion for a stay, the district court found, with respect to minors, "one could reasonably argue both sides of the question whether the defendants' position is 'strong' enough to warrant a stay." *Doe* Dist. Ct. Doc. 243 at 2. However, as to adults, the district court found "[n]o court has upheld restrictions on gender-affirming care for adults of the kinds at issue here." *Id.* I find this significant. It illustrates how the legislators enacting the statute were more concerned with restricting *all* transgender patients from receiving care than ensuring patients receive "only proper medical care."

to the district court, the defendants' failure to satisfy the same decision defense may exist in tandem with an analysis under *Arlington Heights*. The more significant takeaway, however, is the following district court finding: "but for animus, gender-affirming care would not have been addressed at all, but once the issue came up, both animus and the legitimate goal of ensuring proper care played a part." *Doe* Dist. Ct. Doc. 223 at 63. I read this not as the district court engaging with mixed-motive theory, but as its continued discussion of animus.

The district court's analysis rests on this finding of transgender animus. And, "[a]s *Arlington Heights* makes clear, a factor in the analysis can be the availability of less restrictive alternatives." *Doe* Dist. Ct. Doc. 223 at 64. As support, the district court lists numerous avenues legislators could have pursued in restricting access to gender-affirming care without enacting a *ban*. The district court then proceeds to walk through the *Arlington Heights* factors, concluding that while the factors are not exhaustive or controlling, they are relevant to this case and favor the plaintiffs.

Additionally, the legislative history does not support the contention that legislators were concerned with how gender-affirming care has been provided to both adults and minors.[5] The

---

[5] The majority suggests that recognizing a presumption of good faith requires acknowledging that the legislators in this case were concerned with the care patients would be receiving. However, here the district court order denying the stay proves persuasive because it found that these arguments had not been raised by the defendants prior to the motion, writing, "defendants' new-found

district court found clear evidence in the record that the Florida Boards of Medicine, in establishing new standards of care for gender-affirming treatment, shared untrue and misleading information[6] with patients. The district court then proceeds to detail how the rulemaking for these standards departed from usual procedures.

On balance, evidence in the record demonstrates that the plaintiffs and class-members would suffer if the stay were granted—withholding access to gender-affirming care would cause needless suffering. In contrast, denying the stay would support a ruling grounded in the public interest. This matter is a medical issue, where patients are best left to make decisions alongside health professionals, with access to complete, unbiased information, as needed.

B.

Turning to the court's application of intermediate scrutiny, a review of the record and law supports finding that the district court did not err here either. The district court found that the statute is subject to intermediate scrutiny because it is (1) based on sex and (2) based on gender nonconformity. *See Bostock v. Clayton*

---

concern with the manner in which care is being provided—unsupported by anything in the record—does not call for a stay." *Doe* Dist. Ct. Doc. 243 at 5.

[6] For example, the forms, required "the physician to present this one-sided view, while omitting any reference to clinical experience and the widely accepted standards of care," which undermined informed consent and are evidence of transgender animus. *Doe* Dist. Ct. Doc. 223 at 56.

*Cnty.*, 140 S. Ct. 1731, 1737, 1741 (2020) ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."); *see also Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011) ("[G]overnmental acts based upon gender stereotypes . . . must be subjected to heightened scrutiny.").

The district court was able to distinguish this case from our ruling in *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), because of the undisputed evidence of invidious discrimination present in this case. Additionally, the district court also cited *United States v. Carolene Products Co.,* 304 U.S. 144, 152 n.4 (1938), to support the contention that "discrete and insular minorities" are deserving of explicit protections. The majority rejects this line of reasoning and ignores how the district court applied this precedent to its factual findings. These factual findings include recognizing that the defendants in *Dekker* explicitly stated that preventing or impeding an individual from "pursuing"[7] a transgender identity is not a legitimate interest. *Dekker* Dist. Ct. Doc. 242 at 97.

## II.

Given the above factual and legal findings, I would not find that the defendants have made a "strong showing" of likely success on the merits—particularly given the evidence of transgender animus. In granting the stay, the majority quotes the district court,

---

[7] Evidence in the record also shows that the Surgeon General insisted that social transitioning should be disallowed. *Dekker* Dist. Ct. Doc. 193-5.

writing that the "stay issue is close."  The issue being close is not enough to warrant granting the stay and minimizing the thorough and careful analysis the district court engaged in.  The district court appropriately credited arguments on both sides of the case, and found that on balance, the plaintiffs should prevail.  We should defer to such thoughtful decisionmaking.

    For these reasons, I dissent.