No. 24-11996-J

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

*Jane Doe et al.*,
Plaintiffs-Appellees,

v.

*Surgeon General, State of Florida et al.*,
Defendants-Appellants.

U.S. District Court for the Northern District of Florida, No. 4:23-cv-114
(Hinkle, J.)

## DEFENDANTS-APPELLANTS' INITIAL BRIEF

Mohammad O. Jazil
Michael Beato
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 274-1690

*Counsel for Defendants-Appellants Surgeon General and the Board Members*

Ashley Moody
   *Attorney General of Florida*
Henry C. Whitaker
   *Solicitor General*
Daniel W. Bell
   *Chief Deputy Solicitor General*
Myles S. Lynch
   *Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300

*Counsel for Defendants-Appellants Surgeon General, State Attorney Gladson, and the Board Members*

*Jane Doe et al. v. Surgeon General, State of Florida et al.*
24-11996-J

# CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 and Circuit Rule 26.1, Defendants-Appellants Surgeon General, State Attorney Gladson, and the Board Members certify that the following have an interest in the outcome of this case.

1. Abdul-Latif, Hussein, *Amicus*

2. Academic Pediatric Association, *Amicus*

3. Ackerman, Scot, *Defendant*

4. Ahmed, Aziza, *Amicus*

5. Alstott, Anne, *Amicus*

6. American Academy of Child and Adolescent Psychiatry, *Amicus*

7. American Academy of Family Physicians, *Amicus*

8. American Academy of Nursing, *Amicus*

9. American Academy of Pediatrics, *Amicus*

10. American Association of Physicians for Human Rights, Inc., *Amicus*

11. American College of Obstetricians and Gynecologists, *Amicus*

12. American College of Osteopathic Pediatricians, *Amicus*

13. American College of Physicians, *Amicus*

14. American Medical Association, *Amicus*

15. American Pediatric Society, *Amicus*

16. Andersen, Alison, *Counsel for Amicus*

*Jane Doe et al. v. Surgeon General, State of Florida et al.*
24-11996-J

17.  Antommaria, Armand, *Dekker Witness*[1]

18.  Archer, Phil, *Former Defendant*

19.  Aronberg, Dave, *Former Defendant*

20.  Association of American Medical Colleges, *Amicus*

21.  Association of Medical School Pediatric Department Chairs, Inc., *Amicus*

22.  Baker, Kellan, *Dekker Witness*

23.  Bakkedahl, Thomas, *Former Defendant*

24.  Barsoum, Wael, *Defendant*

25.  Bartlett, Bruce, *Former Defendant*

26.  Basford, Larry, *Former Defendant*

27.  Beato, Michael, *Counsel for Defendants*

28.  Bell, Daniel, *Former Counsel for Defendants*

29.  Benson, Matthew, *Defendant*

30.  Biggs, Michael, *Dekker Witness*

31.  Blickenstaff, David, *Counsel for Amicus*

32.  Boe, Bennett, *Former Plaintiff*

33.  Boe, Brenda, *Former Plaintiff*

---

[1] As the district court stated in its final order, the record in this case also relies on "the evidence presented during the trial of a separate case in this court with overlapping issues, *Dekker v. Weida*, No. 4:22cv325-RH-MAF." Doc.223 at 2-3. Therefore, witnesses in the *Dekker* case are included in this CIP. The *Dekker* case is now on appeal in this Court. 23-12155.

