No. 24-11996

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

JANE DOE et al.,
*Plaintiffs-Appellees*,

v.

SURGEON GENERAL, STATE OF FLORIDA, et al.,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court for the
Northern District of Florida, No. 4:23-cv-00114-RH

## BRIEF OF ALABAMA AND 22 OTHER STATES AS
## *AMICI CURIAE* SUPPORTING APPELLANTS

Steve Marshall
 *Attorney General*
Edmund G. LaCour Jr.
 *Solicitor General*
A. Barrett Bowdre
 *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for* Amici Curiae

*(additional counsel listed after signature page)*

*Doe v. Surgeon General, State of Florida*, No. 24-11996

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3) and 26.1-2(b), the undersigned counsel certifies that the following listed persons and parties, in addition to those listed in Appellants' opening brief, may have an interest in the outcome of this case:

1. Bailey, Andrew – *Counsel for Amicus Curiae*;

2. Bird, Brenna – *Counsel for Amicus Curiae*;

3. Bowdre, A. Barrett – *Counsel for Amicus Curiae*;

4. Carr, Christopher M. – *Counsel for Amicus Curiae*;

5. Coleman, Russell – *Counsel for Amicus Curiae*;

6. Commonwealth of Kentucky – *Amicus Curiae*;

7. Drummond, Gentner – *Counsel for Amicus Curiae*;

8. Fitch, Lynn – *Counsel for Amicus Curiae*;

9. Griffin, Tim – *Counsel for Amicus Curiae*;

10. Hill, Bridget – *Counsel for Amicus Curiae*;

11. Hilgers, Michael T. – *Counsel for Amicus Curiae*;

12. Jackley, Marty – *Counsel for Amicus Curiae*;

13. Knudsen, Austin – *Counsel for Amicus Curiae*;

14. Kobach, Kris W. – *Counsel for Amicus Curiae*;

15. Labrador, Raúl R. – *Counsel for Amicus Curiae*;

*Doe v. Surgeon General, State of Florida*, No. 24-11996

16. LaCour Jr., Edmund G. – *Counsel for Amicus Curiae*;

17. Marshall, Steve – *Counsel for Amicus Curiae*;

18. Morrissey, Patrick – *Counsel for Amicus Curiae*;

19. Murrill, Elizabeth B. – *Counsel for Amicus Curiae*;

20. Paxton, Ken – *Counsel for Amicus Curiae*;

21. Rokita, Thedore E. – *Counsel for Amicus Curiae*;

22. Skrmetti, Jonathan – *Counsel for Amicus Curiae*;

23. State of Alabama – *Amicus Curiae*;

24. State of Alaska – *Amicus Curiae*;

25. State of Arkansas – *Amicus Curiae*;

26. State of Georgia – *Amicus Curiae*;

27. State of Idaho – *Amicus Curiae*;

28. State of Indiana – *Amicus Curiae*;

29. State of Iowa – *Amicus Curiae*;

30. State of Kansas – *Amicus Curiae*;

31. State of Louisiana – *Amicus Curiae*;

32. State of Mississippi – *Amicus Curiae*;

33. State of Missouri – *Amicus Curiae*;

34. State of Montana – *Amicus Curiae*;

35. State of Nebraska – *Amicus Curiae*;

*Doe v. Surgeon General, State of Florida*, No. 24-11996

36. State of North Dakota – *Amicus Curiae*;

37. State of Oklahoma – *Amicus Curiae*;

38. State of South Carolina – *Amicus Curiae*;

39. State of South Dakota – *Amicus Curiae*;

40. State of Tennessee – *Amicus Curiae*;

41. State of Texas – *Amicus Curiae*;

42. State of Utah – *Amicus Curiae*;

43. State of West Virginia – *Amicus Curiae*;

44. State of Wyoming – *Amicus Curiae*;

45. Reyes, Sean D. – *Counsel for Amicus Curiae*;

46. Taylor, Treg – *Counsel for Amicus Curiae*;

47. Wilson, Alan – *Counsel for Amicus Curiae*;

48. Wrigley, Drew H. – *Counsel for Amicus Curiae*.

Respectfully submitted this 4th day of September, 2024.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for* Amici Curiae

# TABLE OF CONTENTS

Certificate of Interested Persons .......................................................... C-1

Table of Contents ................................................................................ i

Table of Authorities ............................................................................ ii

Interests of *Amici Curiae* ................................................................. 1

Statement of the Issue ......................................................................... 4

Summary of Argument ........................................................................ 4

Argument.............................................................................................. 6

I.    The Presumption Of Legislative Good Faith Applies To Laws Protecting Children From Sex-Change Procedures.......................................... 6

II.   The District Court Misapplied The Presumption Of Legislative Good Faith.............................................................................................. 9

    A.   The District Court Did Not Presume the Good Faith of Florida's Lawmakers ................................................................................ 10

    B.   The District Court Presumed the Good Faith of WPATH .................... 18

Conclusion .......................................................................................... 27

Certificate of Compliance .................................................................. 29

Certificate of Service ......................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
  585 U.S. 579 (2018)..............................................................7

*Adams v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) (en banc) ................................ 11, 14, 17

*Alexander v. S.C. State Conf. of the NAACP*,
  144 S. Ct. 1221 (2024)................................... 3, 6, 7, 11, 12, 14, 26, 27

*Boe v. Marshall*,
  2:22-cv-184-LCB (M.D. Ala. June 26, 2024) ............................ 18-26

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021)..............................................................8

*City of Renton v. Playtime Theatres, Inc.*,
  475 U.S. 41 (1986)..............................................................3

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022)............................................................17

*Easley v. Cromartie*,
  532 U.S. 234 (2001)..............................................................8

*Eknes-Tucker v. Governor of Ala.*,
  -- F.4th --, No. 22-11707, 2024 WL 3964753
  (11th Cir. Aug. 28, 2024)......................................................18

*Eknes-Tucker v. Governor of Ala.*,
  80 F.4th 1205 (11th Cir. 2023) ........................................... 10, 11

