## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

*Jane Doe et al.*,
Plaintiffs-Appellees,

v.

*Surgeon General, State of Florida et al.*,
Defendants-Appellants.

On Appeal from the U.S. District Court for the Northern District of Florida
No. 4:23-cv-114

## BRIEF OF *AMICUS CURIAE*
## THE FLORIDA HOUSE OF REPRESENTATIVES
## IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

David Axelman (FBN 90872)
General Counsel
**The Florida House of
Representatives**
317 The Capitol
402 South Monroe Street
Tallahassee, Florida 32399-1300
Tel: (850) 717-5500
David.Axelman@myfloridahouse.gov

*Counsel for Amicus The Florida House of
Representatives*

*Jane Doe et al. v. Surgeon General, State of Florida et al.*
24-11996-J

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Under Rule 26.1 and Circuit Rule 26.1-2(b), I certify that I believe the CIP contained in Appellants' opening brief is complete, as supplemented herein.

1.    American Psychiatric Association

2.    Axelman, David, *Counsel for Amicus*

3.    Florida House of Representatives, *Amicus*

4.    Renner, Paul, *Amicus and Speaker of the Florida House*

Dated: September 4, 2024

/s/David Axelman
*Counsel for Amicus The Florida House of Representatives*

# TABLE OF CONTENTS

Page(s)

TABLE OF CONTENTS...................................................................................i

TABLE OF AUTHORTIES................................................................................ii

IDENTITY AND INTEREST OF THE AMICUS CURIAE .......................................1

STATEMENT OF THE ISSUES.........................................................................2

SUMMARY OF THE ARGUMENT ....................................................................2

ARGUMENT ...............................................................................................3

    I.    THERE IS NO EVIDENCE OF CONSENSUS EVEN WITHIN THE RELEVANT MEDICAL ASSOCIATIONS, LET ALONE AMONG THE ENTIRE MEDICAL PROFESSION .................................................................................4

    II.   THE LEGISLATURE WAS NOT MOTIVATED BY ANIMUS .............................. 19

CONCLUSION ........................................................................................... 22

CERTIFICATE OF COMPLIANCE.................................................................. 25

CERTIFICATE OF SERVICE.......................................................................... 25

# TABLE OF AUTHORITIES

<b>Page(s)</b>

## Cases

*Akron v. Akron Center for Reproductive Health, Inc.*,
    462 U.S. 416 (1983) ..................................................................24

*Bostock v. Clayton Cnty., Ga.*,
    590 U.S. 644 (2020) ..................................................................22

*Brown v. Plata*,
    563 U.S. 493 (2011) ..................................................................18

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022) ..................................................................24

*Gibson v. Collier*,
    920 F.3d 212 (5th Cir. 2019) ....................................................11

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) ............................................................. 3, 15

*Graham v. R.J. Reynolds Tobacco Co.*,
    857 F.3d 1169 (11th Cir. 2017) ................................................23

*Jones v. U.S.*,
    463 U.S. 354 (1983) ..................................................................18

*Otto v. City of Boca Raton*,
    41 F.4th 1271 (11th Cir. 2022) .................................................23

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ....................................................3

*Planned Parenthood of S.E. Penn. v. Casey*,
    505 U.S. 833 ..............................................................................24

*Roper v. Simmons*,
    543 U.S. 551 (2005) ..................................................................15

*State v. Loe*,
    692 S.W.3d 215 ..................................................................18, 19

*Stenberg v. Carhart*,
    530 U.S. 914 (2000) ..................................................................24

*Tenney v. Brandhove*,
    341 U.S. 367 (1951) ..................................................................17

*Watson v. Maryland*,
    218 U.S. 173 (1910) ....................................................................3

**Statutes & Constitutional Provisions**

Fla. Stat. § 1000.071(1) (2024) ............................................................22

U.S. Const. amend. X ............................................................................23

**IDENTITY AND INTEREST OF THE *AMICUS CURIAE***

The Florida House of Representatives ("the Florida House"),[1] along with the Florida Senate, passed a bill during its 2023 legislative session that restricts certain medical interventions for minors as treatment for gender dysphoria. In declaring that law to be unconstitutional, the District Court relied heavily on the public position of numerous medical associations that purport to endorse "gender affirming care" ("GAC") for minors and that tout their position as a "medical consensus." The American Academy of Pediatrics ("the Academy") is among those organizations, having taken a leading advocacy role in the ongoing debate.

Following a series of letters from the Academy and the Florida Chapter of the American Academy of Pediatrics ("FCAAP") to Florida's state health regulators urging the purported benefits of GAC for minors, the Florida House issued legislative subpoenas to FCAAP in an effort to determine what it actually means when an organization such as the Academy or FCAAP announces that it endorses certain medical interventions. Specifically, the Florida House sought to determine whether

---

[1] The Speaker of the Florida House has authorized the submission of this brief pursuant to Rule 2.6 of the Rules of The Florida House of Representatives, which authorizes the Speaker to "participate in any suit on behalf of the House, [or] a committee or subcommittee of the House . . . when the Speaker determines that such suit is of significant interest to the House."