*Jane Doe et al. v. Surgeon General, State of Florida et al.*

24-11996-J

34. Brackett, Matthew, *Dekker Witness*

35. Bridges, Khiara, *Amicus*

36. Brodsky, Ed, *Former Defendant*

37. Bruggeman, Brittany, *Witness*

38. Bruno, Nichole, *Plaintiff Gavin Goe's Doctor*

39. Campbell, Jack, *Former Defendant*

40. Cantor, James, *Dekker Witness*

41. Chriss, Simone, *Counsel for Plaintiffs*

42. Clemens, Jonathan, *Witness*

43. Coe, Carla, *Former Plaintiff*

44. Coe, Christina, *Former Plaintiff*

45. Coffman, Gregory, *Defendant*

46. Cohen, David, *Amicus*

47. Cohen, I. Glenn, *Amicus*

48. Creegan, Chris, *Defendant*

49. Cruz Evia, Rebecca, *Former Plaintiff*

50. Cryan, Michael, *Counsel for Amicus*

51. Dalton, Ann, *Witness*

52. Dandeneau, Debra, *Counsel for Amicus*

53. Dekker, August, *Dekker Plaintiff*

54. Derick, Amy, *Defendant*

*Jane Doe et al. v. Surgeon General, State of Florida et al.*
24-11996-J

55.    Di Pietro, Tiffany, *Defendant*

56.    Diamond, David, *Defendant*

57.    Doe, Jane, *Plaintiff*

58.    Doe, Susan, *Plaintiff*

59.    Doe, Jane, *Dekker Plaintiff*

60.    Doe, John, *Dekker Plaintiff*

61.    Doe, Susan, *Dekker Plaintiff*

62.    Donovan, Kevin, *Witness*

63.    Ducatel, Watson, *Defendant*

64.    Dunn, Chelsea, *Counsel for Plaintiffs*

65.    Durrett, John, *Former Defendant*

66.    Edmiston, Kale, *Dekker Witness*

67.    Endocrine Society, *Amicus*

68.    English, Jeffrey, *Dekker Witness*

69.    Erchull, Christopher, *Counsel for Plaintiffs*

70.    Florida Agency for Healthcare Administration, *Dekker Defendant*

71.    Florida Board of Medicine, *Former Defendant*

72.    Florida Board of Osteopathic Medicine, *Former Defendant*

73.    Florida Chapter of the American Academy of Pediatrics, *Amicus*

74.    Foe, Fiona, *Former Plaintiff*

75.    Foe, Freya, *Former Plaintiff*

*Jane Doe et al. v. Surgeon General, State of Florida et al.*
24-11996-J

76.    Fox, Amira, *Former Defendant*

77.    Galarneau, Charlene, *Amicus*

78.    Garcia, Maria, *Defendant*

79.    Ginsburg, Maya, *Counsel for Plaintiffs*

80.    Gladson, William, *Defendant*

81.    Goe, Gavin, *Plaintiff*

82.    Goe, Gloria, *Plaintiff*

83.    Goldberg, Noah, *Counsel for Amicus*

84.    Goodman, Kenneth, *Witness*

85.    Grossman, Joanna, *Amicus*

86.    Grossman, Miriam, *Dekker Third Party*

87.    Haas, Brian, *Former Defendant*

88.    Hamel, Lucien, *Plaintiff*

89.    Hart, Joseph, *former Counsel for Defendants*

90.    Hartnett, Kathleen, *Counsel for Amicus*

91.    Helstrom, Zoe, *Counsel for Amicus*

92.    Hinkle, Robert, *U.S. District Court Judge*

93.    Hruz, Paul William, *Dekker Witness*

94.    Hunter, Patrick, *Defendant*

95.    Hutton, Kim, *Dekker Witness*

96.    Ikemoto, Lisa, *Amicus*

*Jane Doe et al. v. Surgeon General, State of Florida et al.*
24-11996-J

97. Isasi, William, *Counsel for Amicus*

98. Jackson, Valerie, *Defendant*

99. Jacobs, Arthur, *Counsel for Former Defendants& Defendant*

100. Janssen, Aron Christopher, *Dekker Witness & Witness*

101. Jazil, Mohammad, *Counsel for Defendants*

102. Justice, Nicole, *Defendant*

103. K.F., *Dekker Plaintiff*

104. Kaliebe, Kristopher Edward, *Dekker Witness*

105. Kamody, Rebecca, *Amicus*

106. Kang, Katelyn, *Counsel for Amicus*

107. Karasic, Dan, *Dekker Witness & Witness*

108. Kirsh, William, *Defendant*

109. Kramer, Brian, *Former Defendant*

110. Kuper, Laura, *Amicus*

111. Ladapo, Joseph, *Defendant*

112. Ladue, Jospeh, *Dekker Plaintiff*

113. Langford, Vernon, *Witness*

114. Lannin, Cortlin, *Counsel for Amicus*

115. Laidlaw, Michael, *Dekker Witness*

116. Lappert, Patrick, *Dekker Witness*

117. Larizza, R.J., *Former Defendant*

*Jane Doe et al. v. Surgeon General, State of Florida et al.*
24-11996-J

118.  Levi, Jennifer, *Counsel for Plaintiffs*

119.  Levine, Stephen, *Dekker Witness & Witness*

120.  Loe, Linda, *Former Plaintiff*

121.  Loe, Lisa, *Former Plaintiff*

122.  Lynch, Myles, *Counsel for Defendants*

123.  Lopez, Susan, *Former Defendant*

124.  Madden, Ginger, *Former Defendant*

125.  Mandelbaum, Sara, *Counsel for Plaintiffs*

126.  Manian, Maya, *Amicus*

127.  Marstiller, Simone, *Dekker Former Defendant*

128.  McNamara, Meredithe, *Amicus*

129.  Minter, Shannon, *Counsel for Plaintiffs*

130.  Mondry, Emily, *Counsel for Amicus*

131.  Moody, Ashley, *Former Defendant*

132.  Mor, Yuval, *Counsel for Amicus*

133.  Mortensen, Monica, *Defendant*

134.  Nangia, Geeta, *Dekker Witness*

135.  National Association of Pediatric Nurse Practitioners, *Amicus*

136.  Nelson, Melissa, *Former Defendant*

137.  Noel, Olivia, *Former Plaintiff*

138.  Oberman, Michelle, *Amicus*

*Jane Doe et al. v. Surgeon General, State of Florida et al.*
24-11996-J

139.  Olson-Kennedy, Johanna, *Dekker Witness*

140.  Pages, Luz, *Defendant*

141.  Patel, Ami, *Counsel for Plaintiffs*

142.  Pediatric Endocrine Society, *Amicus*

143.  Peral, Stephanie, *Counsel for Plaintiffs*

144.  Percival, James, II, *Counsel for Defendants*

145.  Perko, Gary, *Counsel for Defendants*

146.  Pimentel, Eleonor, *Defendant*

147.  Poe, Patricia, *Former Plaintiff*

148.  Poe, Paul, *Former Plaintiff*

149.  Pope, Kai, *Former Plaintiff*

150.  Popkin, Kelly, *Counsel for Plaintiffs*

151.  Pratt, Joshua, *former Counsel for Defendants*

152.  Pryor, Harold, *Former Defendant*

153.  Purvis, Dara, *Amicus*

154.  Rebouche, Rachel, *Amicus*

155.  Redburn, Thomas, Jr., *Counsel for Plaintiffs*

156.  Roman, Sven, *Witness*

157.  Romanello, Nicholas, *Defendant*

158.  Rothstein, Brit, *Dekker Plaintiff*

159.  Rundle, Katherine, *Former Defendant*

*Jane Doe et al. v. Surgeon General, State of Florida et al.*
24-11996-J

160. Schechter, Loren, *Dekker Witness*

161. Scott, Sophie, *Dekker Witness*

162. Shumer, Daniel, *Dekker Witness & Witness*

163. Silbey, Jessica, *Amicus*

164. Silverman, Lawrence, *Counsel for Plaintiffs*

165. Societies for Pediatric Urology, *Amicus*

166. Society for Adolescent Health and Medicine, *Amicus*

167. Society for Pediatric Research, *Amicus*

168. Society of Pediatric Nurses, *Amicus*

169. Spektrum Health, Inc., *Amicus*

170. Stafford, William, III, *Counsel for Defendants*

171. Starr, Jason, *Counsel for Plaintiffs*

172. Stoll, Christopher, *Counsel for Plaintiffs*

173. SunServe, *Amicus*

174. Szilagyi, Nathalie, *Amicus*

175. Transgender Health Education Network, *Amicus*

176. TransSocial, *Amicus*

177. Ulrich, Michael, *Amicus*

178. Van Meter, Quentin, *Dekker Witness*

179. Van Mol, Andre, *Dekker Witness*

180. Vazquez, Paul, *Witness*

*Jane Doe et al. v. Surgeon General, State of Florida et al.*
24-11996-J

181.  Veroff, Julie, *Counsel for Amicus*

182.  Veta, D. Jean, *Counsel for Amicus*

183.  Vigil, Anegla, *Counsel for Amicus*

184.  Vila, Hector, *Defendant*

185.  Ward, Dennis, *Former Defendant*

186.  Wasylik, Michael, *Defendant*

187.  Weaver, Cynthia, *Counsel for Plaintiffs*

188.  Weida, Jason, *Dekker Defendant*

189.  Whitaker, Henry, *Counsel for Defendants*

190.  Williams, Gregory, *Defendant*

191.  Witthoeft, Emily, *Counsel for Defendants*

192.  World Professional Association for Transgender Health, *Amicus*

193.  Worrell, Monique, *Former Defendant*

194.  Zachariah, Zachariah, *Defendant*

195.  Zanga, Joseph, *Dekker Witness*

Under Circuit Rule 26.1-2(c), Defendants-Appellants certify that the CIP contained herein is complete.

Dated: August 28, 2024

/s/ Mohammad O. Jazil
*Counsel for Defendants-Appellants Surgeon General and the Board Members*

/s/ Henry C. Whitaker
*Counsel for Defendants-Appellants Surgeon General, State Attorney Gladson, and the Board Members*

## STATEMENT REGARDING ORAL ARGUMENT

In its order granting the State of Florida's motion to stay, this Court directed the clerk "to set an expedited briefing schedule and to place this appeal on the next available oral argument calendar." 24-11996, Doc.49 (11th Cir. Aug. 26, 2024).

# TABLE OF CONTENTS

Statement Regarding Oral Argument ............................................................... i

Table of Authorities ............................................................................... iv

Introduction .......................................................................................... 1

Jurisdictional Statement ......................................................................... 2

Statement of the Issues .......................................................................... 2

Statement of the Case & Facts ............................................................... 3

      I.     Gender dysphoria: not all transgender individuals have it, it's difficult to diagnose, and other, basic facts ................................................... 3

      II.    WPATH and the Endocrine Society: primary proponents of treating gender dysphoria with puberty blockers and cross-sex hormones .......... 5

      III.   Florida's medical boards: promulgated rules after hearing from experts on both sides, the public, and patients ..................................... 10

      IV.   Florida Legislature: invited proponents, opponents, and detransitioners to speak before passing legislation ........................................... 16

      V.    Florida's medical boards: wrote informed-consent forms ..................... 19

      VI.   The litigation below: Plaintiffs sue, two classes are certified, and the district court grants relief ................................................... 22

Standard of Review ............................................................................. 23

Summary of the Argument ................................................................... 24

Argument ........................................................................................... 26

      I.     *Eknes-Tucker* controls and resolves much of this case ........................... 27

      II.    The district court conducted a faulty animus analysis for the equal protection claim ........................................................................ 30

III.    The substantive due process claim must fail as well ................................. 37

Conclusion ................................................................................................. 38

Certificate of Compliance ........................................................................ 40

Certificate of Service ............................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Adams v. School Board of St. Johns County,*
 57 F.4th 791 (11th Cir. 2022) ........................................................... 28, 34

*\*Alexander v. South Carolina State Conference of the NAACP,*
 144 S. Ct. 1221 (2024) ................................................................26, 32, 37

*Arlington Heights v. Metropolitan Housing Development Corp.,*
 429 U.S. 252 (1977) ............................................................................. 31

*Bray v. Alexandria Women's Health Clinic,*
 506 U.S. 263 (1993) ........................................................................ 29, 31

*Brnovich v. DNC,*
 594 U.S. 647 (2021) ............................................................................. 33

*Common Cause Fla. v. Byrd,*
 4:22-cv-109, 2024 U.S. Dist. LEXIS 54503 (N.D. Fla. Mar. 27, 2024) ............ 34

*Dobbs v. Jackson Women's Health Org.,*
 142 S. Ct. 2228 (2022) .......................................................................27-29

*\*Eknes-Tucker v. Governor of Alabama,*
 80 F.4th 1205 (11th Cir. 2023) ........................................................*passim*

*Fletcher v. Peck,*
 10 U.S. (6 Cranch) 87 (1810) ................................................................. 32

iv

*Florida v. HHS*,
  8:24-cv-1080, 2024 U.S. Dist. LEXIS 117619 (M.D. Fla. July 3, 2024) ............. 7

*Geduldig v. Aiello*,
  417 U.S. 484 (1974) ............................................................................. 28

*Gibson v. Collier*,
  920 F.3d 212 (5th Cir. 2019) ................................................................. 7

*Greater Birmingham Ministries v. Secretary of Alabama*,
  992 F.3d 1299 (11th Cir. 2021) ........................................................32-33

*Guinn v. United States*,
  238 U.S. 347 (1915) ............................................................................. 31

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
  299 F.3d 1242 (11th Cir. 2002) ............................................................. 24

*Kosilek v. Spencer*,
  774 F.3d 63 (1st Cir. 2014) .................................................................... 7

*L.W. v. Skrmetti*,
  73 F.4th 408 (6th Cir. 2023) ................................................................. 27

*L.W. v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023) ................................................................. 28

*League of Women Voters of Florida Inc. v. Florida Secretary of State*,
  32 F.4th 1363 (11th Cir. 2022) ...............................................26, 31, 33

*League of Women Voters of Florida Inc. v. Florida Secretary of State,*
   66 F.4th 905 (11th Cir. 2023) .................................................................. 24

*State v. Loe,*
   23-697, 2024 Tex. LEXIS 545 (Tex. 2024) ........................................... 28

*Stout by Sout v. Jefferson County Board of Education,*
   882 F.3d 988 (11th Cir. 2018) ............................................................... 37

*Timbs v. Indiana,*
   586 U.S. 146 (2019) ............................................................................... 38

*United States v. O'Brien,*
   391 U.S. 367 (1968) ............................................................................... 33

*University of Georgia Athletic Association v. Laite,*
   756 F.2d 1535 (11th Cir. 1985) ............................................................. 24

**Statutes & Regulations**

28 U.S.C. § 1291 ........................................................................................ 2

28 U.S.C. § 1331 ........................................................................................ 2

Florida Statute section 1000.071 ........................................................... 34

Florida Administrative Code rule 64B8-9.019 ..................................... 16

Florida Administrative Code rule 64B15-14.014 .................................. 16

Florida Administrative Code rule 64B15ER23-9 .................................. 22

Florida Administrative Code rule 64B8ER23-7 .................................... 22

Florida Administrative Code rule 64B8ER23-11 ........................................................... 22

Florida Administrative Code rule 64B8ER23-12 ........................................................... 22