*Fletcher v. Peck*,
  10 U.S. 87 (1810)..............................................................5

*Frontiero v. Richardson*,
  411 U.S. 677 (1973)............................................................11

*Geduldig v. Aiello*,
    417 U.S. 484 (1974)..................................................................10

*Gonzales v. Carhart*,
    550 U.S. 124 (2007)....................................................................9

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)....................................................................9

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
    992 F.3d 1299 (11th Cir. 2021) ...............................................6, 8

*Hunter v. Underwood*,
    471 U.S. 222 (1985).....................................................................8

*Jones v. Mississippi*,
    593 U.S. 98 (2021).....................................................................13

*L.W. ex rel. Williams v. Skrmetti*,
    73 F.4th 408 (6th Cir. 2023) ..................................................3, 17

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
    32 F.4th 1363 (11th Cir. 2022) ...................................................7

*Marshall v. United States*,
    414 U.S. 417 (1974).....................................................................9

*McCleskey v. Kemp*,
    481 U.S. 279 (1987).....................................................................5

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979).....................................................................6

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020)......................................................................3

*Tenney v. Brandhove*,
    341 U.S. 367 (1951).....................................................................4

*United States v. O'Brien*,
   391 U.S. 367 (1968)..............................................................................13

*United States v. Virginia*,
   518 U.S. 515 (1996)..............................................................................11

## Statutes and Regulations

Ala. Code § 26-26-4..................................................................................1

Ariz. Rev. Stat. Ann. § 32-3230...............................................................1

Ark. Code Ann. § 20-9-1502(a)................................................................1

Fla. Admin. Code Ann. § 64B8-9.019......................................................1

Fla. Stat. § 456.52(1)................................................................................1

Ga. Code Ann. § 31-7-3.5.........................................................................1

Idaho Code Ann. § 18-1506C...................................................................1

Ind. Code § 25-1-22-13.............................................................................1

Iowa Code § 147.164 ................................................................................1

Ky. Rev. Stat. Ann. § 311.372 ..................................................................1

La. Rev. Stat. Ann. § 40:1098.2................................................................1

Miss. Code Ann. §§ 41-141-1 et seq. .......................................................1

Mo. Rev. Stat. Ann. § 191.1720 ...............................................................1

Ch. No. 306, 2023 Mont. Laws 858- 862 .................................................1

Neb. Rev. Stat. §§ 71-7301 et seq.............................................................1

N.C. Gen. Stat. §§ 90-21.150 et seq. ........................................................1

N.D. Cent. Code § 12.1-36.1-02 ...................................................................1

N.H. HB619 (2024) (effective Jan. 1, 2025) ...............................................1

Ohio Rev. Code Ann. §§ 3129.01 et seq. ......................................................1

Okla. Stat. tit. 63, § 2607.1 ...........................................................................1

S.C. Code Ann. §§ 44- 42-310 et seq. ...........................................................1

S.D. Codified Laws §§ 34-24-33 et seq. ........................................................1

Tenn. Code Ann. §§ 68-33-101 et seq. ..........................................................1

Tex. Health & Safety Code §§ 161.701 et seq. .............................................1

Utah Code Ann. §58-1-603.1 .........................................................................1

W. Va. Code § 30-3-20 ..................................................................................1

Wyo. Stat. Ann. §§ 35-4-1001 et seq. ...........................................................1

## Other Authorities

Abigail Shrier, *Top Trans Doctors Blow the Whistle on 'Sloppy' Care*,
THE FREE PRESS (Oct. 4, 2021), https://perma.cc/R7M3-XTQ3 ........................16

Azeen Ghorayshi, *Biden Officials Pushed to Remove Age Limits for Trans Surgery,
Documents Show*, N.Y. TIMES (June 25, 2024), https://www.nytimes.com/
2024/06/25/health/transgender-minors-surgeries.html.........................................2

Azeen Ghorayshi, *More Trans Teens are Choosing 'Top Surgery'*,
N.Y. TIMES (Sept. 26, 2022), https://perma.cc/2K79-A7S8...............................15

Christine Milrod & Karasic, *Age is Just a Number: WPATH-Affiliated Surgeons'
Experiences and Attitudes Toward Vaginoplasty in Transgender Females
Under 18 Years of Age in the United States*, 14 J. SEXUAL MED. 524 (2017) ...17

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH (Sept. 6, 2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ..................................................................................... 15, 16, 24-26

E. Coleman et al., *WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, Version 7*, https://perma.cc/SE8J-LGV4.................................................................17

Eugene Volokh, *Is It Unconstitutional for Laws to Be Based on Their Supporters' Religiously Founded Moral Beliefs*, The Volokh Conspiracy (May 10, 2022)...........................................................13

Institute of Medicine, *Clinical Practice Guidelines We Can Trust* (2011), https://perma.cc/7SA9-DAUM............................................................23

Mary McCool, *Scotland's under-18s gender clinic pauses puberty blockers*, BBC NEWS (Apr. 18, 2024), https://perma.cc/7TDX-3DPT ...............................1

NHS England, *Treatment: Gender Dysphoria*, https://perma.cc/FNE7-NMSC .......2

*Recommendation of the Council for Choices in Health Care in Finland (PALKO/COHERE Finland)* (2020), https://perma.cc/VN38-67WT .................2

Roni Rabin et al., *Biden Administration Opposes Surgery for Transgender Minors*, N.Y. TIMES (June 28, 2024), https://www.nytimes.com/2024/06/28/health/transgender-surgery-biden.html .............................................2

Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria* (Dec. 2022), https://perma.cc/FDS5-BDF3 .........................................................2

UK Dep't of Health and Social Care, *Puberty blockers temporary ban extended* (Aug. 22, 2024), https://perma.cc/VB7D-9BYA...................................................2

World Health Organization, *Handbook for Guideline Development* (2012)...........23

## INTERESTS OF *AMICI CURIAE*

The States of Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wyoming respectfully submit this brief as *amici curiae* in support of the Florida Appellants.