No party's counsel authored this brief in whole or in part, and no party, party's counsel, or other person contributed money to fund the preparation or submission of this brief. Finally, all parties have consented to the filing of this brief.

these organizational endorsements are the result of a robust discussion among its physician membership, whether they are made in a perfunctory manner by a small group of organizational leaders, or whether they may even be the product of a decision made unilaterally by a single organizational leader. The Florida House now seeks to advise the Court of what it learned from the response to its subpoenas.[2] Given that the fate of its own legislation hangs in the balance, the Florida House also submits this brief to highlight the constitutional hazards of excessive deference to the advocacy of private organizations at the expense of core state legislative authority. Finally, and without repeating the arguments raised by Appellants, the Florida House wishes to briefly address the District Court's repeated assertions that the legislation at issue was motivated by "animus" and "bigotry."

## STATEMENT OF THE ISSUES

The Florida House adopts Appellants' statement of the issues.

## SUMMARY OF THE ARGUMENT

"Every major medical association agrees." Largely influenced by that superficial mantra, the District Court cast aside legislative judgment, effectively transferred the presumption of good faith from the Florida Legislature to private medical advocacy organizations, and thereby allowed those organizations to dictate how the Legislature may regulate the services their members provide. And it did so despite this Court's

---

[2] All FCAAP documents quoted or referenced in this brief are on file with the Florida House of Representatives.

recent admonition that the "institutional positions" of medical professional societies "cannot define the boundaries of constitutional rights. They may hit the right mark—but they may also miss it. Sometimes by a wide margin, too." *Otto v. City of Boca Raton*, 981 F.3d 854, 869 (11th Cir. 2020).

The decision-making process apparently employed by the Academy and FCAAP demonstrates why *Otto*'s admonition is both constitutionally and pragmatically sound. Although a comprehensive discussion of the legitimate formation of medical consensus is beyond the scope of this brief, the salient point is that the organizational recommendations at issue here should not be taken at face value as evidence that all—or even *most*—physicians agree with their organizations' announced positions. It is bad enough that the District Court subordinated legislative judgment to the decrees of private medical associations. That constitutional harm is exacerbated when those decrees are the product of a black-box approach to decision-making that empowers a mere handful of organizational leaders to dictate public health policy.

## ARGUMENT

State legislative authority to regulate the practice of medicine has long been considered "too well settled to require discussion." *Watson v. Maryland*, 218 U.S. 173, 176 (1910). *See also Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (recognizing that "it is clear the State has a significant role to play in regulating the medical profession"). Yet GAC proponents often say derisively that legislatures cannot know better than "the

experts" do,[3] and therefore that courts should resolve disagreements in favor of the latter. State regulatory authority would serve little purpose if the Constitution compels this result. After all, regulatory guardrails would not be needed if their proper function was limited to telling practitioners to do whatever they wish. Reasonable legislative judgments in this area are not, and cannot be, subject to an "expert's veto." In the remainder of this brief, the Florida House seeks to demonstrate why.

## I.   There is no evidence of consensus even within the relevant medical associations, let alone among the entire medical profession.

In 2022, the Academy and FCAAP jointly sent a series of letters and rule comments to the Florida Board of Medicine and to Florida's Agency for Health Care Administration to tout the purported benefits of GAC for minors. In those letters, they claimed that the Academy represents 67,000 pediatricians, that FCAAP represents 2,600 Florida pediatricians, and that both organizations "endorse and recommend" the use of GAC for minors.[4] They went on to describe GAC as the "irrefutable" standard of care as determined by "medical consensus" and "robust scientific consensus."

---

[3] *See, e.g.*, *The Dangers and Due Process Violations of 'Gender-Affirming Care' for Children: Hearing Before the Subcomm. on the Const. and Limited Govt. of the H. Comm. on the Judiciary*, 118th Cong. 3–4 (2023) (statement of Rep. Mary Gay Scanlon, Ranking Member, H. Subcomm. on the Const. and Limited Govt.). Dismissing opposition to GAC for minors as "far-right ideologies," Representative Scanlon argued that "[t]he idea that politicians are more qualified to judge the medical value or necessity of gender-affirming care than every major medical organization is absurd." *Id.*

[4] The Academy cited Dr. Jason Rafferty's 2018 Policy Statement as its endorsement; FCAAP cited its own press release as evidence of its purported organizational endorsement. Press Release, Florida Chapter of the American Academy of Pediatrics,

Around this time, however, an increasing number of doctors publicly expressed concerns suggesting that the purported consensus was not what it seemed. Notably, some of the doctors expressing these concerns are otherwise longtime advocates for GAC.[5] These and similar statements aroused skepticism whether these organizations necessarily speak for their membership when they take positions on GAC. Accordingly, in April 2023, the Health and Human Services Committee of the Florida House issued a subpoena to FCAAP to investigate whether its public support of GAC for minors (as

---

FCAAP Rejects New Florida Department of Health Guidelines on Gender-Affirming Care for Youth (Apr. 21, 2022), https://www.fcaap.org/posts/news/press-releases/florida-chapter-of-the-american-academy-of-pediatrics-rejects-new-florida-department-of-health-guidelines-on-gender-affirming-care-for-youth/.