# INTRODUCTION

The district court recognized that the State of Florida can impose stringent limitations on the availability and use of treatments for the psychiatric diagnosis of gender dysphoria *except* where the limitations serve as a proxy for discriminating against transgender individuals. The district court concluded that transgender individuals were indeed the target of the State's actions. But that animus analysis was flawed. The district court treated transgender status as worthy of greater scrutiny though this Court has rejected such an approach. The district court also misapplied the *Arlington Heights* factors when assessing the State's motives. In particular, the district court turned the presumption of good faith into a presumption of bad faith. It took the words of seven or so of Florida's 160 state legislators and concluded that a significant number of the legislature, the Governor, and two separate boards of medicine, targeted transgender individuals—and didn't target a psychiatric diagnosis. The district court cited a separate bill to bolster the conclusion. And it ascribed ill-motive to the language in informed-consent forms, which mirrored language in forms for other, unrelated treatments. The result: a judicial veto of the State's policy choices for the treatment of gender dysphoria—a condition for which there's no diagnostic blood tests, X-rays, or CT scans, but a diagnosis that's surging among adolescent girls. This Court should reverse.[2]

---

[2] A note on citations. This case shares a factual record with *Dekker v. Weida*, 4:22-cv-325 (N.D. Fla. 2022). Both *Dekker* and this case concern gender-dysphoria treatments. The same district court judge presided over both cases, and overlapping counsel tried both cases. The *Dekker* case went to trial first, and the *Doe* parties agreed

1

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 (federal-question jurisdiction). This Court has jurisdiction under 28 U.S.C. § 1291 (jurisdiction to review "final decisions of the district courts of the United States"). The district court entered final judgment in Plaintiffs' favor on June 11, 2024. Doc.223. Notices of appeal were timely filed on June 18, 2024, and June 26, 2024. Docs.225 & 232.

## STATEMENT OF THE ISSUES

Plaintiffs challenge several provisions of Florida Senate Bill 254, rules adopted by the Florida Board of Medicine and Florida Board of Osteopathic Medicine, and informed-consent forms also adopted by the boards of medicine. Plaintiffs do so under the Equal Protection Clause and the Due Process Clause. As such, this Court must decide:

1. Whether the challenged laws survive rational-basis review under the Equal Protection Clause.

2. Whether the challenged laws violate the Due Process Clause, namely a parent's right to control a child's medical treatment.

---

to use (and build on) the *Dekker* record. As such, references to the *Dekker* record— "Doc." for a docketed document, "PX" for a plaintiff exhibit, "DX" for a defense exhibit, "Tr." for a transcript—in this motion will include "*Dekker.*" Day four of the *Dekker* transcript is noted by "Tr.*" Else, references are to the *Doe* case.

## STATEMENT OF THE CASE & FACTS

### I.    Gender dysphoria: not all transgender individuals have it, it's difficult to diagnose, and other, basic facts.

This case concerns legislative choices made by the Florida Board of Medicine, Florida Board of Osteopathic Medicine, and Florida Legislature that regulate the use of puberty blockers and cross-sex hormones as treatments for gender dysphoria in minors and adults. At the outset, it's important to understand certain basic (and largely undisputed) facts concerning gender dysphoria.

Gender dysphoria is a psychiatric diagnosis for sustained distress related to an incongruence between one's biological sex and one's gender identity. *Dekker* Tr.971:3-7 (Dr. Levine); *see also Dekker* Tr.38:17-20, 114:3-9 (Dr. Karasic). Sex is based on biology, but gender isn't. *See generally Dekker* Tr.971:15-25, 1099:18-25 (Dr. Levine); *Dekker* DX24 at 7 (Endocrine Society guidelines). Gender identity, in turn, is understood as "a person's deeply felt, inherent sense of being a girl, woman, female, a boy, a man, or male." *Dekker* Tr.120:14-22 (Dr. Karasic).

Unlike biological sex, therefore, gender identity is a psychological concept; it's not based on biology. *Dekker* Tr.971:15–972:2 (Dr. Levine). One's gender identity can change throughout one's life. *Dekker* Tr.165:18-23 (Dr. Karasic). So can transgender status; after all, detransitioners exist, those who decide to transition from one gender to the other and then detransition. *Dekker* Tr.81:23–82:14, 164:2–165:23 (Dr. Karasic);

*Dekker* DX16 at 43 (WPATH standards of care); *Dekker* P.I. Tr.41:17 (testimony from a detransitioner).

Unsurprisingly, sustained distress because of an incongruence between sex and gender identity—i.e., gender dysphoria—is difficult to diagnose. As Plaintiffs' experts concede, there is no "confirmatory laboratory or radiographic study for the diagnosis of gender dysphoria." *Dekker* Tr.400:7-14 (Dr. Antommaria). No "blood test," "X-ray," "MRI," "CT scan," or "imaging of any kind" can be used to diagnose gender dysphoria. *Dekker* Tr.114:15–115:4 (Dr. Karasic); *Dekker* Tr.189:14-16 (Dr. Shumer).

And while only transgender individuals suffer from gender dysphoria, not every transgender individual has gender dysphoria; some transgender individuals have no distressing incongruence between their gender identity and biological sex. *Dekker* Tr.115:5–119:22 (Dr. Karasic). In other words, someone can be transgender but not have gender dysphoria. *Dekker* Tr.115:5–119:22 (Dr. Karasic).

Diagnosing gender dysphoria is difficult for other reasons as well. Transgender individuals, the population that *might* also have gender dysphoria, are far more likely than the general population to suffer from other mental health issues, such as autism, anxiety, depression, and suicidality. *Dekker* Tr.108:11–111:11 (Dr. Karasic); *Dekker* Tr.1053:4–1054:17 (Dr. Levine); *Dekker* DX16 at 173 (WPATH standards of care). Aside from disentangling comorbidities, many factors can influence a person's gender dysphoria, including environmental factors, such as social acceptance. *Dekker* Tr.136:16–137:5 (Dr. Karasic). Other conditions, such as body dysmorphic disorder,

can also be confused with gender dysphoria. *Dekker* DX24 at 8 (Endocrine Society guidelines).

Yet diagnoses of gender dysphoria are surging, especially among adolescent girls. *Dekker* Tr.1030:18–1032:1 (Dr. Levine). There's no explanation for why that's so. *Dekker* Tr.1026:7-13 (Dr. Levine). But non-MDs can and do say whether someone has gender dysphoria; the record includes a diagnosis from a non-MD whose schedule of services includes hypnotism, *Dekker* Tr.646:9–647:5 (Rothstein); *Dekker* PX234 at 170, and a confirmatory diagnosis from a medical intern with only ten hours of training, *Dekker* Tr.676:4–677:10 (Dekker).

## II. WPATH and the Endocrine Society: primary proponents of treating gender dysphoria with puberty blockers and cross-sex hormones.

Some advocate for the use of puberty blockers and cross-sex hormones as treatments for gender dysphoria. Puberty blockers, or GnRH agonists, suppress an adolescent's natural puberty. *E.g.*, *Dekker* DX24 at 12-17 (Endocrine Society guidelines). Puberty blockers are then followed by cross-sex hormones—testosterone for biological females and estrogen for biological males—which make an individual undergo the opposite sex's puberty. *E.g.*, *Dekker* DX24 at 17-21 (Endocrine Society guidelines). Close to 98% of gender-dysphoric patients who take puberty blockers go

on to receive cross-sex hormones. *Dekker* Tr.578:14-20 (Dr. Olson-Kennedy); *see also Dekker* Tr.262:14-22 (Dr. Shumer).

Two advocacy organizations are the primary proponents for using puberty blockers and cross-sex hormones (together with surgeries) to treat gender dysphoria. The first is the World Professional Association for Transgender Health (also called WPATH). It publishes what it calls "standards of care" on treatments for gender dysphoria. *Dekker* DX16 (WPATH standards of care). The drafters of these so-called standards of care must be full members of WPATH with a marked commitment to furthering transgender rights, not necessarily quality medical care, *Dekker* Tr.100:18–101:5 (Dr. Karasic); *Dekker* DX17 (WPATH committee guidelines), and they need not be medical professionals; being a parent of a transgender child suffices, *Dekker* Tr.*100:16-21 (Dr. Janssen); *Dekker* DX16 at 250 (WPATH standards of care).

WPATH is open about the limits and weaknesses of the evidence that purport to support its treatment recommendations. Consider the following admissions from WPATH's standards of care:

- In the adolescent-treatment chapter: "[g]ender-diverse youth should fully understand the reversible, partially reversible, and irreversible aspects of a treatment, *as well as the limits of what is known about certain treatments (e.g., the impact of pubertal suppression on brain development[)]*." *Dekker* DX16 at 63 (emphasis added).

- In the adolescent-treatment chapter: "[t]here is, however, limited data on the optimal timing of gender-affirming interventions as well as the long-term physical, psychological, and neurodevelopmental outcomes in youth." *Dekker* DX16 at 67.

- In the adolescent-treatment chapter: "[t]he potential neurodevelopmental impact of extended pubertal suppression in gender diverse youth has been specifically identified as an area in need of continued study." *Dekker* DX16 at 67.

- In the adult-assessment chapter: the "empirical evidence base for the assessment of" transgender and gender diverse adults "is limited." *Dekker* DX16 at 34-35.

- In the adult-assessment chapter: the "intervention-specific risks associated with the presence of specific physical conditions have not been well researched." *Dekker* DX16 at 40.

- In the hormone-therapy chapter: "[t]here are also major gaps in knowledge regarding the potential effects of testosterone on oocytes and subsequent fertility of" "patients." *Dekker* DX16 at 120.