A majority of States—*amici* included—have determined that children should generally wait until they reach adulthood to undergo sex-change procedures.[1] Many European countries have likewise imposed age limits or other restrictions on these interventions.[2] Even the Biden Administration recently reversed course and came

---

[1] Twenty-four states generally prohibit the administration of puberty blockers, cross-sex hormones, and surgical interventions to minors for the purpose of gender transitioning. *See* Ala. Code § 26-26-4; Ark. Code Ann. § 20-9-1502(a); Fla. Stat. § 456.52(1); Fla. Admin. Code Ann. § 64B8-9.019; Ga. Code Ann. § 31-7-3.5; Idaho Code Ann. § 18-1506C; Ind. Code § 25-1-22-13; Iowa Code § 147.164; Ky. Rev. Stat. Ann. § 311.372; La. Rev. Stat. Ann. § 40:1098.2; Miss. Code Ann. §§ 41-141-1 et seq.; Mo. Rev. Stat. Ann. § 191.1720; Ch. No. 306, 2023 Mont. Laws 858- 862; Neb. Rev. Stat. §§ 71-7301 et seq.; N.C. Gen. Stat. §§ 90-21.150 et seq.; N.D. Cent. Code § 12.1-36.1-02; Ohio Rev. Code Ann. §§ 3129.01 et seq.; Okla. Stat. tit. 63, § 2607.1; S.C. Code Ann. §§ 44- 42-310 et seq.; S.D. Codified Laws §§ 34-24-33 et seq.; Tenn. Code Ann. §§ 68-33-101 et seq.; Tex. Health & Safety Code §§ 161.701 et seq.; Utah Code Ann. §58-1-603.1; W. Va. Code § 30-3-20; Wyo. Stat. Ann. §§ 35-4-1001 et seq. Two additional States prohibit transitioning surgeries for minors. *See* Ariz. Rev. Stat. Ann. § 32-3230; N.H. HB619 (2024) (effective Jan. 1, 2025).

[2] Scotland's National Health Service bans puberty blockers, cross-sex hormones, and transitioning surgeries for patients under 18, with a narrow grandfathering exception for minors prescribed hormones before the ban took effect. Mary McCool, *Scotland's under-18s gender clinic pauses puberty blockers*, BBC NEWS (Apr. 18,

out in favor of age limits on surgeries in response to the public outcry that followed disclosure that senior HHS officials had successfully pressured the World Professional Association for Transgender Health (WPATH) to drop all age limits from its guidelines recommending sex-change procedures for adolescents.[3] States like Florida have simply taken the next logical step, recognizing that transitioning hormonal interventions also leave minors sterilized.

The plaintiffs in this case disagree with these policies, as do the plaintiffs in the many other cases challenging *amici* States' laws. That is their prerogative. They

---

2024), https://perma.cc/7TDX-3DPT. The United Kingdom has temporarily banned the administration of puberty blockers to minors for the purpose of transitioning as healthcare authorities plan clinical trials. *See* UK Dep't of Health and Social Care, *Puberty blockers temporary ban extended* (Aug. 22, 2024), https://perma.cc/VB7D-9BYA. England's National Health Service also generally bans transitioning cross-sex hormones for minors under 16. *See* NHS England, *Treatment: Gender Dysphoria*, https://perma.cc/FNE7-NMSC. Other countries restrict the treatments in other ways. Sweden's "National Board of Health and Welfare currently assesses that the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits of these treatments" and thus recommends the treatments be administered only "in exceptional cases." Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria* (Dec. 2022), https://perma.cc/FDS5-BDF3. Finland's public healthcare authority reached similar conclusions and prohibited clinicians from administering hormones until "after [any] other psychiatric symptoms have ceased" and requiring the child to be sent to a research clinic "for extensive gender identity studies." *Recommendation of the Council for Choices in Health Care in Finland (PALKO/COHERE Finland)* (2020), https://perma.cc/VN38-67WT.

[3] *See* Roni Rabin et al., *Biden Administration Opposes Surgery for Transgender Minors*, N.Y. TIMES (June 28, 2024), https://www.ny-times.com/2024/06/28/health/transgender-surgery-biden.html; Azeen Ghorayshi, *Biden Officials Pushed to Remove Age Limits for Trans Surgery, Documents Show*, N.Y. TIMES (June 25, 2024), https://www.ny-times.com/2024/06/25/health/transgender-minors-surgeries.html.

and the many organizations supporting them can seek to persuade their elected representatives to repeal or amend the laws they do not like. But "not every choice is for judges to make." *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 421 (6th Cir. 2023). "The Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 29 (2020) (Kavanaugh, J., concurring) (cleaned up). These officials "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986) (citation omitted). "[I]t is not" the "function" of federal courts "to appraise the wisdom" of those decisions. *Id.* (citation omitted).

*Amici* thus write in support of Florida's authority to regulate medicine, just as it has always done. Until a few years ago, the notion of providing sex-change treatments to minors was practically unthinkable. So was the idea that the judiciary is the proper branch to sort through the evidence and declare once and for all that kids suffering from psychological distress caused by an incongruence between their "gender identity" and their sex must be allowed to take powerful hormones that risk permanently changing their bodies and minds. As the Supreme Court recently warned, judges should be "wary of plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political area." *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1236 (2024)

(cleaned up). Such is the case here.

## STATEMENT OF THE ISSUE

Whether the district court erred by subjecting Florida's health and welfare laws and regulations to heightened scrutiny based on purported animus against transgender individuals where the court itself found that "a significant number of legislators—more likely than not a majority—were" "motivated by their desire to ensure that patients receive only proper medical care" when they enacted the challenged provision, Doc. 223 at 63, the law does not discriminate based on transgender status, and neither the Supreme Court nor this Court has recognized transgender status as a quasi-suspect class.

## SUMMARY OF ARGUMENT

Those who lose in the statehouse often bring their policy fights to the courthouse. To get in the door, they often must allege that the state law they could not block politically was not only bad policy but pressed in bad faith. Unfortunately, as here, they are sometimes successful even when all they can show is a deep policy disagreement. "In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed." *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951).