[5] For example, Dr. Laura Edwards-Leeper, a psychologist at what has been described as the first major gender clinic in the U.S. (Boston Children's Hospital), publicly expressed concern about the "irresponsible" treatment being administered to minors with gender dysphoria. Referring to her fellow practitioners, she stated in a *60 Minutes* interview that "everyone is very scared to speak up because we're afraid of not being seen as being 'affirming.'" *60 Minutes: Transgender Healthcare, Geldingadalir, Exhume the Truth* (CBS television broadcast May 23, 2021), https://www.cbsnews.com/news/transgender-health-care-60-minutes-2021-05-23/; Mike Francis, *Professor Edwards-Leeper Tells 60 Minutes of Her Concerns About Rushed Gender Transitions*, PACIFIC UNIVERSITY OREGON (June 10, 2021), https://www.pacificu.edu/about/media/professor-edwards-leeper-tells-60-minutes-her-concerns-about-rushed-gender-transitions. And even Dr. Marci Bowers, a transgender gynecologic surgeon who has performed more than 2,000 "sex-change" operations and served as president of WPATH, has commented regarding the state of open discourse and debate: "There are definitely people who are trying to keep out anyone who doesn't absolutely buy the party line that everything should be affirming and that there's no room for dissent." Abigail Shrier, *Top Trans Doctors Blow the Whistle on 'Sloppy' Care,* THE FREE PRESS (Oct. 4, 2021), https://www.thefp.com/p/top-trans-doctors-blow-the-whistle.

expressed to Florida's state health regulators) was actually supported by its membership and the product of an open and transparent decision-making process.

Rather than share any information, Florida's preeminent pediatrics organization responded by suing the Florida House in federal court and invoking associational freedom. *See Fla. Chapter of Am. Academy of Pediatrics, Inc. v. Fine*, No. 4:23-cv-174-AW-MAF (N.D. Fla.). The District Court denied its motion for preliminary injunction and subsequent motion for summary judgment. *Id.*, ECF 14, 29. FCAAP ultimately provided its documents to the Florida House Committee and confirmed through its counsel that it was producing all documents in its possession reflecting its organizational discussion and decision to recommend GAC for minors.[6]

The trove of documents was surprisingly paltry. As FCAAP explained through its counsel, "the reason [it did] not have any more responsive documents is that the Florida Chapter *has not been involved in the national organization's policy-making process*" and because its ostensible organizational support of GAC for minors "did not become a matter of discussion in the Florida Chapter until after the date range of the second subpoena"—i.e., until after November 6, 2023. Yet FCAAP told Florida's state health regulators a year earlier that it "recommended and endorsed" GAC for minors. If its membership did not participate in that decision, who did?

---

[6] The Committee sought documents from January 1, 2018 through November 6, 2023, the date the Committee issued a follow-up subpoena to FCAAP.

Before answering that question, it is helpful to consider the development of America's foremost authority on mental health conditions, the American Psychiatric Association's ("APA") Diagnostic and Statistical Manual of Mental Disorders ("DSM"), for what it reveals about how a professional "consensus" may be formed. Dr. James Davies, an Oxford-trained medical anthropologist who studied the development of the DSM by combing through the APA's archives and interviewing multiple generations of DSM leadership, has explained in lectures that the DSM was drafted based on decisions made by very small committees rather than on the basis of intensive research or comprehensive surveys of practitioners and researchers—in his words, a "consensus of an extremely small group of people – nine people."[7] Tellingly, he interviewed Dr. Robert Spitzer, the Chair of the DSM-III task force who is widely regarded as among the most influential psychiatrists in American history, and quoted Dr. Spitzer as follows:

> Our [leadership] team was certainly not typical of the psychiatry community, and that was one of the major arguments against DSM-III: *it allowed a small group with a particular viewpoint to take over psychiatry and change it in a fundamental way. . . We took over because we had the power.*[8]

Based on his interviews and research, Dr. Davies drew the following conclusion that just as aptly describes today's purported consensus regarding GAC:

---

[7] The Weekend University, *Psychiatry & Big Pharma: Exposed - Dr James Davies, PhD* YOUTUBE (Nov. 24, 2019), https://www.youtube.com/watch?v=-Nd40Uy6tbQ at 37:30.

[8] *Id.* at 38:00.

What an inspection of the construction of DSM . . . reveals is that the separate disorders into which DSM organized diverse behavioral and mental phenomena were largely the outcome of vote-based judgments, *settled by a small, culturally homogenous subset of mental-health professionals who were socially positioned at a given time to have their judgments ratified by the institutional apparatus* of the American Psychiatric Association. [And] while such judgments may indicate that a group of professionals sharing similar sociocultural beliefs, biases, persuasions, and interests may see some things in the same way at a given point in time, they do not confirm that what they see is either objectively true, universal, or indeed stable in any verifiable sense.[9] [10]

None of this is conspiratorial, or even unusual.[11] Instead, it is consistent with how large organizations typically allocate decision-making power. The documents that FCAAP provided to the Florida House demonstrate the point. They appear to show that FCAAP's organizational promotion of GAC for minors was engineered by the Academy's headquarters and FCAAP's president, with FCAAP's executive director playing the role of liaison. For example, the communications surrounding FCAAP's

---

[9] *Id.* at 49:00.