Federal courts have even questioned the reliability of WPATH's so-called standards. *E.g.*, *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019) (the "WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate"); *Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014) (en banc); *Florida v. HHS*, 8:24-cv-1080, 2024 U.S. Dist. LEXIS 117619, at *44-45 (M.D. Fla. July 3, 2024) (noting that Biden-administration officials urged WPATH "to drop proposed age limits for minor transgender surgery" on its standards of care, which WPATH did).

The second organization is the Endocrine Society. It publishes clinical practice guidelines on gender-dysphoria treatments, which WPATH co-sponsors, with several WPATH members serving as contributors to the guidelines. *Dekker* DX24 at 1 (Endocrine Society guidelines); *Dekker* Tr.124:11–125:8 (Dr. Karasic). The guidelines

use the Grading of Recommendations, Assessment, Development, and Evaluation (or GRADE) evidence-rating system. *Dekker* DX24 at 1, 4-5 (Endocrine Society guidelines). GRADE rates the evidence quality for a treatment recommendation: evidence is either high, moderate, low, or very-low quality. *Dekker* DX24 at 4-5 (Endocrine Society guidelines). With higher-quality evidence comes more confidence that treatments will produce the intended result. *Dekker* Tr.346:4-14 (Dr. Antommaria); *Dekker* DX24 at 4-5 (Endocrine Society guidelines). With low-quality evidence, or even very-low-quality evidence, such confidence is either limited or little. *Dekker* Tr.396:21–397:10 (Dr. Antommaria); *Dekker* DX24 at 4-5 (Endocrine Society guidelines).

The Endocrine Society's guidelines include twenty-eight recommendations on treatments. *Dekker* DX24 at 2-4 (Endocrine Society guidelines). Three are backed by moderate-quality evidence, fourteen are backed by low-quality evidence, five are backed by very-low-quality evidence, and six are backed by no evidence at all. *Dekker* DX24 at 2-5 (Endocrine Society guidelines). For example, in the guidelines:

- Low-quality evidence backs the following: "[w]e suggest that clinicians begin pubertal hormone suppression after girls and boys first exhibit physical changes of puberty." *Dekker* DX24 at 3.

- Very-low-quality evidence backs the recommendation that "there may be compelling reasons to initiate sex hormone treatment prior to the age of 16 years," "*even though there are minimal published studies of gender-affirming hormone treatments administered before age 13.5 to 14 years.*" *Dekker* DX24 at 3 (emphasis added).

- The recommendation that "clinicians approve genital gender-affirming surgery only after completion of at least 1 year of

8

consistent and compliant hormone treatment" is backed by no evidence at all. *Dekker* DX24 at 4.

Even beyond WPATH's standards of care and the Endocrine Society's clinical practice guidelines, gender-dysphoria treatments are backed by limited data and studies. Plaintiffs' experts concede as much:

- "Limited prospective outcome data exist regarding transgender and nonbinary youth receiving gender-affirming hormones." *Dekker* Tr.586:18-23 (Dr. Olson-Kennedy).

- "Evidence has been lacking from longitudinal studies that explore potential mechanisms by which gender-affirming medical care affects gender dysphoria and subsequent well-being." *Dekker* Tr.586:24–587:5 (Dr. Olson-Kennedy).

- "There are no large-scale studies examining mental health among transgender and nonbinary youth who receive gender-affirming hormone therapy." *Dekker* Tr.588:14–589:4 (Dr. Olson-Kennedy).

- "Knowledge about the effects of puberty suppression on the developing brain of transgender youth is limited." *Dekker* Tr.*38:16-19 (Dr. Edmiston).

The studies relied on by proponents of the treatments are also exceedingly weak, often backed by online-survey data, *Dekker* Tr.589:8-19 (Dr. Olson-Kennedy); small sample sizes, *Dekker* Tr.*37:11–39:7 (Dr. Edmiston); a lack of long-term data, *Dekker* Tr.*37:11–39:7 (Dr. Edmiston); and a lack of randomized-sampling data, *Dekker* Tr.143:13-15, 146:3–147:18 (Dr. Karasic) (discussing whether high-quality, randomized gender-dysphoria studies are feasible). In other words, they lack key elements that are necessary to ensure the reliability of any conclusions from the studies.

### III. Florida's medical boards: promulgated rules after hearing from experts on both sides, the public, and patients.

It's against this backdrop that Florida's medical boards began rulemaking to regulate the use of puberty blockers and cross-sex hormones as treatments for gender dysphoria in minors. Before promulgating any rules, in 2022, the medical boards made it their business to have a robust debate on the treatments, and to hear from experts who support these treatments and experts who urge caution.

The boards' initial invitation list was long, and included several proponents of the at-issue treatments. PX75 (invitation list). Many declined the invitation. PX25 13:3-22 (November 4, 2022 meeting) (Chairman Diamond).

"[S]everal accomplished pediatric endocrinologists practicing here in Florida," also declined after "stat[ing] their discomfort with the guidelines espoused by the Endocrine Society, WPATH and the American Academy of Pediatrics." PX25 13:3-22 (November 4, 2022 meeting) (Chairman Diamond). More specifically, "[t]hey cited a concern that their positions in various medical societies and indeed their actual employment would be jeopardized should they speak." PX25 13:3-22 (November 4, 2022 meeting) (Chairman Diamond).

Still, the medical boards worked with stakeholders, including advocacy groups like Equality Florida, Tr.436:4-14, 461:7-22 (Vazquez), all to ensure a thoughtful debate. The following experts ultimately testified before the boards:

- Dr. Michael Haller, Chief of Pediatric Endocrinology at the University of Florida. PX23 19:22 (August 5, 2022 meeting).

10

- Dr. Kristen Dayton, University of Florida's Shands Children's Hospital Youth Transgender Clinic. PX24 18:4 (October 28, 2022 meeting).

- Dr. Aron Janssen, a WPATH member and *Dekker* and *Doe* expert. PX24 33:12 (October 28, 2022 meeting).

- Dr. Riittakerttu Kaltiala, Chief of the Department of Adolescent Psychiatry at Finland's Tampere University Hospital, "one of the two nationally centralized gender identity teams for minors" in that country. PX24 47:7 (October 28, 2022 meeting).

- Dr. Meredithe McNamara, Yale School of Medicine. PX24 73:14 (October 28, 2022 meeting).

None of the experts were shrinking violets. Some expressed disagreement with Florida's gender-dysphoria actions, including actions by Florida's Medicaid agency to stop reimbursements for treatments. *E.g.*, PX23 22:2–23:9 (August 5, 2022 meeting) (Dr. Haller); PX24 75:3-22 (October 28, 2022 meeting) (Dr. McNamara). And the experts provided insights specific to their clinical experience. For Dr. McNamara, as an example, "[i]t's all about what the patients want, how that fits into the informed-consent model, and how that is—and how that goes along with clinical practice guidelines." PX24 92:18-25 (October 28, 2022 meeting).

Even so, the experts conceded the limitations of their positions:

- "There is no literature about what is the natural cause of adolescent onset gender dysphoria." PX24 60:17-19 (October 28, 2022 meeting) (Dr. Kaltiala).

- Age guidelines for gender-dysphoria treatments are based on "capacity," not "anatomic physiology." PX23 41:21–42:9 (August 5, 2022 meeting) (Dr. Dayton).

11

- Gender dysphoria is "not as common as many other medical diagnoses, so there are limited data. And it forces us to develop guidelines without often having core randomized control trials like we'd all like." PX23 49:18-23 (August 5, 2022 meeting) (Dr. Haller).

- European countries "have a limited data set as everybody does, because this is the cutting edge of medicine, the data are the data." PX23 45:13-21 (August 5, 2022 meeting) (Dr. Haller).

When asked whether the University of Florida (and its gender clinic) had relevant data to share with the boards of medicine, the boards were told:

> We don't have an active registry of our [gender-dysphoric] patients currently. . . .
>
> We don't have ongoing trials with our patients, but we are working, like, on things like registries of our patients. But no specific, like, investigational trials. . . . I do think something like a larger database throughout the country is not only important to have, but actually is something that our pediatric endocrine society has been working toward doing with all the clinics in the country. So it's not yet fully operational, but it is something that a lot of physicians are going to do. . . . [W]e're not necessarily, you know, systematically collecting like surveys from our patients and things like that to do a more prospective. But I do agree that that would be a really great next step that we need to pursue.

PX24 27:9-13 (October 28, 2022 meeting) (Dr. Dayton); PX23 50:19-22, 51:6-13, 58:16-21 (August 5, 2022 meeting) (Dr. Dayton).

Dr. Janssen's and Dr. Kaltiala's testimonies were particularly noteworthy; they underscored the difference between American and European approaches to treating gender dysphoria. For example, Dr. Janssen opined that gender-dysphoria treatments are used to help patients' mental health comorbidities, like autism and depression:

> Research and clinical experience repeatedly affirm that transition significantly improves the mental and physical health of transgender

12

young people. This is true of each stage of a young person's transition and
transition can and often does alleviate co-occurring mental health issues
that [a] transgender young person experience[s] prior to transition.
Following transition, transgender young people are often able to see
significant improvements in functioning and quality of life.

PX24 39:20–40:4 (October 28, 2022 meeting). But Dr. Kaltiala, who works at "one of

the two nationally centralized gender identity teams for minors" in Finland, PX24 47:7

(October 28, 2022 meeting), testified that mental health comorbidities should be treated

*before* obtaining gender-dysphoria treatments:

> I consider it of utmost importance [that] severe psychiatric disorders first
> be treated into remission.