Because "[c]ourts are not the place for such controversies," *id.*, they should never be eager to find a hidden, unlawful purpose lurking behind a facially valid law.

As Chief Justice Marshall declared, "it is not on slight implication and vague con-jecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void." *Fletcher v. Peck*, 10 U.S. 87, 128 (1810). If a court is to undo the work of the people's representatives, "[t]he opposition between the constitution and the law" must be "clear." *Id.* When there are "legitimate reasons" for a legislature to enact a particular law, courts should "not infer a discriminatory purpose on the part of the State." *McCleskey v. Kemp*, 481 U.S. 279, 298-99 (1987).

The district court here unabashedly flouted these principles, providing a text-book example of why the presumption of legislative good faith exists. Providing sex-change treatments to minors has in recent years become a booming business, with devastating consequences for many. The district court admitted that legislators could conclude that these novel treatments are "experimental—perhaps even that [they] should be prohibited altogether for minors." Doc. 223 at 49 ("Op."). But when Flor-ida enacted a law doing just that, the court enjoined it. Why? Because "[g]ender identity is real," *id.* at 7, "the arc of the moral universe is long, but it bends toward justice," *id.* at 10, and "well-established standards of care" from "the World Profes-sional Association for Transgender Health ('WPATH')" have been endorsed by the U.S. government and other "reputable" medical associations, *id.* at 11-12, 49. Only the "bigotry" of Florida's legislators could explain how they parted ways with the district court's convictions about the moral universe. *Id.* at 89.

Suffice it to say, the district court failed to "draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions," as it was required to do. *Alexander*, 144 S. Ct. at 1235-36. The presumption of legislative good faith applies to health and welfare laws like Florida's. Under the presumption, when a legislature has admittedly "legitimate concerns" (Op. 86) about "substantial harm" (*id.* at 48) that sterilizing treatments are having on children, there is no ground for assuming that bigotry is the real reason the State acted. And, as evidence in this case and others demonstrates, the presumption exists precisely so that States—not regulated entities or courts—can regulate medicine without getting bogged down in extended litigation. The Court should reverse.

## ARGUMENT

### I.   The Presumption Of Legislative Good Faith Applies To Laws Protecting Children From Sex-Change Procedures.

Any "successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). The plaintiff must prove that "the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

6

Crucially, "when a court assesses whether a duly enacted statute is tainted by discriminatory intent, 'the good faith of the state legislature must be presumed.'" *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (per curiam) (quoting *Abbott v. Perez*, 585 U.S. 579, 603 (2018)). The presumption is rightfully daunting for plaintiffs pressing an animus claim. If their evidence fails to "rule[] out" the "possibility" that the legislature acted for a permissible purpose, "that possibility is dispositive," *Alexander*, 144 S. Ct. at 1241, and the presumptively lawful act is deemed lawful.

The Supreme Court in *Alexander* recently provided additional guidance regarding how the presumption should be given effect. The Court explained that at least three "constitutional interests" "justify this presumption": (1) "due respect for the judgment of state legislators"; (2) reluctance in "declaring that the legislature engaged in offensive and demeaning conduct"; and (3) wariness toward "plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Id.* at 1236 (cleaned up). The presumption "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Id.* at 1235-36 (citing *Abbott*, 585 U.S. at 610-12). Thus, the presumption requires that courts give "dispositive" weight to any "possibility" that a disparate

impact on a group "was simply a side effect of the legislature's" legitimate goals rather than the goal itself. *Id.* at 1241.

Compounding the "demanding" "burden of proof," *Easley v. Cromartie*, 532 U.S. 234, 241 (2001), is the fact that even when dealing with a small number of decisionmakers, "[p]roving the motivation behind official action is often a problematic undertaking," *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). That is true even when there is evidence that *some* legislators were motivated by inappropriate goals, for "[i]t stretches logic to deem" one legislator's "intent" "as *the* legally dispositive intent of the entire body of the [State] legislature on that law." *Greater Birmingham Ministries*, 992 F.3d at 1324. And in trying to prove the intent of a body the size of Florida's Legislature (composed of 120 House members and 40 Senators), "the difficulties in determining the actual motivations of the various legislators that produced a given decision increase." *Hunter*, 471 U.S. at 228. It is not enough to prove the motives of only a handful of the bill's backers, for "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021). Instead, a plaintiff must show "that the legislature as a whole was imbued with [improper] motives." *Id.* Making that showing is not merely difficult; it's "near-impossible." *Greater Birmingham Ministries*, 992 F.3d at 1324.

The presumption applies in spades for health and welfare laws. "[T]he structure and limitations of federalism … allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotation marks omitted). "Medical uncertainty does not foreclose the exercise of legislative power," or empower federal courts "to serve as the country's *ex officio* medical board with powers to approve or disapprove medical and operative practices and standards." *Gonzales v. Carhart*, 550 U.S. 124, 164 (2007). To the contrary, "in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation, even assuming, arguendo, that judges with more direct exposure to the problem might make wiser choices." *Marshall v. United States*, 414 U.S. 417, 427 (1974).

## II.    The District Court Misapplied The Presumption Of Legislative Good Faith.

As this Court noted in staying the district court's injunction, while "[t]he district court properly recognized that '[s]tatutes come to federal court with a 'presumption of legislative good faith,'" it utterly failed to apply the presumption to the Florida Legislature. Order Staying Injunction at 5.

9

## A.    The District Court Did Not Presume the Good Faith of Florida's Lawmakers.

To begin, the district court erred in finding that Florida's law requiring children to wait until adulthood to obtain sex-change procedures "target[s] transgenders" rather than "specific medical procedures." Op. 40. The court seemed to think that "[t]ransgender and cisgender individuals are not treated the same" because a boy can get testosterone to correct his hormone imbalance and promote fertility while a girl cannot receive testosterone to *create* a hormone imbalance and *inhibit* or *destroy* fertility. *Id.* at 37. But those are obviously not the same treatments. And this Court in *Eknes-Tucker* and the Supreme Court more than 50 years ago in *Geduldig* made clear that regulating a treatment only one sex (or gender identity) might undergo is not sex-based discrimination. *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023) (discussing *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). Such neutral regulations, standing alone, cannot count as "animus."