[10] The Chair of the DSM-IV Task Force, Dr. Allen Frances, was quoted as saying his Task Force "knew that most decisions" in the DSM-III "were arbitrary" but that the DSM-IV largely incorporated those decisions anyway because its objective was merely to "stabilize" the system that the DSM-III created. *Id.* at 46:20–48:20. With regard to the current version, DSM-5, the APA allegedly has prevented its authors from discussing its creation by securing confidentiality agreements from them, and allegedly has denied access to its archives by "embargoing" the relevant documents for 20 years post-publication. *Id.* at 1:42:00. Small wonder, if true.

[11] Of course, the Court need not make any determinations about the veracity of Dr. Davies' research, although there is little reason to doubt it. Instead, the Court need only consider the obvious possibility that private organizations can and do make decisions in this manner.

submission of rule comments to Florida's health regulators reveal a process by which an Academy "team" drafted rule comments and coordinated with FCAAP's executive director to have FCAAP's president sign and submit the comments on behalf of 2,600 Florida pediatricians who apparently were never consulted. On what basis can those comments possibly be said to reflect the views of the 2,600 Florida pediatricians who comprise FCAAP's membership?

The content of these communications is equally concerning. Discussing the proposed rule comments to the Florida Board of Medicine, FCAAP's president suggested to its executive director that the comments should note that the inability to conduct ongoing studies would "preempt attaining more data on the effectiveness of care." Notably, she wanted to emphasize in the proposed letter "how important ongoing research is and it should be maintained/allowed as medicine is often evolving." The Academy "team" responded by shooting down this suggestion. As FCAAP's executive director explained to its president, the Academy's team was reluctant "to add an argument that additional studies/research is needed." Why? Partly because it would "lend[] credence to the argument that these bans are needed because there is insufficient evidence to support this type of care."

The communications relating to FCAAP's submission of earlier rule comments to the Florida Board of Medicine at least involved a few more participants—the four other physician members who served on FCAAP's executive committee. Even then, their roles were passive. Their approval of those rule comments was memorialized in

perfunctory "I approve" emails, and the executive committee meeting minutes reflect that all discussion of GAC for minors proceeded from the premise that it was to be supported.

Indeed, FCAAP produced but one email to its entire membership regarding GAC for minors—and it was not an invitation for members to authorize or otherwise participate in the formation of an organizational position on the matter. Instead, it was a call to action from FCAAP's president that urged FCAAP's membership to write to the Florida Board of Medicine "in opposition to any proposed policy to limit or prohibit" GAC for minors. *Any* limit. Disturbingly, the minutes of an executive committee meeting several months later reflect that a committee member "indicated that the Chapter needs to think about how to collect data on the mental health outcomes for these kids and asked if there is an entity that is tracking this data." One would expect FCAAP's decision-makers to know about the mental health outcomes of "kids" receiving GAC *before* encouraging FCAAP's members to oppose *any* limiting regulations.

Although the views of five organizational leaders are known (or can reasonably be inferred by their acquiescence), the views of the other 2,600 or so members of FCAAP are a mystery. Do 2,000 of those pediatricians agree with the five who exercised FCAAP's organizational authority to promote GAC for minors? Perhaps. It is equally

plausible that 2,000 of them *disagree*, however.[12]  Neither the Florida House nor the courts have any way of knowing. And given that FCAAP apparently did not poll its membership, here is the more critical point—even *FCAAP* likely does not know how many of its pediatrician members actually agree that GAC is beneficial for minors. It seemingly has no basis to conclude that there is a consensus *even within its own organization*, let alone within the entire medical profession.[13]

This is not just a Florida issue; it applies to the Academy itself. FCAAP's acknowledgment through counsel that it (and by extension, its membership) was not involved in the Academy's "policy-making process" demonstrates the point. It stands to reason that if the Academy did not include in its decision-making process the physician membership of the Nation's third-largest state, it likely did not include the

---

[12] Although it is certainly true that "a single dissenting expert" does not "automatically defeat[] medical consensus," *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019), the opacity of the Academy's decision-making process leaves the judiciary in the dark as to whether relatively few practitioners disagree with its formal position or relatively few practitioners *agree* with it. The same is true of the other "major medical organizations" that promote GAC.

[13] Some might respond that the pronouncements of these organizations necessarily reflect the views of a majority of their membership because their members would leave or vote for new leadership were it otherwise. But there is little reason to believe that is so. Membership in prominent professional societies provides a variety of benefits, and many members undoubtedly calculate that such benefits warrant continued membership despite their disagreement with certain organizational positions. For example, some attorneys disagree with the American Bar Association's positions on certain matters but may choose to maintain membership for a variety of reasons. Continued membership does not signal approval of every organizational pronouncement. Nor should it be expected that most busy practitioners are even aware of every position that their professional association adopts.

physician membership of its other 58 chapters in the United States either.[14] So where is the evidence of consensus *even within the Academy*?