> Very seldom we see patients where you could think that the mental health
> comorbidities would only be secondary and mild. It is often stated in the
> literature. . . .

> I have also myself reviewed the literature and the evidence for—because
> it is often stated that the gender reassignment will also help in the mental
> health difficulties and the functional impairments. This is not the case.
> There is no evidence base for such claims.

> Literature and the research on the impact of gender reassignment of
> mental health is lousy at best and I cannot conclude based on my own
> reviews and the reviews by COHERE Finland, and also the Cass review
> and some other experts, that there is evidence to say that mental health
> difficulties, psychiatric disorders (indiscernible) if an adolescent
> experiencing gender dysphoria is given gender reassignment, for instance.
> These are separate problems and if the psychiatric problems seem to be
> more fundamental, they have to be treated first.

PX24 56:5–57:11 (October 28, 2022 meeting).

Members of the public also provided input during the meetings. Detransitioners

discussed the (lack of) care they received for their gender dysphoria. One said that "my

therapist lied on documentation to say I had been her patient for far longer than I had

been and that I had no preexisting conditions that might affect my gender identity disorder diagnosis." PX24 131:6-10 (October 28, 2022 meeting). Another stated that "I obtained testosterone by calling Planned Parenthood and was prescribed after just a 30-minute phone conversation." PX24 143:25–144:2 (October 28, 2022 meeting).

Public officials provided public comment, too. Public officials who *opposed* the state action were even moved to the front of the public-comment line, in deference to their office. Tr.431:3-14, 437:12-20 (Vazquez). Specifically, Democratic officials, like Representative Eskamani and agricultural official Nathan Bruemmer, spoke in favor of the treatments, and against the proposed rules. *E.g.*, PX23 66:16, 85:21 (August 5, 2022 meeting).

And, as Dr. Kaltiala's testimony highlighted, the boards were aware of the seeming divergence of WPATH and the Endocrine Society from health agencies of other countries. Note that:

- Sweden's National Board of Health and Welfare determined that "the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits of these treatments," and that "[t]reatment with GnRH analogues, gender-affirming hormones, and mastectomy can be administered" only "*in exceptional cases.*" *Dekker* DX8 at 3 (report) (emphasis added).

- Finland's Council for Choices in Healthcare urged extreme caution when providing gender transitioning services to children. It says that "[t]he reliability of the existing studies with no control groups is highly uncertain, and because of this uncertainty, no decisions should be made that can permanently alter a still-maturing minor's mental and physical development." *Dekker* DX9 at 7 (report).

14

- The U.K. National Institute of Health and Care Excellence reviewed studies that purport to support puberty blockers for gender-dysphoric minors. *Dekker* DX11 (report). The institute concluded that "all small, uncontrolled observational studies" for puberty blockers "are of very low certainty using modified GRADE" and the studies "reported physical and mental health comorbidities and concomitant treatments very poorly." *Dekker* DX11 at 11 (report). As for cross-sex hormones, the institute stated that evidence of their effectiveness was also of a "very low" quality. *Dekker* DX12 at 4 (report). The U.K.'s Cass Review, which reviewed gender-identity services in the country, stated that there's a "lack of consensus" and open discussion about the nature of gender dysphoria and therefore about the appropriate clinical response. *Dekker* DX10 at 16 (report).

- France's Académie Nationale de Médecine concluded that "great medical caution" must be taken "given the vulnerability, particularly psychological, of this population [of younger people presenting with gender dysphoria] and the many undesirable effects, and even serious complications, that some of the available therapies can cause." *Dekker* DX13 at 1 (report).

- The Royal Australian and New Zealand College of Psychiatrists has said that there's a "paucity of evidence" on the outcomes of those presenting with gender dysphoria. *Dekker* DX14 at 1 (report).

After considering the expert and public commentary, written comments, and even impassioned disruptions,[3] the medical boards voted to pass rules to regulate gender-dysphoria treatments for minors. Both rules contain the same language:

---

[3] *E.g.*, PX25 77:22–78:3 (November 4, 2022 meeting) ("Everyone in this room, and I promise you, your names, your emails, your phones, your emails, your phones, everything will be published, and you will not live the moment down. Every person that kills themselves because of this that I know, I will make sure their family contacts you. The blood is on your hands."); 82:15-17 (disruption); 86:11-13 (The rules are "dangerous, regressive, purposefully hateful, and another strong step towards fascism for the state of Florida.").

(1) The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.

(a) Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.

(b) Puberty blocking, hormone, and hormone antagonist therapies.

(2) Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

Fla. Admin. Code R. 64B8-9.019; Fla. Admin. Code R. 64B15-14.014. The rules went into effect in March 2023.

## IV. Florida Legislature: invited proponents, opponents, and detransitioners to speak before passing legislation.

Around the same time, the Florida Legislature began its work. The legislature invited experts on both sides of the issue to provide commentary. Again, some declined while others shared their expertise. *See, e.g.*, PX27 39:4-14 (February 21, 2023 committee hearing) (noting that Dr. Gallagher, a treatment proponent in Florida, was invited to provide commentary but declined); 33:9-10 (Dr. Levine).

Like at the medical-board proceedings, a detransitioner provided commentary. She spoke about how medical professionals "failed to" provide her with informed consent, failed to address her mental-health comorbidities (like autism), and failed to provide her with "other option[s]" than "medical transition." PX27 40:1–52:11 (February 21, 2023 committee hearing).

The legislature also had before it the State Medicaid agency's Generally Accepted Professional Medical Standards—or GAPMS report—that assessed whether the State

should provide Medicaid reimbursements for the use of puberty blockers and cross-sex hormones to treat gender dysphoria. *Dekker* DX6 (report). That report included a systematic review of the efficacy of these treatments from Dr. Romina Brignardello-Petersen, a Canadian researcher with a Ph.D. in clinical epidemiology and health care research. *Dekker* DX6 at 52 (report). Based on Dr. Brignardello-Petersen's assessment, "the best available evidence regarding the effects of" gender-dysphoria treatments "found low and very low certainty evidence suggesting improvements in gender dysphoria, depression, anxiety, and quality of life." *Dekker* DX6 at 55 (report).

After several hearings and amendments, the legislature passed Senate Bill 254. The legislation:

- Prevents minors from receiving puberty blockers and cross-sex hormones as treatments for gender dysphoria. That said, the legislation contains a grandfather provision (like the medical-board rules): it allows minors, who were currently receiving such treatments, to continue receiving those treatments, if they complete an informed-consent form drafted by the medical boards. Fla. Sen. Bill 254 § 5.

- Allows adults to receive puberty blockers and cross-sex hormones as treatments for gender dysphoria, if they complete an informed-consent form drafted by the medical boards. Fla. Sen. Bill 254 § 5.

- Requires the medical boards to draft informed-consent forms through emergency rulemaking. Fla. Sen. Bill 254 § 5.

- Requires informed consent between physicians and patients to be done in person. Fla. Sen. Bill 254 § 5.

- Requires physicians to treat gender dysphoria. Fla. Sen. Bill 254 § 5.

17

- Fixes civil and criminal penalties for violating the legislation. Fla. Sen. Bill 254 §§ 6-7.

Several legislators provided justifications for SB254. Among other things, they explained that their support was based on:

- The need for protecting patients. *E.g.*, PX30 88:8-9 (March 22, 2023 subcommittee hearing) ("because I do care deeply for these patients, I'm up on your bill"); 92:25–93:2 ("our primary role as legislators, as lawmakers of Florida, or any state, is to protect our citizens").

- The need for the Florida Legislature to "draw the line when drastic life-altering gender dysphoria therapies and surgeries are being prescribed for our children." PX29 5:11-14 (March 13, 2023 committee hearing); 117:20-24 (same).

- A concern that "given the seriousness of the" at-issue "procedure[s]," consultations and informed-consent discussions "should be done with a doctor in person." PX30 31:17-19 March 22, 2023 subcommittee hearing); *see also* PX31 10:22–11:2 (March 23, 2023 committee hearing) ("The treatments have the potential for life-altering effects and should be provided by our most highly educated and trained health care practitioners, as well as being regulated in a heightened manner and differently than most other medical treatments.").

- A worry that the medical profession was not doing right by their patients. PX36 20:17-24 (April, 19, 2023 house session) ("[A]s we learned from the situation up at Vanderbilt, we now know there are plenty of doctors who are not guided by conscience but by the fact that these surgeries pay a lot of money. . . . The art of medicine is not for sale.").

The Governor signed SB254 into law in May 2023.

18

### V.    Florida's medical boards: wrote informed-consent forms.

To comply with their obligations under the legislation, the medical boards then began drafting the informed-consent forms. Dr. Mortensen, a member of the Board of Medicine, took the lead. She's a pediatric endocrinologist at Nemours Children's Hospital in Jacksonville, Florida. Tr.478:11-18 (Dr. Mortensen). She "believe[s] that transgender people exist," "believe[s] that transgender people can suffer from" gender dysphoria, and has "treated" patients "with gender dysphoria." Tr.480:24–481:24 (Dr. Mortensen). No one from the governor's office, legislature, or surgeon general's office, influenced her actions. Tr.486:5-13 (Dr. Mortensen).

As a starting point, she relied on the informed-consent forms that Nemours provides to patients. Tr.485:5-10 (Dr. Mortensen). Dr. Mortensen also relied on documents, like the Endocrine Society's guidelines on gender-dysphoria treatments, when drafting the forms. Tr.492:24–493:7 (Dr. Mortensen).