To find that Florida's neutral regulations did *not* stand alone, the district court inverted the presumption. Though acknowledging evidence that "legislators and Board members act[ed]" not "from animus against transgenders" but from the belief "that the treatments at issue are harmful, should be banned for minors, and should be prescribed with greater care for adults," Op. 41, the district court *still* went looking for animus—precisely the opposite of the Supreme Court's instruction that

10

if there are two possible explanations for a legislature's action, courts "err[] in crediting the less charitable conclusion." *Alexander*, 144 S. Ct. at 1242.

So it is the district court resorted to slogans like "[g]ender identity is real" to settle the case. Op. 7. A sponsor of Florida's law said that people cannot "change their sex," which the court seized on as evidence "that the sponsor does not believe gender identity is real." Op. 44. But the notion that the *only* explanation for thinking that people cannot "change their sex" is animus is ludicrous. The Supreme Court has always shared this belief. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) (Ginsburg, J.) (recognizing that "[p]hysical differences between men and women … are enduring" and "[i]nherent"); *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth."). So has this Court. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807-08 (11th Cir. 2022) (en banc) (emphasizing the "immutable characteristic of biological sex"); *Eknes-Tucker*, 80 F.4th at 1221, 1225, 1228, 1230 (referring to "biological sex"). Even the guidelines the plaintiffs rely on depend on unchanging biological reality to determine which cross-sex hormones to prescribe—"females are given testosterone and males are given estrogen." *Eknes-Tucker*, 80 F.4th at 1228.

The district court did not explain how the sponsor's statement was in any way incorrect—just that it somehow indicated that the sponsor "acted for the admittedly

impermissible purpose of preventing or impeding transgender individuals from adhering to their transgender identities." Op. 44. But the statement—in addition to being biological fact—could also reflect "concerns about fertility and sexuality that a child entering puberty is not well-equipped to evaluate." *Id.* at 86. After all, even if the court were right that the Constitution brooks no dissent from its view of "gender identity," there is currently no way to know which children who identify as transgender will continue to do so. At least for *them*, as the district court itself recognized, so-called "gender-affirming care" is only temporarily "affirming" and can "go terribly wrong and cause substantial harm." *Id.* at 47-48. "[C]ertainly nothing rules out th[e] possibility" that saving kids from lifelong harms was the sponsor's motive, and "that possibility is dispositive." *Alexander*, 144 S. Ct. at 1241.

The district court also counted as animus any kind of religious statement offered by a legislator. Not only that, but when one House member said that "all people were created 'in the image of God, he created them. Male and female, he created them,'" the district court attributed this "animus" to every other House member because "[n]obody who voted for the bill expressed disagreement with these statements or called the speaker[] out." Op. 44. This was error twice over.

First, even if the statement were evidence of animus by that one legislator, the other members' silence is not evidence that *they* were animated by animus. As the Supreme Court has explained, "[w]hat motivates one legislator to make a speech

about a statute is not necessarily what motivates scores of others to enact it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968). It is impossible for a court to apply the presumption of legislative good faith and find animus based on legislative silence.

Second, the district court did not explain how one's views about how people came to exist has anything to do with moral disapproval of a protected class. Someone who does not believe that God created people could still believe that sex is immutable, as the Supreme Court has long recognized. And to the extent the district court faulted the legislator for referencing his religious beliefs in sharing his moral views about how best to protect children, that was error, too. Moral views on all sides inevitably play a role in debates like this, as they do in debates about *every* law, from murder laws to environmental laws to tax laws. *See, e.g.*, *Jones v. Mississippi*, 593 U.S. 98, 120 (2021) (noting that States properly make "broad moral and policy judgments" "when enacting" laws). Whether "the arc of the moral universe … bends toward" sterilizing children with gender dysphoria, as the district court suggested (at 10), or instead protecting their long-term autonomy, moral considerations are inescapable. And "[r]eligious people have moral views just like secular people do, and they're just as entitled as secular people to use the political process to enact their views into law." Eugene Volokh, *Is It Unconstitutional for Laws to Be Based on Their Supporters' Religiously Founded Moral Beliefs*, The Volokh Conspiracy (May 10, 2022), https://perma.cc/6NAQ-HE3H (emphasis omitted). So long as the

13

Legislature's choice is rational and not motivated by animus against a protected class, it is constitutional. "That should have been the end of it." Order Staying Injunction at 6.

Of course, it wasn't. To take just one more example, the district court highlighted one House member who "said this legislation would end 'the castration and mutilation of children,'" and another who complained of doctors taking children and "cut[ting] off their breasts" and "sever[ing] their genitalia." Op. 45-46. The court deemed this "[p]robably about as far removed from reality as any statement by any legislator ever," and again castigated other legislators for failing to "call[] the speakers out" because, according to the court, there was no evidence that any "transgender minor has ever been castrated or intentionally sterilized in Florida or elsewhere." *Id.*

Here again, rather than "draw[ing] the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions," *Alexander*, 144 S. Ct. at 1235-36, the court presumed animus. The more likely explanation is that the legislators were sincere in their concerns. After all, not even two years ago this Court decided the case of Drew Adams, a female student *from Florida* who "began taking birth control to stop menstruation and testosterone to appear more masculine and underwent a 'double-incision mastectomy' to remove breast tissue." *Adams*, 57 F.4th at 798. And in 2022, the *New York Times* profiled Dr. Sidhbh Gallagher, a surgeon *in Miami* who uses "platforms like TikTok" to

advertise "gender-affirming" surgeries to troubled teens.[4] One of her "best-known catchphrases on TikTok" is "'Yeet the Teet,' slang for removing breasts."[5] Dr. Gallagher boasted that she performed "13 top surgeries on minors" in 2021.[6]

Then there are the WPATH standards themselves, which recommend sterilizing hormonal *and* surgical interventions for adolescents of any age. WPATH suggests providing puberty blockers to a gender dysphoric child at Tanner stage 2—the very first stage of puberty, before the child's gametes have matured.[7] It then suggests following that treatment with cross-sex hormones—testosterone for females, estrogen for males.[8] Doing so prevents natural pubertal maturation. And according to the plaintiffs' expert endocrinologist, Dr. Daniel Shumer, "[p]rogression through natal puberty is required for maturation of egg or sperm." Doc. 30-4 at 27. Thus, contra the district court, *all* doctors who prescribe this regimen "intentionally sterilize" their minor patients, at least as long as the patients continue taking "gender-affirming care"—and, for at least some patients, long afterward.