As it turns out, the Academy announced its official position in a formal policy statement drafted by Dr. Jason Rafferty and titled "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents" ("the Policy Statement").[15] Although the Academy's policy statement process (assuming it is followed) ostensibly provides for some level of collaboration,[16] the Policy Statement identifies the "lead author" as Dr. Rafferty, along with a single "contributor" and the members of three Academy committees (along with their "liaisons" and support staff). Remarkably, it appears that the lead author tasked with speaking for the Nation's preeminent pediatrics organization on this issue was fresh out of medical school and

---

[14] *Join Your Chapter*, AMERICAN ACADEMY OF PEDIATRICS, https://www.aap.org/en/community/join-your-chapter/ (last visited Sept. 4, 2024) ("There are 59 chapters in the United States and 7 chapters in Canada. The US chapters generally are drawn along state lines, but two states with large populations (New York and California) constitute more than one chapter.").

[15] Jason Rafferty, MD, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 PEDIATRICS 4 (2018), https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for?autologincheck=redirected.

[16] *Policy Statement Development Process*, AMERICAN ACADEMY OF PEDIATRICS, https://www.aap.org/en/policy/policy-statement-development-process/ (last visited Sept. 4, 2024).

still *in residency* at the time.[17] [18]

One cannot help but speculate why Academy leadership selected such an inexperienced practitioner for that weighty task,[19] or how his "area of expertise" might have been described in the "intent" document that constitutes the first step in the Academy's formal Policy Statement Development Process.[20] Regardless of the answers, it seems clear enough that far fewer than one percent of the Academy's membership of 70,000 was actually involved in the development and approval of its Policy Statement. And if its Florida activities are indicative of its nationwide practices, it appears that to the extent the Academy's leadership interfaced with its membership at all it was merely

---

[17] *See* Complaint, *Ayala v. Am. Academy of Pediatrics, et al.*, Case No. PC-2023-05428 (R.I. Super. Ct. Oct. 23, 2023).

[18] The recent elevation of medical residents to the status of "experts" in treating gender dysphoria apparently is not unique to the Academy. The APA, for its part, recently published a textbook titled *Gender-Affirming Psychiatric Care* that is marketed as an authoritative scientific source of best practices. Its lead author is a medical resident. *Gender-Affirming Psychiatric Care*, AMERICAN PSYCHIATRIC ASS'N PUBLISHING, https://www.appi.org/Products/Gender-Related-Issues/Gender-Affirming-Psychiatric-Care (last visited Sept. 4, 2024). To date, the APA has seemingly ignored calls to disclose details about the peer-review process that allowed this publication. *An Open Letter to the American Psychiatric Association Regarding the Publication of* Gender-Affirming Psychiatric Care, FOUNDATION AGAINST INTOLERANCE AND RACISM (January 2024), https://www.fairforall.org/open-letters/open-letter-apa/.

[19] The Policy Statement discloses that Dr. Rafferty "conceptualized the statement, drafted the initial manuscript, reviewed and revised the manuscript, approved the final manuscript as submitted, and agrees to be accountable for all aspects of the work." *See* note 15, *supra*.

[20] *See* note 16, *supra*.

with state-chapter leadership and for the purpose of securing cooperation in promoting

the message that had been announced from on high.[21]

To be clear, the problem is not that a handful of physicians may have authority

under their organization's bylaws to speak for their organization, or to appoint a

committee or task force for that purpose. As a general matter, that is no problem at

all—an organization is certainly free to designate a small leadership team to make its

decisions, or even to designate a single person to make unilateral decisions that bind

the organization without input from its membership. The problem arises when the

person (or small group) designated to make decisions on the organization's behalf

leverages that *organizational* grant of authority to override (with the judiciary's assistance)

the *constitutional* authority of legislatures to protect the public health, safety, and welfare.

In more concrete terms, a small task force or even a single person (for example,

the president) of an organization such as the Academy may well operate within the

bounds of *organizational authority* by declaring that the organization of 70,000 physicians

supports a position. But it does not follow that 70,000—or even 10,000—physicians

*actually* support that position. No amount of bluster from the Academy about how

diligently or rigorously its curated team worked on the Policy Statement can change

this. It is entirely possible—and for all the courts know, it is the actual state of affairs—

that far fewer than 50% of these organizations' physician members actually support the

---

[21] *See* note 14, *supra* ("Academy chapters are organized groups of pediatricians and other
health care professionals working to achieve AAP goals in their communities.").

use of GAC (particularly for minors). "Words have no meaning if the views of less than 50% . . . can constitute a national consensus." *Roper v. Simmons*, 543 U.S. 551, 609 (2005) (Scalia, J., dissenting).