Her informed-consent forms contained several requirements, like receiving X-ray scans, receiving DEXA scans, and requiring frequent mental-health evaluations. The forms even prohibit the prescription of cyproterone acetate, a drug that's not available in the United States. *See, e.g.*, DX2–DX7 (informed-consent forms).

Dr. Mortensen explained each requirement. For the X-ray and DEXA scans, she explained that puberty blockers impact bone-mineral density and height, which the scans can gauge. Tr.496:6-25, 498:14–499:2 (Dr. Mortensen). For the mental-health evaluations, Dr. Mortensen explained that "there's been a lot of data to support the

coexistence of depression and anxiety, as well as ADHD, oppositional defiant, and then a broader spectrum of kids who are neurodivergent or autistic or on the spectrum" who are also diagnosed with gender dysphoria. Tr.494:6-14 (Dr. Mortensen). "So we thought it important that all of their comorbidities be addressed as well." Tr.494:6-14 (Dr. Mortensen). Then, for cyproterone acetate, both WPATH and the Endocrine Society's guidance lists the drug as a treatment option, and there was a concern that "people who have been coming from other countries" are "already on it, so we wanted to make sure that they knew what the side effects were. And there have been some people who are trying to order it from overseas or from Canada to get it, so we just wanted to make sure that they were aware." Tr.503:22–504:8 (Dr. Mortensen).

The medical boards held meetings on the informed-consent forms, with members and staff providing input. With this many experts, authors, lawyers, and staff, the discussion, along with the forms, were dense and complex; medical studies, syntax, and grammar were all part of the mix, as the following vignette reflects:

> Attorney McNulty: Thank you. And then the second item on that same page is . . . where it requires the DEXA scan. But the other forms say annual. Is there a length of time you want that DEXA scan, like what period of time? Or just—the other forms say like annual bone scan but I'm not sure—
>
> Dr. Ackerman: Other forms said a bone scan. It's a DEXA scan, not a bone scan.
>
> Attorney McNulty: It says, "Bone DEXA scan."
>
> Dr. Ackerman: No, no. It's a DEXA scan, it's not a bone scan.
>
> Dr. Benson: It's a bone density scan.

Attorney McNulty: So what should the right—

Dr. Ackerman: A bone scan is a nuclear study that looks at osteoblastic changes in the bones. A DEXA scan is basically a low dose x-ray of the bone to look at the bone density. So it should be—it's a DEXA scan, it's not a bone scan.

Dr. Benson: You could put a bone density scan or something.

Dr. Ackerman: Yeah. Bone density scan, yeah. Bone density scan. Don't use—so I move that we change all of that terminology to say, "Bone density scan (DEXA)."

Attorney Dierlman: Do you want it to say annual across all—

Dr. Ackerman: No, no. I didn't get there yet.

Attorney Dierlman: Okay.

Dr. Ackerman: We'll go with that in a second. Let's clarify what it is. "Bone density scan (DEXA scan)."

Unidentified Speaker: Yeah, yeah.

Dr. Ackerman: Because I get this—it happens to me all the time that a patient needs a DEXA scan, and they get a bone scan. No, no. Because—all the time.

PX39 66:11–67:25 (June 23, 2023 meeting). Also consider the following:

Dr. Ackerman: Box six, "I understand my surgery—risk factors." Those are breast cancer, right, the breast cancer risk factors one?

Chairman Romanello: Yes.

Dr. Ackerman: So it says, "I.e." bracket one, bracket to [sic]. Technically, it should be "E.g."

Chairman Romanello: Okay.

Dr. Ackerman: For example, not that is. I.e. is that is, meaning those are the only two. E.g. is for example. There's more than just those two.

PX39 128:1-11 (June 23, 2023 meeting).

21

To be sure, the forms themselves include lots of information. But this isn't that unusual: the medical boards were also tasked with drafting informed-consent forms for medical-marijuana usage. Those forms, too, were dense and lengthy. DX8 (medical-marijuana informed-consent forms).

In the end, the boards settled on the emergency rules and settled on the informed-consent forms for minors and adults. Fla. Admin. Code R. 64B8ER23-7; Fla. Admin. Code R. 64B15ER23-9; Fla. Admin. Code R. 64B8ER23-11; Fla. Admin. Code R. 64B8ER23-12; DX2–DX7 (informed-consent forms).

## VI.    The litigation below: Plaintiffs sue, two classes are certified, and the district court grants relief.

After the first set of medical-board rules were passed, but before SB254 was enacted, Plaintiffs initiated this action. Plaintiffs, who are minors and adults with gender dysphoria, sued the Surgeon General, the medical boards, and state attorneys. Doc.1. Plaintiffs' initial complaint dealt with the first set of medical-board rules, Doc.1, but Plaintiffs amended their complaint to challenge SB254, Docs.56 & 59.

Plaintiffs sought two preliminary injunctions, one seeking to enjoin the laws' minor-specific requirements, Doc.30, and the other, the adult-specific requirements, Doc.115. The first (minor) motion was granted, Doc.90, but the second (adult) motion was denied, Doc.151.

Plaintiffs again amended their complaint, Docs.114 & 118, this time, to add their challenges to the emergency rules and informed-consent forms. Each of their

complaints concerned the same two constitutional arguments: that the laws violate the Equal Protection Clause and Fourteenth Amendment substantive due process.

Plaintiffs also moved for class certification. Doc.120. The class-certification motion was granted, and one adult and one minor class were certified. Doc.166 at 14.

Then there was a trial. The trial length was shortened, because the parties agreed to rely on (and build on) the record in *Dekker v. Weida*, 4:22-cv-325 (N.D. Fla. 2022).

Following trial, the district court ruled for Plaintiffs on their equal protection and due process claims; it enjoined the first set of medical-board rules, provisions of SB254, and the second set of medical-board rules (with the informed-consent forms). Doc.223. The court found that the rules and legislation were passed with discriminatory animus against transgender individuals. Doc.223. The court also discussed the presumption of good faith, which it interpreted as mere deference to the State in passing laws—deference that goes away when "proof" of discriminatory intent is found. *E.g.*, Doc.223 at 38-39.

The State appealed, Docs.225 & 232, and sought a stay of the final order and judgment, Docs.226 & 233. The district court denied the motion on July 11, 2024. Doc.243. The State moved for a stay before this Court on July 17, 2024, and the motion was granted on August 26, 2024.

## STANDARD OF REVIEW

"In reviewing a judgment following a bench trial," this Court reviews "de novo both conclusions of law and the application of the law to the facts," and reviews

"findings of fact for clear error." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 921 (11th Cir. 2023). "The facts found by a district court are 'clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246 (11th Cir. 2002) (quoting *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1543 (11th Cir. 1985)). And, as a practical matter, this Court sits in the same position as the district court when assessing facts from transcripts of legislative and board proceedings.

## SUMMARY OF THE ARGUMENT

Two separate boards of medicine adopted a rule. The legislature then passed a statute. The boards, consistent with the statute, adopted informed-consent forms. The rule, the statute, and the forms all limit the use of puberty blockers and cross-sex hormones for the treatment of a specific diagnosis, gender dysphoria. It's a diagnosis that's difficult to make because there are no confirmatory tests; gender identity itself is difficult to pin down, changing over time for some. Low or very low-quality evidence supports the treatments for gender dysphoria, meaning the treatments might not work. There are first-person accounts of botched treatments. The treatments also come with side effects like infertility. And there are known unknowns like the effects on brain development and cognition.

Under the circumstances, the State's limitations on access to puberty blockers and cross-sex hormones for the treatment of gender dysphoria serve a legitimate

interest and easily satisfy rational-basis review under the Equal Protection Clause. This Court has already said so. These limitations also satisfy the Due Process Clause, namely the requirements of substantive due process. Again, this Court has already said so.

Yet the district court concluded that the facially neutral rules, legislation, and forms still run afoul of the U.S. Constitution. The court suggested that the laws are *not* facially neutral because they apply only to the transgender population. But this Court, relying on Supreme Court precedent, said the opposite; laws specific to a medical treatment do *not* become facially discriminatory simply because a particular group might need the treatment. This isn't like a tax on yarmulkes; the concern is for the treatment of a medical diagnosis and not an irrational targeting of a specific group.

Because the laws are facially neutral, a sensitive, fact-specific *Arlington Heights* inquiry is needed to assess whether animus was the reason for the State's actions. The district court, however, suggested that the State's laws, on their face, discriminate against transgender individuals who themselves are entitled to some heightened level of protection. The district court then conducted an *Arlington Heights* review; however, the court failed to properly apply a presumption of good faith that attaches to each of the *Arlington Heights* factors. And it wrongly deemed the presumption forfeited for 160 state legislators and two separate medical boards based on the words of seven or so legislators, the subject of separate legislation, and the language in informed-consent forms. That was error.

25

Ultimately, even the district court conceded that there was evidence on both sides of the animus question. Still, the court *assumed* that animus drove a significant number of the State's decisionmakers to act as they did. That too was error.

Finally, the due process claim must fail. As the district court itself acknowledged, the due process claim cannot succeed where the State has grounds to prohibit certain medical treatment. The State has such grounds.