---

[4] Azeen Ghorayshi, *More Trans Teens are Choosing 'Top Surgery'*, N.Y. TIMES (Sept. 26, 2022), https://perma.cc/2K79-A7S8.

[5] *Id.*

[6] *Id.*

[7] *See* E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH (Sept. 6, 2022), at S48, https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ("SOC 8").

[8] *Id.*

The surgeries WPATH recommends for minors sterilize them, too. In addition to so-called "top surgeries," WPATH recommends "orchiectomy" (removal of the testicles), "vaginoplasty" (creation of a "neo-vagina" from a male patient's penile tissue), "hysterectomy" (removal of the uterus), and "metoidioplasty" (creation of a "neo-penis" from a female patient's clitoris) for minors.[9] The only surgery WPATH does *not* recommend "in youth under 18 at this time" is "phalloplasty," which uses skin grafts and implants to create a "neo-penis" and carries "high rates of complications in comparison to other gender-affirming surgical treatments."[10] And lest anyone think these recommendations are "removed from reality," not long ago WPATH's president, Dr. Marci Bowers, performed a transitioning vaginoplasty on then 17-year-old Jazz Jennings as part of the national reality television show *I Am Jazz*.[11] Indeed, according to a 2017 paper published by one of the plaintiffs' expert witnesses, Dr. Dan Karasic, over half of the WPATH-affiliated surgeons surveyed said they "[p]erformed vaginoplasty on [a] transgender minor" in the United

---

[9] SOC-8, *supra*, at S64.

[10] *Id.*

[11] *See* Abigail Shrier, *Top Trans Doctors Blow the Whistle on 'Sloppy' Care*, THE FREE PRESS (Oct. 4, 2021), https://perma.cc/R7M3-XTQ3.

States[12]—and that was when the WPATH Standards required that a patient reach the "[a]ge of majority in a given country" before becoming surgically sterilized.[13]

Tragically, then, there were plenty of reasons for Florida's legislators to be concerned—just as there were plenty of reasons for legislators and regulators in 25 other States to be concerned. "Are we to believe that the hundreds of lawmakers whose votes were needed to enact these laws" *all* acted out of animus? *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 254 (2022). And what about all the European countries that have restricted these interventions—bigots all? According to the district court, the incredible answer is "yes." That the court could arrive at such an answer demonstrates that it did not afford the presumption of legislative good faith to Florida's lawmakers.[14]

---

[12] Christine Milrod & Dan H. Karasic, *Age is Just a Number: WPATH-Affiliated Surgeons' Experiences and Attitudes Toward Vaginoplasty in Transgender Females Under 18 Years of Age in the United States*, 14 J. SEXUAL MED. 524, 626 (2017).

[13] E. Coleman et al., *WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, Version 7*, at 21, https://perma.cc/SE8J-LGV4.

[14] As this Court found in staying the district court's injunction, "even if the district court were correct in its animus decision, heightened scrutiny under the Equal Protection Clause does not apply to invidious discrimination based on a non-suspect class, and '[n]either the Supreme Court nor this court has recognized transgender status as a quasi-suspect class." Order Staying Injunction at 7 (quoting *L.W.*, 73 F.4th at 419); *see also Adams*, 57 F.4th at 803.

### B.     The District Court Presumed the Good Faith of WPATH.

One of the reasons the district court gave for not crediting the concerns of Florida's lawmakers is that they strayed from the "well-established standards of care for treatment of gender dysphoria" authored by WPATH. Op. 11. The court "credit[ed]" testimony by the plaintiffs' witnesses "that these standards are widely followed by well-trained clinicians … and have been endorsed by the United States Department of Health and Human Services." *Id.* The court thus seemed to apply a presumption of good faith in favor of *WPATH* rather than the Florida Legislature.

Although it should not matter—the presumption of good faith exists so that challenges to rational state laws are not determined by a party's success in discovery—third-party discovery in Alabama's defense of its similar law reveals "that WPATH's lodestar is ideology, not science." *Eknes-Tucker v. Governor of Ala.*, -- F.4th --, No. 22-11707, 2024 WL 3964753, at *15 (11th Cir. Aug. 28, 2024) (Lagoa, J.) (statement respecting denial of rehearing en banc). Consider just a few of the revelations that confirm why the Constitution entrusts States, *not* self-interested medical organizations, with the regulation of medicine, and affords State legislative bodies, *not* the regulated entities, a presumption of good faith.[15]

---

[15] *See generally* Defendants' Motion for Summary Judgment, *Boe v. Marshall*, 2:22-cv-184-LCB (M.D. Ala. June 26, 2024), ECF 619 at 1-27; Defendants' Reply in Support of Summary Judgment, *id.* (M.D. Ala. Aug. 5, 2024), ECF 650 at 1-89. In the discussion of the evidence that follows, "*Boe* Doc. #" refers to the district court

*First*, there's a reason the district court found that HHS had "endorsed" the WPATH Standards: Senior government officials *influenced* the guidelines they now hold up as "evidence-based." Admiral Rachel Levine, the Assistant Secretary for Health at HHS, met regularly with WPATH leaders, "eager to learn when SOC 8 might be published" because "[t]he failure of WPATH to be ready with SOC 8 [was] proving to be a barrier to optimal policy progress" for the Biden Administration.[16] After WPATH provided Levine exclusive access to the near-final draft of SOC8,[17] Levine asked WPATH to remove the recommended age minimums for transitioning treatments.[18] According to officials within Levine's office, the Admiral was concerned that the listing of "specific minimum ages for treatment … will result in devastating legislation for trans care."[19] Levine's chief of staff thus suggested that WPATH hide the recommendations by removing the age limits from SOC-8 and creating an "adjunct document" that could be "published or distributed in a way that is less visible than the SOC8."[20] And according to a WPATH participant who met

---

docket entry in *Boe v. Marshall*, with the page number referencing the original pagination.