In sum, medical organizations do not necessarily speak for their membership—not even for a *majority* of their membership—when they declare their organizational support. But the rhetorical force of the arguments advanced by those who promote GAC depends on the willingness to make that inferential leap. Advocates of GAC (at least those who engage in legal advocacy) undoubtedly are aware that regulation of the practice of medicine is a fundamental state police power and that legislatures are entitled to even *greater* deference when they legislate in areas of "medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). To overcome this daunting obstacle, they have constructed a narrative in which the science is said to be so well settled that there *is no* uncertainty.

And many have bought into it. As one member of Congress declared during a House committee hearing, GAC "is supported by every major medical association" collectively "representing over 1.3 million American doctors. *It's just not up for debate.*"[22] Of course, nearly all science is by its very nature "up for debate," and the contention that *this* area is somehow an exception is preposterous.[23] But this comment is

---

[22] *See* note 3, *supra*, at 4 (statement of Representative Scanlon).

[23] Even the WPATH "standards of care" to which GAC advocates pledge their allegiance describes this as a "rapidly evolving" field. E. Coleman et al.,

characteristic of the unquestioning acceptance of the premise that organizational pronouncements necessarily reflect the views of their membership.

It is also characteristic of efforts to avoid and silence debate. If proponents of GAC are falsely portraying a medical consensus, it is fair to ask why more dissenting physicians have not spoken out. Some have, of course—in statehouses,[24] in the media,[25] within their professional organizations,[26] and elsewhere. But they do so at great personal

---

*Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S3 (2022), https://www.tandfonline.com/doi/full/10.1080/26895269.2022.2100644.

[24] *See, e.g., Panel Discussion on Gender Dysphoria and Minors: Hearing Before the H. Comm. on Health and Human Services*, 91st House (Fla. 2023), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8453. Dr. Laidlaw, a member of the Endocrine Society, provided a critique of its oft-cited guidelines and explained that "nine out of ten of the persons who created" its guidelines are members of WPATH—"so it's a very biased sample of physicians and others who created this document." *Id.* at 21:45– 32:20; *see also id.* at 34:50 (testimony of Dr. Stephen Levine, Professor of Psychiatry at Case Western University and Chair of the Standards of Care committee for the fifth edition of WPATH's "standards of care," refuting 13 fundamental ideas that are used to justify the use of GAC for minors and raising the specter of a "medical misadventure").

[25] *See, e.g.*, note 5, *supra*.

[26] For example, some members of the Academy introduced and supported a resolution several years ago for consideration at the Academy's annual leadership forum, seeking a systematic review of the evidence regarding GAC. According to its co-sponsor, the Academy's "leadership voted it down" and "decried the resolution as transphobic." Julia Mason and Leor Sapir, Opinion, *The American Academy of Pediatrics' Dubious Transgender Science*, WALL ST. J. (Aug. 17, 2022), https://www.wsj.com/articles/the-american-academy-of-pediatrics-dubious-transgender-science-jack-turban-research-social-contagion-gender-dysphoria-puberty-blockers-uk-11660732791.

risk[27]—one that understandably leaves them "very scared to speak up."[28] No legitimate consensus can be formed in such an environment, and the illusion of a consensus depends partly on dissuading the public expression of dissent.[29] As now-Speaker Johnson aptly put it, "something has gone terribly wrong."[30]

The Supreme Court has recognized that "[o]ne must not expect uncommon courage even in legislators." *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). Even less should one expect uncommon courage from physicians who stand to lose their livelihoods should they express opinions disfavored in today's political climate. More

---

[27] The highly publicized saga of Dr. Lisa Littman is but one of myriad examples. Dr. Littman, who coined the term "rapid onset gender dysphoria" and dared to describe the recent "phenomenon whereby teens and young adults who did not exhibit childhood signs of gender issues appeared to suddenly identify as transgender," apparently lost her job as a result of the ensuing backlash. Jonathan Kay, *An Interview with Lisa Littman, Who Coined the Term 'Rapid Onset Gender Dysphoria*,' QUILLETTE (Mar. 19, 2019), https://quillette.com/2019/03/19/an-interview-with-lisa-littman-who-coined-the-term-rapid-onset-gender-dysphoria/.

[28] *See* note 5, *supra*. Anecdotally, well-credentialed practitioners who oppose the use of GAC have expressed reluctance to appear as expert witnesses for the same reason.

[29] As University of South Florida psychiatrist (and former liaison to the Academy) Dr. Kristopher Kaliebe recently explained, there is a "spiral of silence" in which professional associations "look to each other for cues" and take the position that "until they change their stance, we don't want to change ours." Aaron Sibarium, *They Support Sex Changes for Children, with Safeguards. A Top Child Psychiatry Group Won't Let Them Speak at Its Annual Conference*, THE WASHINGTON FREE BEACON (Aug. 11, 2023), https://freebeacon.com/campus/they-support-sex-changes-for-children-with-safeguards-a-top-child-psychiatry-group-wont-let-them-speak-at-its-annual-conference/.

[30] *See* note 3, *supra*, at 3 (statement of Chair Mike Johnson).

to the point, the constitutional authority of state legislatures to regulate the practice of medicine cannot depend on whether a critical mass of physicians is willing to exhibit such uncommon courage. The fate of such legislation in a courtroom should not depend on it, either.