## ARGUMENT

Though the district court said that "the merits are close enough," it then erred in siding with Plaintiffs. Doc.243 at 3. This Court's decision in *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), provides the framework for this case, and forecloses the kind of facially discriminatory analysis the district court included in its final order. The Supreme Court's decision in *Alexander v. South Carolina State Conference of the NAACP*, 144 S. Ct. 1221 (2024), and this Court's decision in *League of Women Voters of Florida v. Florida Secretary of State*, 32 F.4th 1363 (11th Cir. 2022), among others, make clear that the district court misapplied the legislative presumption of good faith, treating it as mere deference, and erred in its *Arlington Heights* analysis. The district court's *Arlington Heights* analysis also reached the wrong conclusion. Finally, the due process claim fails because, as even the district court said, "a parent's right to control a child's medical treatment does not give the parent a right to insist on treatment that is properly prohibited on other grounds." Doc.223 at 83. And Florida has plenty of health-related grounds.

**I.** *Eknes-Tucker* **controls and resolves much of this case.**

As an initial matter, this Court's decision in *Eknes-Tucker* controls and supports the State's constitutional arguments concerning the legislative choices made to regulate treatments for a diagnosis of gender dysphoria. There, this Court held that an Alabama statute that regulates puberty blockers and cross-sex hormones as gender-dysphoria treatments didn't violate the Equal Protection Clause or Fourteenth Amendment substantive due process. 80 F.4th at 1231.

**A.** *Eknes-Tucker* explained that the Alabama statute didn't amount to sex-based discrimination. That's because the statute didn't "establish an unequal regime for males and females." *Id.* at 1228. It applied to both biological males and females diagnosed with gender dysphoria. *Id.* It "refer[red] to sex only because the medical procedures that it regulate[d]" were "themselves sex-based." *Id.* Under the Alabama statute, neither biological males nor biological females can obtain certain treatments for gender dysphoria until they reach the age of majority; there's no preference for one sex over the other. *Id.*; *see also L.W. v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023). The same is true of Florida's laws.

**B.** *Eknes-Tucker* also recognized that Alabama's statute didn't discriminate based on transgender status. The statute didn't "further any particular gender stereotype," and it didn't matter that the law was a "regulation of a medical procedure that only one" group (transgender individuals) "can undergo." 80 F.4th at 1229-30 (citing *Dobbs v.*

*Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245-46 (2022), and *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). The same is true of Florida's laws.

**C.** For that matter, treating transgender individuals as a quasi-suspect class on par with race or "distinct from sex" doesn't make sense. *Id.* at 1230. The Equal Protection Clause provides greater protection only for immutable characteristics. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807-08 (11th Cir. 2022) (en banc). The record in this case confirms this Court's "grave doubts" about transgender status triggering greater scrutiny. *Id.* at 803 n.5. Plaintiffs' expert conceded that transgender status is not immutable; it can change. *Dekker* Tr.81:23–82:14, 164:2–165:17 (Dr. Karasic). And the courtroom testimony of a detransitioner provides a specific example of transgender status changing—that is, a person's gender identity reverting and realigning with biological sex. *Dekker* P.I. Tr.41:17–45:6. *Cf. State v. Loe*, 23-697, 2024 Tex. LEXIS 545, at *42-63 (Tex. 2024) (Blacklock, J., concurring) (recognizing the difficulty in assessing gender identity).

Nor can transgender status trigger heightened scrutiny under a discrete-or-insular-minority analysis because transgender individuals are not a politically powerless group. "The President of the United States," the Department of Health and Human Services, and "the Department of Justice support the Plaintiffs." *L.W. v. Skrmetti*, 83 F.4th 460, 487 (6th Cir. 2023); *see also Dekker* DX1, DX2, DX3 (Biden administration's policies on gender-dysphoria treatments). "A national anti-discrimination law, Title VII, protects transgender individuals in the employment setting." *L.W.*, 83 F.4th at 487.

28

"The major medical organizations support the Plaintiffs." *Id.* "[T]he only large law firms to make an appearance in the case all entered the controversy in support of the Plaintiffs." *Id.* All that remains true in Florida's case with no contrary evidence introduced below. *Id.*

**D.** Additionally, a health-related statute doesn't lose its "facially neutral" status, and doesn't evidence animus against a particular group, because it applies only to that group. Doc.223 at 40-41. This Court previously cited abortion as an example of the principle. *Eknes-Tucker*, 80 F.4th at 1229-30. Just as "the goal of preventing abortion does not constitute invidiously discriminatory animus against women," one can't say that limitations on access to gender-dysphoria treatments constitute discriminatory animus against transgender individuals. *Id.* (cleaned up, quoting *Dobbs*, 142 S. Ct. at 2246, and *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 273-74 (1993)).

**E.** According to *Eknes-Tucker*, therefore, all that's left is the rational-basis standard. Based on an application of that standard, the Alabama statute easily passed constitutional muster. This Court explained that the "safety and wellbeing" of Alabama's citizens, through the regulation of specific treatments for a medical diagnosis, is "quintessentially the sort" of matter "our system of government reserves to legislative, not judicial, action." *Id.* at 1231.

As for the substantive due process claim, *Eknes-Tucker* rejected that too. It made clear that there's no "right to treat one's children with transitioning medications subject to medically accepted standards." *Id.* at 1224 (cleaned up).

29

**F.** At base, Plaintiffs in this case raise the same constitutional issues in their complaints as the plaintiffs in *Eknes-Tucker*. *E.g.*, Docs.114 & 118. The issues should be decided the same way as they were in *Eknes-Tucker*.

True, the statute in *Eknes-Tucker* concerned treatments for minors, while the laws in this case concern treatments for minors and adults. But that matters little. If a statute that regulates gender-dysphoria treatments isn't discriminatory, it doesn't matter whether it applies to minors, adults, or both. And *Eknes-Tucker* found that puberty blockers and cross-sex hormones, as a general matter, not just as to minors, were new treatments, access to which weren't deeply rooted in our nation's history and tradition. 80 F.4th at 1220-21, n.11 & 12. Thus, the reasoning of *Eknes-Tucker* still controls and still supports the State of Florida.

## II.    The district court conducted a faulty animus analysis for the equal protection claim.

The district court didn't quite follow *Eknes-Tucker* before finding animus on the part of the Florida Legislature and Florida's two separate boards of medicine. Nor did the district court follow binding precedent from the Supreme Court and this Court concerning the application of *Arlington Heights*.

**A.** The district court first "frame[d] the issue," by suggesting that it could conclude that the statute was motivated by animus without troubling itself with "the *Arlington Heights* factors." Doc.223 at 41. It reasoned that the statute was not "facially neutral" because the statute and rules "apply only to transgenders." Doc.223 at 40.

That's contrary to what this Court and the Supreme Court have said when it comes to health-related statutes. *See supra* Argument I, E. More fundamentally, *Arlington Heights* itself held that that kind of "proxy discrimination" theory works only if the classification in question is "unexplainable on grounds other than" discrimination. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). For example, a "tax on wearing yarmulkes is a tax on Jews," and can only be explained by "an irrational object of disfavor." *Bray*, 506 U.S. at 270. So too with a literacy test requirement for voters whose ancestors weren't eligible to vote before 1866. *Guinn v. United States*, 238 U.S. 347, 364-65 (1915). But, again, as this Court pointed out in *Eknes-Tucker*, the same is decidedly not true of "the regulation of a medical procedure that only one sex can undergo." 80 F.4th at 1229. That kind of regulation has an obvious, nondiscriminatory justification: limiting access to treatments for a difficult-to-diagnose psychiatric condition that carries significant risks, and that might not work to address the condition.

**B.** Beyond misclassifying the laws, the district court erred in then applying the *Arlington Heights* factors. It misconstrued the legislative presumption of good faith. And it ultimately relied on scant evidence to paint a 160-member legislature and two boards of medicine with animus.

**1.** "The Supreme Court has instructed that when a court assesses whether a duly enacted statute is tainted by discriminatory intent, 'the good faith of the state legislature must be presumed.'" *League of Women Voters of Fla.*, 32 F.4th at 1373. The Supreme Court recently clarified that the presumption is an evidentiary "inference that cuts in

the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 144 S. Ct. at 1235-36. Each of the *Arlington Heights* test's eight factors comes infused with the presumption. *See Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021).[4] In practice, as *Greater Birmingham* shows, the presumption works like a weight placed on a scale that was previously in equipoise. Plaintiffs must overcome this evidentiary presumption for each of the factors. This makes Plaintiffs' task difficult. But that's as it should be; whether laws were enacted because of an improper motive presents "a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 128 (1810).

Here, however, the district court treated the presumption as mere deference that the State forfeited because of the disparaging statements of seven or so legislators. Doc.223 at 38-39, 50. So when deciding the question of whether "legislators and Board

---

[4] *Greater Birmingham* specifically cited and then used the presumption of good faith to rein in an "unlimited" and unfocused "look-back to past discrimination." 992 F.3d at 1325. Its discussion of the remaining intent factors also made clear that each remains firmly moored to the presumption. *Id.* at 1322 (requiring "clear" and "stark" pattern of "discriminatory impact"); *id.* at 1323 (limiting relevance of a legislative sponsor's statements to the "law at issue"); *id.* at 1324 (explaining that it "stretches logic to deem a sponsor's 'intent'" to reflect "*the* legally dispositive intent of the entire body"); *id.* at 1326-27 (deferring to the "valid neutral justifications" for the law over suspicions of race-based intent because "no black legislators" voted for the law); *id.* at 1327 (declining to infer foreseeability and knowledge of an impact because of an "enforcement delay"); *id.* at 1328 (refusing to find that the legislature failed to consider alternatives where it "did not include the alternative option that Plaintiffs would have preferred").

members act[ed] from animus against transgenders, or" "from a belief—whether or not correct—that the treatments at issue are harmful, should be banned for minors, and should be prescribed with greater care for adults," the district court chose animus. Doc.223 at 41. It did so despite recognizing that there was "evidence on each side." Doc.223 at 41. No inferences were made in favor of the State; they cut against the State.