[16] *Boe* Doc. 560-34 at 54; *see Boe* Doc. 557-16 ¶¶79-90; *Boe* Doc. 560-35 at 1 ("the US Department of Health is very keen to bring the trans health agenda forward").

[17] *Boe* Doc. 560-39 at 16.

[18] *Boe* Doc. 560-36 at 11 ("We sent the document to Admiral Levine.… She asked us to remove" the age minimums); *id.* at 50, 57.

[19] *Boe* Doc. 560-36 at 28.

[20] *Boe* Doc. 560-36 at 29.

with Admiral Levine and HHS, Levine "and the Biden administration worried that having ages in the document will make matters worse" politically "for trans youth."[21]

WPATH leaders voiced two main concerns with Levine's request. The first, as voiced by WPATH's current president, was "that without specific age requirements, insurers may not grant authorization" for the treatments.[22] The second, as voiced by WPATH's former president, was "that politics always trumps common sense and what is best for patients."[23] A member of the adolescent chapter put it this way: "I don't know how I feel about allowing US politics to dictate international professional clinical guidelines."[24] WPATH initially insisted that the age minimums could not be removed because they had been approved by SOC-8's consensus process.[25] (Indeed, the chair of SOC-8 said the consensus was "[t]he only evidence [they] had" for the recommendation.[26]) WPATH thus responded to Levine: "[W]e

---

[21] *Boe* Doc. 560-36 at 11.

[22] *Boe* Doc. 560-36 at 57; *id.* ("If we don't put ages, the insurances companies specify 18 years old, hence the main reason to list the ages.").

[23] *Boe* Doc. 560-36 at 25.

[24] *Boe* Doc. 560-36 at 32; *see id.* ("[W]e have a very high up politician telling us that having the ages specified front and center would politically lead to more attacks and legislative efforts. I see no reason not to trust that assessment is accurate."); *id.* ("I'm also curious how the group feels about us making changes based on current US politics."); *id.* at 33 ("I think it's safe to say that we all agree and feel frustrated … that these political issues are even a thing and are impacting our own discussions and strategies."); *id.* at 32 ("I need someone to explain to me how taking out the ages will help in the fight against the conservative anti trans agenda.").

[25] *Boe* Doc. 560-36 at 17.

[26] *Boe* Doc. 560-36 at 57.

heard your comments regarding the minimal age criteria" and, "[c]onsequently, we have made changes to the SOC8" by downgrading the age "recommendation" to a "suggestion."[27] Pressure from the American Academy of Pediatrics (AAP) then tipped the scale, convincing WPATH to remove the age minimums from SOC-8.[28] After deleting the age minimums (SOC-8 still falsely proclaims "all statements" were voted on by "[e]very member of the SOC"[29]), WPATH leaders promptly sought for "all [to] get on the same exact page, and PRONTO."[30] They settled on a public explanation focused on "individualized care" and a promise of "strengthened criteria."[31] In reality, the change was purely political.

*Second*, WPATH also allowed political and ideological considerations to influence its assessment and reporting of the evidence for SOC-8. Early in the SOC-8 drafting process, WPATH hired a team from Johns Hopkins University to conduct "dozens" of systematic evidence reviews for authors to use.[32] The team lead privately reported the results to the Agency for Healthcare Research and Quality at

---

[27] *Boe* Doc. 560-36 at 17.

[28] *Boe* Doc. 557-16:¶¶91-98; *Boe* Doc. 560-37 at 13-14; *id.* at 109 ("The AAP comments asked us to remove age[s]"); *id.* at 338 ("[W]e have agreed to remove the ages.… I hope that by doing this AAP will be able to endorse the SOC8.…").

[29] SOC-8, *supra*, at S250.

[30] *Boe* Doc. 560-38 at 120; *see id.* at 113 ("I do think we need to speak more as a cohesive voice").

[31] *Boe* Doc. 560-38 at 113; *id.* at 116.

[32] *Boe* Doc. 560-23 at 24.

HHS: "[W]e found little to no evidence about children and adolescents."[33] She also told HHS that she was "having issues with this sponsor"—WPATH—"trying to restrict our ability to publish."[34] Among other things, WPATH required the team to seek "final approval" of proposed articles from an SOC-8 leader and "at least one member of the transgender community."[35] WPATH explained that it was of "paramount" importance "that any publication based on WPATH SOC8 data [be] thoroughly scrutinized and reviewed to ensure that publication does not negatively affect the provision of transgender healthcare in the broadest sense"—as WPATH defined it.[36] As one author of SOC-8 put it: "My hope with these SoC is that they land in such a way to have serious effect in the law and policy settings that have affected us so much recently; even if the wording isn't quite correct for people who have the background you and I have."[37]

Acting on the advice of "social justice lawyers," some WPATH authors intentionally chose *not* to seek evidence reviews so they wouldn't have to report the results. As one author explained: "Our concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts

---

[33] *Id.* at 22.
[34] *Id.*
[35] *Boe* Doc. 560-17 at 75-81.
[36] *Id.* at 91.
[37] *Boe* Doc. 560-34 at 24.

us in an untenable position in terms of affecting policy or winning lawsuits."[38] Sure enough, plaintiffs' lawyers here told the district court that "WPATH's treatment protocols … provide an *evidence-based*, safe and effective treatment approach for gender dysphoria." Doc.30-6 at 19 (emphasis added). The district court bought it, unable to imagine that WPATH or other "reputable" groups could "have so readily sold their patients down the river." Op. 89.