In light of the foregoing discussion, it is easy to see why the judiciary should continue to reject the idea that legislative authority "depends on" the views of "the psychiatric community." *Jones v. U.S.*, 463 U.S. 354, 364 n.13 (1983). The "lesson" the Supreme Court has drawn from the "uncertainty of diagnosis in this field [of psychiatry] and the tentativeness of professional judgment" is "not that government may not act in the face of this uncertainty, but rather that courts should pay *particular deference* to reasonable legislative judgments." *Id.* (emphasis added). That lesson simply cannot be squared with the deference that the District Court afforded to "the bureaucratic organizations that present themselves to the world as the voices of official medical opinion." *State v. Loe*, 692 S.W.3d 215, 241 n.5 (Blacklock, J., concurring). After all, "courts must not confuse professional standards with constitutional requirements." *Brown v. Plata*, 563 U.S. 493, 539–40 (2011).

Even the Chair of the DSM-IV Task Force has opined that "[g]uidelines should not be left in the hands of professional associations. . . . *use experts, but don't allow them to*

*call the final shots.*"[31] If legislative judgment is not upheld here, it will be professional associations who call the shots. Or as Justice Blacklock of the Texas Supreme Court recently put it, ""If . . . judges were to say that childhood transgender treatments *cannot* be outlawed because of ideological objections from politically powerful places like the American Psychiatric Association, then what would really be doing the work? It would certainly not be the text or history of the Constitution."[32] *Loe*, 692 S. at 248 (Blacklock, J., concurring).

## II.    The Legislature was not motivated by animus.

In granting a stay of the injunction last week, a motions panel of this Court recognized that the State is likely to succeed on the merits—partly because the District Court "likely misapplied the presumption that the legislature acted in good faith." Order, ECF 49 at 5 (Aug. 26, 2024). The Florida House will not burden the Court by

---

[31] Lawrence Rubin, *Allen Frances on the DSM-5, Mental Illness and Humane Treatment*, PSYCHOTHERAPY.NET (2018), https://www.psychotherapy.net/interview/allen-frances-interview#section-where-dsm-5-went-wrong.

[32] This is true regardless of whether plaintiffs invoke equal protection, substantive due process, or some other constitutional doctrine to argue that legislatures cannot lawfully restrict or prohibit the sort of practices at issue here. For example, under the appropriate level of equal protection review (rational basis), some argue that legislatures cannot have a rational basis to disagree with a consensus of the entire medical profession. Indeed, the District Court essentially adopted that view. Appellants' Appx. at 945. Similarly, under an erroneous heightened-scrutiny standard, GAC advocates argue that legislative restrictions on GAC for minors cannot be narrowly tailored if they are inconsistent with the purported medical consensus. Judicial acceptance of either argument would empower unelected, unaccountable, and often self-interested private actors to "call the final shots."

reiterating the arguments in the State's merits brief, but rather will address a few passages from the District Court's Order.

First, the District Court's erroneous animus analysis led it to a series of uninformed predictions about what the Legislature would have done but for the perceived animus. For example, the Court speculated that "[i]t is more likely than not that a majority of unbiased legislators . . . would have agreed instead with the many professional associations" that purportedly endorse GAC. Appellants' Appx. at 920–21. Contrary to the unspoken premise of this conclusion, however, the Florida Legislature does not believe that the "appeal to authority" fallacy is a constitutional command. *See, e.g.*, Appellants' Appx. at 931 ("Restrictions on gender-affirming care that comport with the Endocrine Society or WPATH standards pass constitutional muster.").

The Legislature had sound reasons to disagree with the purported "consensus," and those reasons are too lengthy to catalogue here. It suffices to note that the Legislature conducted multiple committee hearings, heard from physicians and a broad cross-section of the public (including those who support GAC and those who described the harm that GAC caused themselves and their children), and made a policy decision that was well within the bounds of its constitutional authority. A few unfortunate comments from a handful of legislators among the 109 who supported the legislation does not suffice to undo the Legislature's work to address a pressing public health issue.

Scores of legislatures around the country have enacted similar legislation, as the recent and well-documented explosion of gender dysphoria diagnoses has brought the issue of GAC to the public consciousness. It disparages the Legislature to suggest that its members would have ignored the issue "[h]ad there been no animus." Appellants' Appx. at 920. The District Court's unadorned speculation that "more likely than not a majority" of the 109 legislators who voted for the bill "were motivated in part by animus," *id.*, is flatly wrong.

Second, the District Court criticized the Legislature for referring to what it described as a "deeply flawed" report "that reached the predetermined conclusion that gender-affirming care for minors was experimental and so not covered by Medicaid." Appellants' Appx. at 905. As Part I of this brief and numerous other sources suggest, the predetermined conclusions come from the medical associations advocating for GAC. Perhaps the most obvious example is from the Academy itself. Following years of criticism of its resident-drafted Policy Statement—and after several years of resisting calls from its members to conduct a systematic review of the evidence—the Academy's board of directors finally authorized a systematic review in August 2023. But its board (again, not its membership) simultaneously "reaffirmed" the Policy Statement—i.e., it doubled down on the very Policy Statement that the systematic review would test.[33]

---

[33] Alyson Sulaski Wyckoff, *AAP Reaffirms Gender-Affirming Care Policy, Authorizes Systematic Review of Evidence to Guide Update*, AAP NEWS (Aug. 4, 2023), https://publications.aap.org/aapnews/news/25340/AAP-reaffirms-gender-affirming-care-policy.