**2.** To be sure, the evidence of animus marshalled against the State was minimal, though the use of this evidence highlights how the presumption of good faith became a presumption of bad faith. Critical to the district court's analysis were the words of seven or so legislators. It was from these statements that the court found the evidence of animus to be "clear," Doc.223 at 8, and a lack of an on-the-record rebuke by colleagues damning, Doc.223 at 51. The district court's analysis is unconvincing. It's a stretch to use the "failure of other members to call the[ir colleagues] out" on the record as evidence that "a majority of legislators in both houses and the Governor" were motivated by animus, "at least in part." Doc.223 at 51. That's especially so because case, *United States v. O'Brien*, 391 U.S. 367, 384 (1968), after case, *Brnovich v. DNC*, 594 U.S. 647, 689 (2021), after case, *League of Women Voters of Fla.*, 32 F.4th at 1373-74, makes clear that the legislators speak only for themselves.

Citing another, separate bill as evidence of animus was also error. Doc.223 at 51. The focus should be on the bill at hand, not some other piece of legislation. *See Greater Birmingham*, 992 F.3d at 1322-25. Nevertheless, as the district court noted, that other bill "declares it the 'policy' of every Florida public school from kindergarten through

33

twelfth grade that 'a person's sex is an immutable biological trait,'" Doc.223 at 51 (quoting Florida Statute section 1000.071(1)), which the undisputed evidence before the district court, *see supra*, along with precedent, *Adams*, 57 F.4th at 807, says is indeed the case. The bill's direction that pronouns used in school correspond to natal sex similarly makes sense too. Doc.223 at 51 (quoting Florida Statute section 1000.071(1)). What's more, other than the text of the statute, there's no record in this case to show that Florida Statute section 1000.071 was the product of animus. Using it to ascribe ill-motive for SB254 makes little sense especially when there are non-discriminatory reasons for the other bill—and the other bill isn't, on its face, devoid of rational reasons to justify it.

In a similar vein, the Governor's, Surgeon General's, and even the legislature's actions remain irrelevant when assessing animus on the part of Florida's two *independent* medical boards. *See generally Common Cause Fla. v. Byrd*, 4:22-cv-109, 2024 U.S. Dist. LEXIS 54503, at *77-89 (N.D. Fla. Mar. 27, 2024) (three-judge panel) (collecting cases and explaining why a governor's alleged intentions can't be imputed to a legislature).

As detailed above, the boards went through a painstaking process to hear from experts on all sides before promulgating their rules to limit puberty blockers and cross-sex hormones, and then to put forward informed-consent forms. *See supra.* The district court focused on the language in the informed-consent forms as "[t]he clearest evidence of the Boards' animus—of a goal to prevent or impede individuals from pursuing their transgender identities." Doc.223 at 54. Yet, as noted above, Dr. Mortensen, the initial

author of the forms, explained how she went through the process of putting pen to paper; she started with forms from other institutions before a public group-writing exercise made changes to the forms. And, in the end, the forms did include bureaucratese endemic to any document written by many hands. It bore a striking similarity to forms for the State's medical-marijuana patients, who don't seem to be hindered with its implementation. DX8 (medical-marijuana informed-consent forms).

**3.** A brief recitation of the *Arlington Heights* factors makes plain that the district court erred in both applying the legal standards and then finding animus.

*Direct Evidence, Contemporary Statements, and State Justifications*. The record shows that the State's policymakers care for individuals with gender dysphoria and want to ensure that these patients receive quality care. That's true of the boards of medicine. *See, e.g.*, PX25 27:25–28:2 (November 4, 2022 meeting) ("Children and youth with gender dysphoria are suffering. They need care, the best possible care, excellent care."). And it's true of the legislature. *See, e.g.*, PX30 92:2-3 (March 22, 2023 subcommittee hearing) ("we're not trying to hurt them; we're trying to help them"); 88:8-9 ("And because I do deeply care for these patients, I'm up on your bill.").

Both the legislature and the boards of medicine also heard from detransitioners who discussed the misuse of puberty blockers, cross-sex hormones, and surgeries. *Supra*. Experts provided their perspectives as well, underscoring the lack of medical consensus to treat a diagnosis of gender dysphoria. *Supra*.

35

*Impact, Foreseeability, and Knowledge.* Though only transgender individuals can be diagnosed with gender dysphoria, not all transgender individuals have gender dysphoria. *Supra.* The record is devoid of information concerning the number of people who'll be diagnosed with gender dysphoria. At most, there's some information on the number of children on Medicaid who have sought the treatments, PX33 81:6-15 (April 3, 2023 senate session), and a comment from a treatment proponent on the number of children being treated for gender dysphoria at certain gender clinics, PX23 36:24–38:1 (August 5, 2022 meeting). There's nothing more on impacts.

*Less Discriminatory Alternatives.* Unlike another bill proposed by the legislature (HB1421), SB254 includes a grandfather provision, doesn't address private insurance-related issues, and remains focused on treatments for a diagnosis. Importantly, SB254 does *not* ban the use of chemical treatments for a psychiatric diagnosis of gender dysphoria, as the district court suggests. It limits the use of such treatments to adults and to minors who're already on the treatments.

*Historical Background.* There wasn't any testimony concerning this factor. No historian offered a critique of Florida's history of addressing gender dysphoria or transgender individuals. That makes sense because the surge in diagnoses of gender dysphoria is a very recent phenomenon. *Supra.*

*Substantive and Procedural Departures.* Finally, neither Plaintiffs nor the district court ever identified a statute, a rule, or a procedure that the legislature or the boards of

medicine violated when taking their respective actions. So, there was no departure, substantive or procedural, that dooms the State's actions.

**4.** In the end, the little evidence of animus, coupled with evidence of legitimate, treatment-specific concerns underscore how the "trial court base[d] its findings upon a mistaken impression of applicable legal principles." *Alexander*, 144 S. Ct. at 1240. The district court took the sensational (statements from a few legislators), the irrelevant (language of another bill and the actions of other actors), and the mundane (the dense text of informed-consent forms) to conclude the extraordinary: that the State of Florida's elected and medical officials acted out of animus. Only a presumption of bad faith can justify such a conclusion—a tilting of the scales in Plaintiffs' favor and a flipping of the evidentiary burden and attendant inferences. That was error. More to the point, this "erroneous view of the law" is per se clear error because it draws the inferences most critical to the State. *Stout by Sout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1005 (11th Cir. 2018); *see also Alexander*, 144 S. Ct. at 1235-36 (explaining that the presumption of good faith is a "starting presumption that the legislature acted in good faith" and that it "directs" courts "to draw the inference that cuts in the legislature's favor").

## III. The substantive due process claim must fail as well.

Finally, the substantive due process claim must fail. The district court said that this particular "claim neither adds to nor detracts from the equal-protection challenge to the ban on [the at-issue] treatments." Doc.223 at 83. "If the state could properly

37

prohibit the treatments at issue as unsafe, parents would have no right to override the state's decision. *Eknes-Tucker* so holds." Doc.223 at 83. That's mostly right.

To reiterate, *Eknes-Tucker* held that there's no fundamental right for parents to obtain puberty blockers and cross-sex hormones to treat their children's gender dysphoria. 80 F.4th at 1224. Central to *Eknes-Tucker*'s conclusion is a recognition that these "drugs" come with "uncertainty regarding benefits," "recent surges in use, and irreversible effects." *Id.* at 1225.

And, even if *Eknes-Tucker* hadn't come out, Plaintiffs still can't make a claim. Nothing in the record establishes a purported right to use specific drugs to treat gender dysphoria as being deeply rooted in the nation's history and traditions. *Timbs v. Indiana*, 586 U.S. 146, 154 (2019).

## CONCLUSION

Whether the State chooses to use a hammer or a scalpel to regulate gender-dysphoria treatments is a matter for the State to decide. *See Dobbs*, 597 U.S. at 236. Even the district court recognized that the State could choose to impose "[s]tringent regulation[s]" on puberty blockers and cross-sex hormones, and that such regulations "would easily survive constitutional challenge." Doc.223 at 91. But the district court's faulty animus analysis now results in a judicial veto of the State's choices. That shouldn't be so. This Court should reverse for the reasons above.

Dated: August 28, 2024

Ashley Moody
*Attorney General of Florida*

/s/ Mohammad O. Jazil
Mohammad O. Jazil
mjazil@holtzmanvogel.com
Michael Beato
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 274-1690

*Counsel for Defendants-Appellants Surgeon General and the Board Members*

/s/ Henry C. Whitaker
Henry C. Whitaker
henry.whitaker@myfloridalegal.com
*Solicitor General*
Daniel W. Bell
daniel.bell@myfloridalegal.com
*Chief Deputy Solicitor General*
Myles S. Lynch
myles.lynch@myfloridalegal.com
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300

*Counsel for Defendants-Appellants Surgeon General, State Attorney Gladson, and the Board Members*

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing complies with the typeface and type-style requirements of Rule 32. I also certify that this brief contains 9,599 words.

Dated: August 28, 2024                    /s/ Mohammad O. Jazil
                                           Mohammad O. Jazil

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing certificate was filed on ECF.

Dated: August 28, 2024                    /s/ Mohammad O. Jazil
                                           Mohammad O. Jazil