*Third*, while WPATH claimed to follow international standards for guideline creation, it did not meet these standards. For instance, the standards on conflicts of interest that WPATH itself cited in SOC-8 recognize that the experts best equipped for creating practice guidelines are those at arm's length from the services at issue—sufficiently familiar with the topic, but *not* professionally engaged in performing, researching, or advocating for the practices under review.[39] While the standards suggest ways for guideline committees to benefit from those clinicians' expertise, they understandably recommend not putting clinicians who are financially dependent on the services under review in charge of evaluating the safety or efficacy of those exact services.[40] WPATH did the opposite, expressly limiting SOC-8 authorship to

---

[38] *Boe* Doc. 560-24 at 2.

[39] *See* Institute of Medicine, *Clinical Practice Guidelines We Can Trust* 81-93 (2011), https://perma.cc/7SA9-DAUM; World Health Organization, *Handbook for Guideline Development* 19-23 (2012).

[40] The Institute of Medicine guideline, for instance, recognizes that "[i]n some circumstances, a [clinical development group] may not be able to perform its work

existing WPATH members—who already practiced or espoused "gender-affirming care."[41] The chair of the Johns Hopkins evidence review team thus warned the WPATH leaders after the organization had selected the authors: "We would expect many, if not most, SOC-8 members to have competing interests."[42] WPATH did not listen. After SOC-8 was published, the chair of guideline agreed that "most participants in the SOC-8 process had financial and/or nonfinancial conflicts of interest."[43]

WPATH also boasted that it used a process "adapted from the Grading of Recommendations, Assessment, Development and Evaluations (GRADE) framework" for "developing and presenting summaries of evidence" using a "systematic approach for making clinical practice recommendations."[44] According to WPATH, the Johns Hopkins evidence review team conducted systematic evidence reviews, "assigned evidence grades using the GRADE methodology," and "presented

---

without members who have [conflicts of interest], such as relevant clinical specialists who receive a substantial portion of their incomes from services pertinent to the [clinical practice guideline]." Inst. of Medicine, *supra*, at 83. In such circumstances, "[m]embers with [conflicts of interest] should represent not more than a minority of the [clinical development group]," and "[t]he chair or cochairs should not be a person(s) with [a conflict of interest]." *Id.*

[41] *See* SOC-8, *supra*, at S248.

[42] *Boe* Doc. 560-16 at 1.

[43] *Boe* Doc. 619 at 13 (citation omitted).

[44] SOC-8, *supra*, at S250.

evidence tables and other results of the systematic review" to SOC-8 authors.[45] Chapter members then graded the recommendation statements based on the evidence.[46]

The reality did not match what WPATH told the world. As the chair of SOC-8 wrote, "we were not able to be as systematic as we could have been (e.g., we did not use GRADE explicitly)."[47] He even voiced his concern that "continuing pressure in health care to provide evidence-based care" was itself evidence of an "attack" on "[t]rans health care."[48] Likewise, one of the expert witnesses in this case, Dr. Karasic, testified that rather than relying on systematic reviews, drafters of the mental health chapter of SOC-8 "used authors … we were familiar with."[49] SOC-8 abandoned the GRADE notations disclosing the quality of evidence for each treatment recommendation.[50] And authors admitted that they used "recommend"—a term of art that, per SOC-8, was to be reserved for strong recommendations based on "high quality" evidence, "few downsides," and "a high degree of acceptance among providers and patients"[51]—to describe controversial treatment recommendations with

---

[45] *Id.* at S249-50.

[46] *Id.* at S250.

[47] *Boe* Doc. 560-40 at 8.

[48] *Boe* Doc. 560-40 at 5.

[49] *Boe* Doc. 619 at 14 (citation omitted).

[50] *Id.*; *see Boe* Doc. 560-31 at 62.

[51] *See* SOC-8, *supra*, at S250.

low-quality evidence.[52] WPATH members even acknowledged "that a global consensus on 'puberty blockers' does not exist."[53] SOC-8 recommended them still.[54]

\* \* \*

These facts underscore the necessity of the presumption of *legislative* good faith. The district court instead extended a presumption of good faith to *WPATH*, giving regulated parties authority to dictate to the State how they will be regulated. But the presumption exists precisely to spare courts from being transformed into "weapons of political warfare," ad hoc medical boards, and gender theorists. *Alexander*, 144 S. Ct. at 1236. It also exists to spare States from the burdens of litigation every time they enact a health and welfare law that is unpopular with medical organizations whose members depend on providing the procedures at issue. It is a doctrine of judicial humility, recognizing the limited authority assigned to courts and their limited ability to gather every fact needed to settle novel policy questions. Maybe WPATH and the district court are on the "right side of history," with "the arc of the moral universe" bending toward sterilizing children. Op. 10 Or maybe history is repeating itself in grim fashion, and we'll one day wonder how this medical scandal spread so far before being reined in. In any event, because "nothing rules out th[e]

---

[52] *Boe* Doc. 619 at 14 (citation omitted); *Boe* Doc. 560-33 at 14-16, 61, 93.
[53] *Boe* Doc. 560-30 at 63.
[54] *See* SOC-8, *supra*, S113-14.

possibility" that Florida acted to protect kids from sterilizing treatments, the district court grievously erred. *Alexander*, 144 S. Ct. at 1241.

## CONCLUSION

The Court should reverse.

Respectfully submitted,

Steve Marshall
  *Attorney General*
s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for* Amici Curiae

SEPTEMBER 4, 2024

*(additional counsel listed below)*

27

## ADDITIONAL COUNSEL

TREG TAYLOR
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL R. LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS W. KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
Commonwealth of Kentucky

ELIZABETH B. MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

GENTNER DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General & Reporter
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

SEAN D. REYES
Attorney General
State of Utah

PATRICK MORRISEY
Attorney General
State of West Virginia

BRIDGET HILL
Attorney General
State of Wyoming

## CERTIFICATE OF COMPLIANCE

1.    I certify that this brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i). This brief contains 6,459 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Rule 32(f).

2.    In addition, this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: September 4, 2024

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.

## CERTIFICATE OF SERVICE

I certify that on September 4, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve all counsel of record.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.