That process is precisely backwards.[34] Yet the District Court afforded a presumption of good faith to these organizational leaders and to the authors of their guidelines and policy statements—while giving short shrift to the presumption of good faith to which the Legislature is entitled.

Finally, the District Court's strained analysis of the animus issue is exemplified by what it described as "perhaps the best evidence" of animus—a different bill declaring the policy of Florida's public school system to be that "sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to" a person's sex. Appellants' Appx. at 908 (quoting Fla. Stat. § 1000.071(1) (2024)). If a policy to maintain a previously unquestioned biological reality and a corresponding, centuries-old convention of the English language is "the best evidence" of animus, then the animus analysis is self-refuting.

## CONCLUSION

"Like many cases . . ., this case boils down to one fundamental question: Who

---

[34] Dr. Erica Anderson—a transgender psychologist, a former president of WPATH's United States chapter (USPATH), and a member of the American Psychological Association task force that writes its guidelines for transgender care, has put it this way in criticizing the Academy's process: "You do the evidence review and then you derive your protocols," Anderson said. "You don't say we have protocols and oh, we're going to do an evidence review. No, the protocols are derivative of the evidence review." Kendall Tietz, *Transgender Psychologist Warns of 'Emotional Blackmail' Used by Colleagues in Their Treatment of Minors*, FOX NEWS (Aug. 24, 2023) https://www.foxnews.com/media/transgender-psychologist-hubris-blame-harmful-industry-standards-treatment-minors?msockid=1051d006f2976b210a90c222f38d6a58.

decides?" *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 780 (2020) (Kavanaugh, J., dissenting). By placing "unfailing trust in professional groups," the District Court effectively allowed those groups to make the decision. *Otto v. City of Boca Raton*, 41 F.4th 1271, 1276–77 (11th Cir. 2022) (Grant, J., concurring in denial of rehearing en banc). But those groups are imbued with no constitutional authority—least of all the authority to veto legislative judgment about the regulation of medicine. When a court overrules legislative judgment because "the experts" disagree with it, legislative power is effectively transferred to private interest groups, thereby empowering a trivial number of unelected people to dictate public health policy merely because they hold leadership positions in their organizations. The answer to the question of "who decides" cannot be five (or even fifty) doctors who happen to hold influential leadership or task force positions at a particular moment in time—particularly when they make their decisions behind closed doors.

The answer instead lies in the Tenth Amendment, under which "[s]tate governments retain their historic police powers to protect public health." *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1190 (11th Cir. 2017) (citing U.S. Const. amend. X). Although the District Court found it "remarkable" that the Legislature would "arrogate to the state the right to make the decision," Appellants' Appx. at 945, there is nothing remarkable about that. To the contrary, weighing the "risks and benefits" of novel medical practices, *id.*, and deciding public health policy is part and parcel of what legislatures and regulators do. The Legislature did not arrogate that "right" to itself—

the Tenth Amendment did. What is remarkable is that the District Court essentially arrogated that authority and transferred it to WPATH, the Academy, and other private medical associations.

In summary, if ever there was an opportunity for the federal judiciary to demonstrate that it does not operate as "the Nation's *ex officio* medical board," this is it. *Stenberg v. Carhart*, 530 U.S. 914, 968 (2000) (Kennedy, J., dissenting) (quoting *Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 456 (1983) (O'Connor, J., dissenting)). "[T]he State may regulate based on matters beyond 'what various medical organizations have to say about the *physical* safety of a particular procedure.'" *Id.* at 967 (citation omitted). "The permissibility of [GAC], and the limitations, upon it, are to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 232 (2022) (quoting *Planned Parenthood of S.E. Penn. v. Casey*, 505 U.S. 833, 979 (Scalia, J., concurring in judgment in part and dissenting in part)). Neither the Nation nor the judiciary needs another half-century public health policy battle to play out in its courtrooms.

Respectfully submitted,

*/s/ David Axelman*
David Axelman (FBN 90872)
General Counsel
**The Florida House of Representatives**
317 The Capitol
402 South Monroe Street

24

Tallahassee, Florida 32399-1300
Tel: (850) 717-5500
David.Axelman@myfloridahouse.gov

*Counsel for Amicus The Florida House of
Representatives*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing complies with the typeface and type-volume requirements of Rules 29(a)(5) and 32(a), and that this brief contains 6,349 words, excluding the items listed in Rule 32(f).

*/s/ David Axelman*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed electronically on September 4, 2024, through the Court's ECF system, causing a notice of electronic filing to be served on all counsel of record.

*/s/ David Axelman*