No. 24-11996

In the
United States Court of Appeals for the Eleventh Circuit

JANE DOE, *et al.*,
*Plaintiffs-Appellees*,
v.
SURGEON GENERAL, STATE OF FLORIDA, *et al.*,
*Defendants-Appellants*.

On Appeal from the
United States District Court for
the Northern District of Florida

Brief *Amicus Curiae* of America's Future, Public Advocate of the United States, Eagle Forum, Eagle Forum Foundation, Clare Boothe Luce Center for Conservative Women, Leadership Institute, U.S. Constitutional Rights Legal Defense Fund, Fitzgerald Griffin Foundation, One Nation Under God Foundation, LONANG Institute, Restoring Liberty Action Committee, and Conservative Legal Defense and Education Fund in Support of Defendants-Appellants and Reversal

KERRY L. MORGAN
 Wyandotte, MI
J. MARK BREWER
 Johnson City, TX
JAMES N. CLYMER
 Lancaster, PA
JOSEPH W. MILLER
 Fairbanks, AK
PATRICK MCSWEENEY
 Powhatan, VA
RICK BOYER
 Lynchburg, VA

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
 WILLIAM J. OLSON, P.C.
 370 Maple Avenue W., Suite 4
 Vienna, VA 22180-5615
 (703) 356-5070
 *Attorney of Record
 September 4, 2024

*Attorneys for Amici Curiae*

C-1 of 3

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The *amici curiae* herein, America's Future, Public Advocate of the United States, Eagle Forum, Eagle Forum Foundation, Clare Boothe Luce Center for Conservative Women, Leadership Institute, U.S. Constitutional Rights Legal Defense Fund, Fitzgerald Griffin Foundation, One Nation Under God Foundation, LONANG Institute, Restoring Liberty Action Committee, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this Certificate of Interested Persons and Corporate Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3.

America's Future, Public Advocate of the United States, Eagle Forum, Eagle Forum Foundation, Clare Boothe Luce Center for Conservative Women, Leadership Institute, U.S. Constitutional Rights Legal Defense Fund, Fitzgerald Griffin Foundation, One Nation Under God Foundation, and Conservative Legal Defense and Education Fund are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them. LONANG Institute and Restoring Liberty Action Committee are

educational organizations, and they are not publicly traded corporations, nor do they have a parent company which is a publicly traded corporation.

The following is a list of persons or parties, in addition to those listed in Appellants' opening brief and any other *amicus* briefs that may be filed, that have an interest in the outcome of this matter:

1.   America's Future (*Amicus*)

2.   Boyer, Rick (Counsel for *Amici* America's Future, *et al.*)

3.   Brewer, J. Mark (Counsel for *Amici* America's Future, *et al.*)

4.   Clare Boothe Luce Center for Conservative Women (*Amicus*)

5.   Clymer, James N. (Counsel for *Amici* America's Future, *et al.*)

6.   Clymer Musser & Sarno, P.C. (Counsel for *Amici* America's Future, *et al.*)

7.   Conservative Legal Defense and Education Fund (*Amicus*)

8.   Eagle Forum (*Amicus*)

9.   Eagle Forum Foundation (*Amicus*)

10.  Fitzgerald Griffin Foundation (*Amicus*)

11.  Integrity Law Firm (Counsel for *Amici* America's Future, *et al.*)

C-3 of 3

12.    Law Offices of Joseph Miller, LLC (Counsel for *Amicus* Restoring Liberty Action Committee)

13.    Leadership Institute (*Amicus*)

14.    LONANG Institute (*Amicus*)

15.    McSweeney, Patrick (Counsel for *Amici* America's Future, *et al*.)

16.    Miller, Joseph W. (Counsel for *Amicus* Restoring Liberty Action Committee)

17.    Morgan, Jeremiah L. (Counsel for *Amici* America's Future, *et al*.)

18.    Morgan, Kerry L. (Counsel for *Amici* America's Future, *et al*.)

19.    Olson, William J. (Counsel for *Amici* America's Future, *et al*.)

20.    One Nation Under God Foundation (*Amicus*)

21.    Pentiuk, Couvreur & Kobiljak, P.C. (Counsel for *Amici* America's Future, *et al*.)

22.    Public Advocate of the United States (*Amicus*)

23.    Restoring Liberty Action Committee (*Amicus*)

24.    U.S. Constitutional Rights Legal Defense Fund (*Amicus*)

25.    William J. Olson, P.C. (Counsel for *Amici* America's Future, *et al*.)

\_\_\_\_s/William J. Olson\_\_\_\_
William J. Olson

## TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . . . . C-1

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT

I.    THE DISTRICT COURT ERRED IN HOLDING TRANSGENDER STATUS IS
      EQUIVALENT TO RACE, AND THAT THE FLORIDA STATUTE WAS
      ENACTED OUT OF ANIMUS. . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    Transgender Status Is Most Certainly Not the Same as Race . . . . 7

      B.    The District Court's Multiple Findings of Animus Were
            Illegitimate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.   THE CIRCUIT COURT RELIED ON THE FABRICATED VIEWS OF
      WPATH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      A.    The District Court Erroneously Relied on the "Standards" of a
            Politicized "Transgender" Advocacy Group . . . . . . . . . . . . . 21

      B.    Numerous Scientific Entities Question WPATH's Politicized
            Guidelines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.    Discovery in *Eknes-Tucker* Has Revealed WPATH'S
          Politicization and Conflicts of Interest . . . . . . . . . . . . . . . . . . 25

III.    A DECISION IN FAVOR OF THE PLAINTIFFS WILL BE USED TO
          CHALLENGE THE BAN ON SURGERIES FOR MINORS . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

Page

**UNITED STATES CONSTITUTION**
Amendment XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, *passim*

**STATUTES**
18 U.S.C. § 116 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Fla. Stat. § 456.001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29
Fla. Stat. § 456.52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**CASES**
*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2022) . . . . . . . . . . . . . . . . 29, 30
*B.P.J. v. West Virginia*, 98 F.4th 542 (4th Cir. 2024) . . . . . . . . . . . . . . . 30
*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) . . . . . . . . . . 22
*Edmo v. Corizon, Inc.*, 949 F.3d 489 (9th Cir. 2020) . . . . . . . . . . . . . . 22
*Eknes-Tucker v. Governor of the State of Alabama*, 80 F.4th 1205 (11th
        Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
*Eknes-Tucker v. Governor*, 2024 U.S. App. LEXIS 21958 . . . . . . . . 21, 25, 27
*Gavin Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir.
        2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31
*Geduldig v. Aiello*, 417 U.S. 484 (1974) . . . . . . . . . . . . . . . . . . . . . . 11
*Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019) . . . . . . . . . . . . . . . . . 22
*Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) . . . . . . . . . . . . . . . . . 22
*Roe v. Wade*, 410 U.S. 113 (1973) . . . . . . . . . . . . . . . . . . . . . . . 21, 22
*Skinner v. Oklahoma*, 316 U.S. 535 (1942) . . . . . . . . . . . . . . . . . . . . 17
*Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023) . . . . . . . . . . 9
*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252
        (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

**MISCELLANEOUS**
J. Agapoff, "Exposures to information about castration and emotional
        trauma before puberty are associated with men's risk of seeking
        genital ablation as adults," *Sexual Medicine* (Apr. 11, 2023) . . . . . . . 19
AP, "Scalia: Don't invent minorities," *Politico* (Aug. 19, 2013) . . . . . . . . . 7

iv

M. Arain, "Maturation of the adolescent brain," *Neuropsychiatr. Dis. Treat.* (Apr. 3, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

S. Baxendale, "The impact of suppressing puberty on neuropsychological function: A review," *ACTA Paediatrica* (Feb. 9, 2024) . . . . . . . . . . 15

D.L. Drakeman, The Hollow Core of Constitutional Theory (Cambridge Univ. Press: 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

H. Grossman, "Former trans kid shares agony of side effects from 'mutilating' medical transition: 'I've gotten no help'," *Fox News* (Feb. 3, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

H. Grossman, "NIH study recruiting 18-year-olds to learn 'unknown' side effects of testicle removal for gender dysphoria," *Fox News* (Apr. 19, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

J. Klein, "'Gender fluidity': The ever-shifting shape of identity," *BBC* (Sept. 14, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

S. Levine, "Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults," JOURNAL OF SEX & MARITAL THERAPY, vol. 48, 2022, issue 7 (Mar. 17, 2022) . . . . . . . . . . 15, 16

J. Ludvigsson, "A systematic review of hormone treatment for children with gender dysphoria and recommendations for research," *ACTA Paediatrica* (May 1, 2023) . . . . . . . . . . . . . . . . . . . . . . . . 14

"NHS England Stops Prescribing Puberty Blockers and Updates its Cross-Sex Hormones Policy for Minors," *Society for Evidence Based Gender Medicine* (Mar. 29, 2024) . . . . . . . . . . . . . . . . . 16

J. Reed, "I Thought I Was Saving Trans Kids. Now I'm Blowing the Whistle," *The Free Press* (Feb. 9, 2023) . . . . . . . . . . . . . . . . 15

M. Rothblatt, The Apartheid of Sex: A Manifesto on the Freedom of Gender (Crown Pub.: 1995) . . . . . . . . . . . . . . . . . . . . . . . . 10

R. Schlott, "We were pushed to transition as teens — now we're 'vindicated' by study showing kids grow out of it," *New York Post* (Apr. 16, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. Shrier, Irreversible Damage: The Transgender Craze Seducing Our Daughters (Regnery: 2020) . . . . . . . . . . . . . . . . . . . . . . . . 14

v

## INTEREST OF *AMICI CURIAE*[1]

America's Future, Public Advocate of the United States, Eagle Forum, Eagle Forum Foundation, Clare Boothe Luce Center for Conservative Women, Leadership Institute, U.S. Constitutional Rights Legal Defense Fund, Fitzgerald Griffin Foundation, One Nation Under God Foundation, and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. LONANG Institute and Restoring Liberty Action Committee are nonprofit educational organizations. Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of law.

## STATEMENT OF THE ISSUE

Whether Florida's ban on puberty blockers and cross-sex hormones for minors violates the Equal Protection Clause of the Fourteenth Amendment.

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

## STATEMENT OF THE CASE

A 2023 Florida law imposes certain limits on doctors prescribing puberty blockers and cross-sex hormones as "treatments" for gender dysphoria. *Doe v. Ladapo*, 2024 U.S. Dist. LEXIS 105334 at *8 (N.D. Fl. 2024). The statute prohibits prescription of the drugs to minors, but includes a "grandfather" provision allowing their use for minors already receiving them (*id.* at *8-9) and allows such drugs to be prescribed for the treatment of other conditions such as early-onset puberty. *Id.* at *17-18. For adults and grandfathered minors, the statute limits prescribing ability to licensed physicians only, and requires in-person visits, not telehealth visits, before the drugs can be prescribed where allowed. *Id.* at *9-10.

Suit was filed by adults identifying as transgender and by minors. *Id.* at *5-6. Plaintiffs challenged both the statute and regulations adopted by the Florida Board of Medicine to implement the statute based on the Equal Protection Clause. *Id.* at *10.

The district court initially granted the minor plaintiffs a preliminary injunction (*Doe v. Ladapo*, 676 F. Supp. 3d 1205, 1227 (N.D. Fl. 2023)), while denying injunctive relief to the adult plaintiffs (*Doe v. Ladapo*, 2023 U.S. Dist.

2

LEXIS 217440 (N.D. Fl. 2023)).  On June 11, 2024, the district court declared both the statute and implementing rules unconstitutional.  *Doe v. Ladapo*, 2024 U.S. Dist. LEXIS 105334, *108-109 (N.D. Fl. 2024) ("*Doe*").  The court believed that the Florida legislature was motivated by "animus" against individuals identifying as "transgender."  *Id*. at *46-51, 56.  Relying on *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), the court ruled that because animus was at least a factor in the legislature's decision, deference to the legislature was not required, and intermediate scrutiny applies. *Doe* at *75.

The district court admitted that: "[s]afeguarding health, especially of minors, is a legitimate state interest.  Measures that substantially promote that interest — in reality, not just in a decisionmaker's unfounded supposition — survive intermediate scrutiny."  *Id*. at *76.  However, relying heavily on the Endocrine Society Clinical Practice Guidelines for the Treatment of Gender Dysphoria and the World Professional Association for Transgender Health ("WPATH") Standards of Care, version 8, the court ruled that puberty blockers and cross-sex hormones can be medically effective treatments for gender dysphoria, and accordingly, the Florida statute failed intermediate scrutiny.  *Id*.

at *15, *76-77.  The court declared the statute unconstitutional "to the extent it prohibits gender-affirming care for individuals who have reached or passed Tanner stage II," as well as its limitations on non-physicians prescribing the drugs, and any penalties imposed by the statute for these violations.  *Id.* at *108-110.  The court enjoined the defendants from enforcing the statute or the implementing rules.  *Id.* at *108-109.

This Court stayed the injunction pending appeal, finding the defendants likely to succeed on the merits.  *Doe v. Surgeon Gen.*, 2024 U.S. App. LEXIS 21601 (11th Cir. 2024).  This Court found that "the district court likely misapplied the presumption that the legislature acted in good faith when it concluded that the prohibition and regulation provisions, and the implementing rules, were based on invidious discrimination against transgender" persons.  *Id.* at *10.  This Court noted that the district court conceded "that there was 'evidence on each side' [on the question of animus], and even that 'once the issue came up, a significant number of legislators — more likely than not a majority — were also motivated by their desire to ensure that patients receive only proper medical care.'  That should have been the end of it."  *Id.*  This Court did not believe that *Arlington Heights*, a Title VII employment case, has any significant

4

bearing on an equal protection case. *Id*. Finally, this Court held that since "transgender" status is not a suspect class, rational basis review applies. *Id.* at *11-12.

## SUMMARY OF ARGUMENT

The district court invalidated the Florida statute designed to protect minors from their bodies being ravaged as a result of the current fad of transgenderism. The court asserted that the statute violated the Equal Protection Clause based on factors which in no way make out an equal protection claim. For example, the fact that the statute protected only minors suffering from gender dysphoria certainly does not make it discriminatory. The district court's assertion that transgender status was equivalent to racism was unsupported and wholly unpersuasive. The reasons the court offered for its conclusion that the legislature was motivated by animus in numerous ways were absurd on their face. There was no legitimate basis whatsoever for the court to invoke the Equal Protection Clause, making its ruling *ultra vires*.

The district court relied heavily on the medical "standards" for persons with gender dysphoria  recommended by an advocacy group — the "World Professional Association for Transgender Health" ("WPATH"). That

organization has been discredited as a medical authority by multiple courts, including this Court.  WPATH has been found to tailor its standards to achieve victories in court for transgender persons.  It cannot be relied on for providing medical advice.

The district court protested mightily against a post-injunction criticism by a state legislator that the court's opinion would allow for the castration of minors. To be sure, the plaintiffs limited their challenge to the provisions of the law that did not include surgery, and the court's ruling addressed only the portions of the law challenged.  However, if the pharmaceutical portions of the Florida statute are struck down in this case based on discrimination, racism, or animus, it will not be long before a follow-on challenge is filed against the ban on castration. Also, the district court ascribed animus to numerous state legislators based on comments that referenced our Creator God in ways that call into question the logic underlying the court's decision.

6

**ARGUMENT**

I.  **THE DISTRICT COURT ERRED IN HOLDING TRANSGENDER STATUS IS EQUIVALENT TO RACE, AND THAT THE FLORIDA STATUTE WAS ENACTED OUT OF ANIMUS.**

A.  **Transgender Status Is Most Certainly Not the Same as Race.**

The district court conducted not a shred of inquiry into the text, context, ratification history, or purpose of the Equal Protection Clause before ruling that it protected transgender persons every bit as much as it did African Americans. The district court wholly ignored Justice Scalia's caution that: "It's not up to the courts to invent new minorities that get special protections."[2]  The court believed that this was exactly its role — to update the Constitution to address the newest progressive social-political cause.

It should not need repeating that the Equal Protection Clause was written into the Constitution to ensure that African Americans had the same rights as whites. But certain judges have come to believe that certain phrases in the Constitution provide them with empty vessels into which they may pour their personal preferences based on their views concerning religion, sociology, politics, or economics.  In doing so, the district court adopted an approach that

---

[2]  AP, "Scalia: Don't invent minorities," *Politico* (Aug. 19, 2013).

Professor Donald L. Drakeman has described as "the hollow core of constitutional theory."[3]

To enable itself to employ the Equal Protection Clause to achieve its purposes, the district court first factually presupposed without evidence, that transgenderism is the functional equivalent of race — a radical and unsupported legal conclusion. It described opposition to transgender ideology as "not different in kind or intensity from the animus that has attended **racism**…." *Doe* at *13 (emphasis added). It asserted that "some **transgender** opponents invoke religion to support their position, just as some once invoked religion to support their **racism**…." *Id*. (emphasis added). It went further and asserted that, "[i]n time, discrimination against **transgender** individuals will diminish, just as **racism** and misogyny have diminished." *Id*. at *14 (emphasis added). It claimed that, for equal protection, "**[r]ace** is the paradigm — leaving aside affirmative action as a remedy for prior discrimination,[4] it is almost never

---

[3]   *See* D.L. Drakeman, The Hollow Core of Constitutional Theory (Cambridge Univ. Press: 2020) ("For constitutional theory to return to its historical core … it needs to refocus on what I will refer to … as the will of the lawmaker, the Framers' intentions…" *Id*. at 3.).

[4]   For no apparent reason, the court interjected its view that the equal protection clause authorized decisions based on race in the context of affirmative action, despite this practice having recently been ruled unconstitutional in

appropriate to parcel out government benefits or burdens based on **race**.
**Transgender** status is **much the same**." *Id*. at *39 (emphasis added).

To the court, the logic of its position was impeccable: (i) transgender status is "much the same as race"; (ii) discrimination against transgender people is the equivalent to discrimination against African-Americans; ergo, (iii) federal judges may strike down any state laws restricting transgender medical care that they personally find objectionable.

Appellants point out one of the most compelling reasons that transgender status is not like race. "Plaintiffs' expert conceded that transgender status is not immutable; it can change." Appellants' Br. at 28. According to transgender ideology, "gender fluidity" is just as real as "gender identity": "[f]or some people, gender identity and expression isn't fixed — rather, it can change daily."[5] According to "gender-fluid" psychologist Liz Powell, "gender fluidity enables people to take their identity and expression one day at [a] time, instead of feeling tied to a single, overarching gender label." *Id*. According to Powell, gender "is not a fixed point," but rather "flexible and able to shift depending on

---

*Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023).

[5] J. Klein, "'Gender fluidity': The ever-shifting shape of identity," *BBC* (Sept. 14, 2022).

9

various factors, both within a person's internal self as well as their external surroundings." *Id.*

One of the earliest spokespersons for transgenderism, transgender author and lawyer Martine Rothblatt, explained that gender can change at will:

> [T]ransgenderism developed during the 1980s.  The guiding principle … is that people should be free to **change**, either **temporarily or permanently**, the sex type to which they were assigned since infancy … even if a sex type was real at birth, it **can now be changed at will**….  [M. Rothblatt, <u>The Apartheid of Sex: A Manifesto on the Freedom of Gender</u> (Crown Pub.: 1995) at 16 (emphasis added).]

Since the district court decision contained no meaningful analysis of the similarity between race and transgender status — other than to assert their identity as fact — the court never bothered to explain if it believed that the absolutely immutable characteristic of race was really directly comparable to the highly mutable characteristic of transgender orientation.

## B.     The District Court's Multiple Findings of Animus Were Illegitimate.

The district court then sought to establish a second ground on which to invoke the Equal Protection Clause.  It asserted that the Florida State legislature was motivated by animus.

10

Consider the manner in which the district court invoked its accusation of animus.  The first reason is "[t]his statute and these rules explicitly apply only to transgenders." *Doe* at *44.  Here, the district court departed from this Court's decision in *Eknes-Tucker v. Governor of the State of Alabama*, 80 F.4th 1205 (11th Cir. 2023).  To be sure, as the district court stated, *Eknes-Tucker* "explicitly did *not* address animus…." *Doe* at *34.  However, *Eknes-Tucker* relied on *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974) which stated:

> "the 'goal of preventing **abortion**' does not constitute '**invidiously discriminatory animus**' against **women**."  By the same token, the regulation of a course of treatment that **only gender nonconforming individuals** can undergo would not trigger heightened scrutiny unless the regulation were a pretext for invidious discrimination against such individuals.  [*Eknes-Tucker* at 1229-30 (citation omitted) (emphasis added).]

Thus, the district court's finding of an equal protection violation, based in part on the fact a statute applied only to transgender persons, stands in stark disagreement with this Court's view, discussed *supra*, that (i) a law which restricts abortion, and therefore applies only to women, does not violate equal protection; and directly applicable here, (ii) a law that only regulates treatment to transgender persons does not violate equal protection, absent a pretext.

11

The district court's opinion was based on its wholesale adoption of the ideology of Transgenderism. The court appeared to reject the simple notion that people are born male or female, with the convoluted statement that they are "born with external sex characteristics, male or female, and chromosomes that match," but believing their real nature is their "gender identity — a deeply felt internal sense of being male or female." *Doe* at *11. "The elephant in the room should be noted at the outset. Gender identity is real." *Id*. at *12. Nevertheless:

> there are those who believe that cisgender individuals **properly** adhere to their natal sex and that transgender individuals have **inappropriately** *chosen* a contrary gender identity…. Many people with this view tend to **disapprove all things transgender** and so **oppose** medical care that supports a person's transgender existence…. There has long been, and still is, **substantial bigotry** directed at transgender individuals…. Where there is **bigotry**, there are usually — one hopes, always — opponents of **bigotry**. [*Id*. at *12-13, *95 (bold added).]

Thus, the district court's central premise is that transgenderism is **natural, normal, proper, and desirable**, and every person should be free to choose to be a different sex based on feelings, and the rest of society must yield to those feelings. In the mind of the district court, anyone who takes a different view is malicious, operating from a position of at least disapproval and likely hatred

12

equivalent to racism, is incapable of caring, and only wishing harm upon the person suffering from the mental disorder of "gender dysphoiria." Thus, the Court embraces the notion that transgender persons are victims, and "federal courts have a role to play" (*id*. at *14) to protect them from ignorance, hate, and bigotry. Although courts may rule upon acts of discrimination as defined by law, they lack jurisdiction to protect a "deeply felt internal sense of gender" based on amorphous rationales such as "ignorance, hate, and bigotry." The Equal Protection Clause is no barrier to a state law blocking minor males from becoming eunuchs and minor females from becoming sterilized.

The court appears oblivious to the fact that it is neither natural nor normal for a male to want to be a female, and for a female to want to be a male. Most people would hope that persons who today are not comfortable in their own bodies, preferring to have been born as a different sex, would adjust their emotions with their biological reality. The state legislators understand that most minors with these feelings grow out of them, and the problem disappears.[6] They do not want parents who are overtaken by wokeism, who cater to a confused

_____

[6] *See* R. Schlott, "We were pushed to transition as teens — now we're 'vindicated' by study showing kids grow out of it," *New York Post* (Apr. 16, 2024) ("'gender non-contentedness, while being relatively common during early adolescence, in general decreases with age.'").

13

child by indulging the child's temporary feelings made irreversible through drugs (and surgery).[7]

When a girl is given large doses of testosterone, it does not make her a boy — only a girl with male attributes, such as a beard.  That hormone causes the female body to change in ways that are easier to induce than to undo (if they can be), should the girl's feelings change.  When a boy is given large doses of estrogen, it does not make him a girl — only a boy with female attributes, such as larger breasts.  And, estrogen can cause the male body to change in ways that are not readily reversible (if they are reversible at all), should the boy's feelings change.[8]

Thus, hormone therapy helps trap the child into a decision that he or she might make at the age of 12, which might be deeply regretted by age 14.  Why the district court would so resent the efforts of the Florida legislature to protect

---

[7] A. Shrier, Irreversible Damage:  The Transgender Craze Seducing Our Daughters (Regnery: 2020) at 31.

[8] J. Ludvigsson, "A systematic review of hormone treatment for children with gender dysphoria and recommendations for research," *ACTA Paediatrica* (May 1, 2023) ("Evidence to assess the effects of hormone treatment on the above fields in children with gender dysphoria is insufficient.").

14

children from such mistakes is explainable only by the court's wholesale embrace of the ideology of transgenderism.

Reliable studies on the long-term effects of puberty blockers for reasons other than precocious puberty have never been done.[9]  Here too, once the normal physiological development of a child is interfered with by pharmaceutical companies and physicians who make a living from such treatments, the results cannot be known, but it can be terribly negative.[10]

Consider this Abstract from a recent study about puberty blockers and cross-sex hormones and surgical alterations:

> Despite the precedent of years of gender-affirmative care, the social, medical and surgical interventions are still based on **very low-quality evidence**.  The **many risks** of these interventions, including medicalizing a temporary adolescent identity, have come into a clearer focus through an awareness of detransitioners.  The risks of gender-affirmative care are ethically managed through a properly conducted informed consent process.  Its elements — deliberate sharing of the hoped-for benefits, known risks and

---

[9]  S. Baxendale, "The impact of suppressing puberty on neuropsychological function: A review," *ACTA Paediatrica* (Feb. 9, 2024) ("Critical questions remain unanswered regarding the nature, extent and permanence of any arrested development of cognitive function associated with puberty blockers.  The impact of puberal suppression on measures of neuropsychological function is an urgent research priority.").

[10]  J. Reed, "I Thought I Was Saving Trans Kids. Now I'm Blowing the Whistle," *The Free Press* (Feb. 9, 2023).

long-term outcomes, and alternative treatments — must be delivered in a manner that promotes comprehension.  The process is **limited by: erroneous professional assumptions; poor quality of the initial evaluations; and inaccurate and incomplete information shared with patients and their parents**….  **Beliefs about gender-affirmative care need to be separated from the established facts**.[11]

The National Health Service of England decommissioned puberty blockers as a treatment of adolescent gender dysphoria:  "The NHS in England will not prescribe Puberty Suppressing Hormones to children and young people with gender incongruence / dysphoria, from 1 April 2024."[12]

In Section III, *infra,* we explain why the decision reached in this case, in all likelihood, will govern surgical interventions, and for that reason an obvious point needs to be made.  When a male child is castrated by the removal of healthy tissue, that is an irreversible decision with lifelong consequences.  When a female child has healthy breasts removed, that decision too is irreversible.  The Florida legislature seeks to prevent children, whose brains are not yet fully

---

[11]  S. Levine, "Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults," Journal of Sex & Marital Therapy, vol. 48, 2022, issue 7 (Mar. 17, 2022) (emphasis added).

[12]  "NHS England Stops Prescribing Puberty Blockers and Updates its Cross-Sex Hormones Policy for Minors," *Society for Evidence Based Gender Medicine* (Mar. 29, 2024).

developed, from making life-altering decisions.[13]  Viewed in this manner, it is the district court that has served transgender ideology to enjoin a state law that will protect children.  It is the district court's ruling that would do untold harm to children, if allowed to stand.

If the district court is now to remove the statutory protection from minors being sterilized based on the consent of their parents, it will need to address a series of questions that thus far have been ignored.  The Equal Protection Clause has been determined to restrict the ability of the state to compel criminals to be "rendered sexually sterile" by a vasectomy for a male or a salpingectomy for a female which might be imposed in an arbitrary manner.  *Skinner v. Oklahoma*, 316 U.S. 535, 537 (1942).  Does a minor have any protection from being rendered sexually sterile if the consent comes from the parents?

The district court found animus everywhere in Tallahassee, apparently believing that the Florida legislature is populated with bigots and haters.  It found highly objectionable the following statement made by a legislator:  "I can say I'm a porcupine, but that doesn't make it so."  *Doe* at *46.  What is wrong with that?  A boy can say he is a girl, but that doesn't make him so.  Neither does "gender

---

[13]  M. Arain, "Maturation of the adolescent brain," *Neuropsychiatr. Dis. Treat.* (Apr. 3, 2013).

17

affirming care," which is better understood to be "sexually destructive" care.

Does the district court really believe that a boy can actually become a girl? If so,

that is yet another reason for this Court not to follow that court into the world of

unreality.

The district court also was offended by these statements of legislators:

"[T]he ultimate gender affirming care" would be to tell children they are "creatures of God, made in his image, that they were made the way they are, and there's absolutely nothing wrong with it. God doesn't make mistakes." [*Id*. at *47.]

the bill "saves trans people" and "recognizes who they are in the eyes of God." [*Id*. at *47-48.]

"all people were created 'in the image of God, he created them. Male and female, he created them. Folks, this is rock solid, irreversible truth... [Y]ou are either male or female. This is not subject to one's opinion." [*Id*. at *48.]

Has the nation fallen so far that testifying to God's love for his Creation

constitutes animus? It would be the view of these *amici* that there is nothing

more "affirming" than conveying a message that God loves them, that God

created them as He did, and that He will walk with them through this difficult

time. The district court has a very different worldview from the legislators and

would rather see hurting people be encouraged to pursue and get deeper in their

confused state by being told that the solution to their emotional and mental

18

problem comes through beginning a lifetime of pharmaceuticals and possibly a surgeon's knife.

These were among the statements of legislators which the court believed made "clear that the sponsors' purpose, at least in part, was to prevent individuals from pursuing their transgender identities." *Id*. at *47.

The district court was particularly incensed by a statement made by a legislator "[a]fter entry of the preliminary injunction" that "he would not stop fighting to defend children from 'wokeist' judges 'who support child castration and mutilation.'" *Id*. at *50. The court bristled at this statement, responding with this explanation:

> In closing argument, the defendants, through their attorney, admitted that there was absolutely no factual basis for these remarks — that the record included no evidence that any Florida child had ever been castrated or mutilated, that the plaintiffs asserted no right to be so treated, and that the preliminary injunction did not address surgery at all. The sponsor just made it up. [*Id*. at *50.]

A fact checker would rule: technically true, but highly misleading. First, even if the record did not show any child had been castrated, those surgeries have been performed.[14] Second, although the plaintiffs did not challenge the ban on

---

[14] *See* J. Agapoff, "[Exposures to information about castration and emotional trauma before puberty are associated with men's risk of seeking genital ablation as adults](#)," *Sexual Medicine* (Apr. 11, 2023); H. Grossman,

19

castration in the law, and therefore the court's injunction did not address it, if this decision stands that the entire statute is predicated on animus, and transgender status is equivalent to race, the die would be cast. Any subsequent challenge to the anti-castration provisions of the statute would be enjoined almost automatically. *See* Section III, *infra*. Therefore, no, the sponsor did not just make it up.

Based on these statements by legislators, the court based its erroneous finding of bigotry and animus. Actually, it was the court which took offence at the criticisms of legislators. After all this invective, the court eventually admitted:

> It **sometimes** happens that **opponents of bigotry deem opposing viewpoints bigoted even when they are not**. [*Id.* at *95 (emphasis added).]

However, in the end, the court refused to accept the possibility that it was one of those opponents of bigotry which was unfairly seeing bigotry in legislators where there was none. The court stuck with its finding of animus and racism,

---

"NIH study recruiting 18-year-olds to learn 'unknown' side effects of testicle removal for gender dysphoria," *Fox News* (Apr. 19, 2023); H. Grossman, "Former trans kid shares agony of side effects from 'mutilating' medical transition: 'I've gotten no help'," *Fox News* (Feb. 3, 2023).

for without that, it would have been powerless to strike down the Florida state

law which the court found so reprehensible.

## II.    THE CIRCUIT COURT RELIED ON THE FABRICATED VIEWS OF WPATH.

### A.    The District Court Erroneously Relied on the "Standards" of a Politicized "Transgender" Advocacy Group.

As evidence for what procedures promote the health of children with

gender dysphoria, the district court relied heavily on the "Standards of Care,

Version 8" ("SOC-8") published by the "World Professional Association for

Transgender Health" ("WPATH"), describing them as:

> **well-established standards of care** for treatment of gender
> dysphoria … set out in … the [WPATH] Standards of Care, version
> 8.  [T]hese standards are **widely followed** by well-trained clinicians
> [and] have been endorsed by the United States Department of Health
> and Human Services.  [*Doe* at *15 (emphasis added).]

There, the district court made a serious mistake.  As Judge Lagoa recently

pointed out in a similar case, "recent revelations indicate that WPATH's lodestar

is ideology, not science."  *Eknes-Tucker v. Governor*, 2024 U.S. App. LEXIS

21958 at *49 (Lagoa, J., concurring).  In uncritically accepting the authority of

WPATH, the district court repeated the mistake the Supreme Court made in *Roe

v. Wade,* 410 U.S. 113 (1973), which made a legal ruling based on politicized

21

"experts." When *Roe* was overturned in 2022, the Court properly criticized its previous decision for relying on the "expertise" of activists devoted to skewing the debate. "**Relying on two discredited articles** by an **abortion advocate**, the Court erroneously suggested — contrary to Bracton, Coke, Hale, Blackstone, and a wealth of other authority — that the common law had probably never really treated post-quickening abortion as a crime." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 272 (2022) (emphasis added).

These criticisms of WPATH are becoming well known. In a First Circuit case, the district court appointed as an expert Dr. Stephen Levine, who himself had helped to draft Version 5 of the WPATH "Standards of Care" ("SOC-5"). Dr. Levine admitted that "The [Standards of Care are] … **not a politically neutral document**. WPATH aspires to be both a scientific organization and **an advocacy group for the transgendered**. These **aspirations sometimes conflict**." *Kosilek v. Spencer*, 774 F.3d 63, 78 (1st Cir. 2014) (emphasis added). The Fifth Circuit has noted that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate…." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019). *See also Edmo v. Corizon, Inc.*, 949 F.3d 489, 497 (9th Cir. 2020) (O'Scannlain, J., opinion

respecting denial of reh'g *en banc*) ("The WPATH Standards are merely criteria promulgated by a controversial private organization with a declared point of view.")

### B.    Numerous Scientific Entities Question WPATH's Politicized Guidelines.

WPATH's Standards have been criticized by others providing care for transgender persons.  "Beyond WPATH," an organization of "concerned medical and mental health professionals" including numerous doctors, psychiatrists, counselors, and mental health professionals, ripped SOC-8's plethora of "errors and ethical failures":

> WPATH endorses early medicalization as fundamental while **[European] countries now promote psychosocial support as the first line of treatment** [of gender dysphoria], delaying drugs and surgery until the age of majority is reached in all but the most exceptional cases.  A **chapter on ethics** that had appeared in earlier drafts was **eliminated** in the final release — a further abdication of ethical responsibility.[15]

The judge in the court below confidently stated that the procedures banned by Florida are "never [conducted on] younger children."  *Doe I* at *15.  But WPATH has worked overtime to disprove the district court.  In fact, "a very

---

[15] "WPATH Has Discredited Itself," *BeyondWPATH.org* (emphasis added).

short time after [WPATH's SOC-8] went public, a major unexpected 'correction' was issued.  However this wasn't a 'correction' this was an ideological turnaround.  This change of heart was reported all over the world as it **removed all minimum age requirements** for 'gender affirmative' surgeries," including "14+ years old for cross-sex hormones [and] 15+ years old for double mastectomies."[16]  In the final version of SOC-8, WPATH eliminated even these minimum age recommendations, opening the door to a for-profit medical and judicial assault on the bodies of young children.

The organization Beyond WPATH points out the damning fact that, "[w]hile presented as evidence-based, the Standards of Care fail to acknowledge that independent systematic reviews have deemed the evidence for gender-affirming treatments in youth to be of very low quality and subject to confounding and bias, rendering any conclusions uncertain."  It adds, "[f]or these and other reasons, we believe **WPATH can no longer be viewed as a trustworthy source** of clinical guidance in this field."  *Id.* (emphasis added).

---

[16]  "WPATH Explained," *Genspect.org* (Oct. 1, 2022) (emphasis added).

**C.** **Discovery in *Eknes-Tucker* Has Revealed WPATH'S Politicization and Conflicts of Interest.**

Litigation in *Eknes-Tucker* has uncovered still more evidence that WPATH is far more driven by politics, profits, and litigation strategy than science. As Judge Lagoa noted in that case, "[t]he leaked documents suggest that WPATH officials are aware of the risks of cross-sex hormones and other procedures yet are mischaracterizing and ignoring information about those risks." *Eknes-Tucker* at *22 (Lagoa, J., concurring).

A report provided by Dr. James Cantor, Ph.D., reveals internal WPATH emails admitting that WPATH **changed the recommendations** in SOC-8, under heavy pressure from the Biden administration, and **at the urging of attorneys hoping to use the SOC in courts** against states like Alabama that seek to protect children from irreversible and damaging cross-sex hormones and puberty blocker "treatments."

Publicly, WPATH insists that a unanimous medical "consensus" exists in favor of these "treatments." But, until the internal WPATH emails were subpoenaed in *Eknes-Tucker*, WPATH had covered up deep concerns among some of its own stakeholders about the safety and medical usefulness of

25

irreversible hormonal and puberty blocker treatments, and whether young children are even capable of giving informed consent to them.

Dr. Cantor states that "[m]embers of the Guideline Development Group acknowledged that **there is no consensus** among treatment providers regarding the use of puberty blockers."[17]  One wrote, "I think *there is no agreement on this within pediatric endocrinologists*, what is **significant risk** especially balanced against the benefits of e.g. **thinking time which can be very important for a 14 year old.**"  *Id.* (bold added).  Incredibly, another member conceded, "I'm not clear on which 'agreement regarding the value of blockers' is required to be espoused by a WPATH member/mentor.  My understanding is that *a global consensus on 'puberty blockers' does not exist*."  *Id.*

Dr. Cantor notes, "Members of the WPATH Guideline Development Group went so far as to explicitly advocate that SOC 8 be written to maximize impact on litigation and policy *even at the expense of scientific accuracy*."  *Id.*  One wrote, "*My hope with these SoC is that they land in such a way as to have serious effect in the law and policy settings* that have affected us so much

---

[17]  Appendix A to supplemental expert report of James Cantor, Ph.D., *Boe v. Marshall*, Case No. 2:22-cv-00184, Dkt. 591-24, p. ii (M.D. Ala. 2024) (emphasis added).

26

recently; *even if the wording isn't quite correct* for people who have the background you and I have." *Id*.

Judge Lagoa highlights this issue in her *Eknes-Tucker* concurrence:

Indeed, "a contributor to WPATH's most recent Standards of Care ["SOC-8"] frankly stated, '[o]ur concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits.' This only reinforces the district court's improper reliance on the scientific claims of an advocacy organization to craft constitutional law." [*Eknes-Tucker* at *49-50 (Lagoa, J., concurring).]

## III.   A DECISION IN FAVOR OF THE PLAINTIFFS WILL BE USED TO CHALLENGE THE BAN ON SURGERIES FOR MINORS.

Florida's law at issue here bans "sex-reassignment prescriptions and procedures" for individuals under 18 years old.  Fla. Stat. § 456.52(1).  The phrase "sex-reassignment prescriptions and procedures" is defined to include three categories:

1. Puberty blockers, used to stop or delay normal puberty;

2. Hormones or hormone antagonists which are inconsistent with the person's biological sex; and

27

3. "Any medical procedure, including a surgical procedure, to affirm a person's perception of his or her sex if that perception is inconsistent with the person's" biological sex. Fla. Stat. § 456.001(9)(a).

With respect to the ban on such medical interventions for minors, the plaintiffs only challenged the ban on puberty blockers and cross-sex hormones, but did not challenge the ban on surgeries. *See Doe* at *10. Indeed, the district court went very far out of its way to state and then reiterate that surgery was not at issue before it:

> the plaintiffs have not challenged, as part of this litigation, the prohibition on surgery for minors…. The ban on surgery has never been at issue in this litigation…. [*Id*. at *10, *16.]

Accordingly, the district court's order is limited to puberty blockers and cross-sex hormones. *See* Order at 4(g), *id*. at *110.

The district court judge took umbrage to certain statements made by Florida legislators and the Governor, even though the judge acknowledged it was "just political hyperbole." *See id*. at *48-50. Yet he responded to those statements by pointing out that "the record included no evidence that any Florida child had ever been castrated or mutilated." *Id*. Of course, why would it, since it was not at issue in the case?

28

The fact remains obvious that if plaintiffs prevail in their challenge to the ban on puberty blockers and cross-sex hormones for minors, that decision would be used to invalidate the ban on sex-change surgeries or other medical procedures for minors. The rationale adopted by the district court — that Florida's law was driven by legislators' animus against transgenders — would be judicially established and apply with equal force against the ban on § 456.001(9)(a)(3)'s coverage of "any medical procedure, including a surgical procedure" if this Court affirms in this case. That would be only one more step — the inevitable next step — in pursuit of the insatiable LGBTQ agenda.

No matter how the district court protests, "step by step" is how the LGBTQ agenda has always operated, as shown by a recent example. When the U.S. Supreme Court judicially amended the Civil Rights Act to expand the scope of the prohibition of employment discrimination to cover sexual orientation and gender identity in *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2022), the Court made clear that the decision narrowly applied to the facts before it and not to other aspects of federal law, claiming that "we do not purport to address bathrooms, locker rooms, or anything else of the kind." *Id.* at 681. But Justice

29

Alito properly recognized that there would be no respect for the Court's narrow view of its decision:

> What the Court has done today — interpreting discrimination because of 'sex' to encompass discrimination because of sexual orientation and gender identity — is virtually certain to have far-reaching consequences.  Over 100 federal statutes prohibit discrimination because of sex….  The Court's brusque refusal to consider the consequences of its reasoning is irresponsible.  [*Bostock* at 724-25 (Alito, J., dissenting).]

Almost immediately after inauguration, the Biden Administration began relying on *Bostock* to effectively amend a plethora of federal statutes claiming *Bostock* gave it the force of law to do so.  *See, e.g.,* 89 *Fed. Reg*. 33806-08 (Department of Education amending Title IX implementing regulations to cover sexual orientation and gender identity).  Thus, *Bostock* began to be used exactly as Justice Alito warned, in ways Justice Gorsuch had disclaimed.

Another example of "just one more step" is the Fourth Circuit's decision that the Fourteenth Amendment somehow compels a public school to allow one girl to use the boys' restroom.  *Gavin Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020).  Although that decision applied only to school restrooms, it is now being relied on to force public schools to let biological boys engage in girls sports.  *See B.P.J. v. West Virginia*, 98 F.4th 542 (4th Cir.

30

2024).  And the *Grimm* decision was also relied upon by the U.S. Department of Education Title IX rules.  *See* 89 *Fed. Reg.* 33542, 33807 ("Since *Bostock*, three Federal courts of appeals have held that the plain language of Title IX's prohibition on sex discrimination must be read similarly to Title VII's prohibition.  *See* … *Grimm*, 972 F.3d at 616.").

The pattern is clear.  Even though this case involves a challenge only to puberty blockers and cross-sex hormones, it soon will also apply to surgery.  If "gender affirming" pharmaceutical intervention is mandated today, then surgical intervention will be mandated tomorrow.  Therefore, as the Florida legislators understood, this Court in this case will decide if a parent has the authority to consent to the irreversible and mutilating surgical castration of a son.  On the other hand, it may be that 18 U.S.C. § 116 may prohibit comparable female genital mutilation.  That statute provides:  "It shall not be a defense to a prosecution under this section that female genital mutilation is required as a matter of religion, custom, tradition, ritual, or standard practice."  Therefore, if what is called "gender affirming" surgery could be performed only on boys, and not be permitted on girls, that would raise real equal protection issues.

31

## CONCLUSION

For the foregoing reasons, the decision of the district court should be reversed.

Respectfully submitted,

 /s/William J. Olson

KERRY L. MORGAN
  PENTIUK, COUVREUR & KOBILJAK, P.C.
  2915 Biddle Avenue, Suite 200
  Wyandotte, MI 48192

J. MARK BREWER
  209 N. Nugent Ave.
  Johnson City, TX 78636

JAMES N. CLYMER
  CLYMER MUSSER & SARNO, P.C.
  408 West Chestnut Street
  Lancaster, PA 17603

JOSEPH W. MILLER
  LAW OFFICES OF JOSEPH MILLER, LLC
  P.O. Box 83440
  Fairbanks, AK 99708

September 4, 2024
*Attorneys for Amici Curiae*

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA 22180-5615
  (703) 356-5070
  wjo@mindspring.com
*Attorney of Record

PATRICK MCSWEENEY
  3358 John Tree Hill Road
  Powhatan, VA 23139

RICK BOYER
  INTEGRITY LAW FIRM
  P.O. Box 10953
  Lynchburg, VA 24506

32

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Defendants-Appellants and Reversal, was made, this 4th day of September, 2024, by the Court's Case Management/ Electronic Case Files system upon the attorneys for the parties.

  /s/William J. Olson
William J. Olson
Attorney for *Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

IT IS HEREBY CERTIFIED:

1.    That the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Defendants-Appellants and Reversal complies with the type-volume limitation of Rule 29(a)(5), Federal Rules of Appellate Procedure, because this brief contains 6,484 words, excluding the parts of the brief exempted by Rule 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point CG Times.

                                         /s/ William J. Olson
                                    William J. Olson
                                    Counsel for *Amici*

                                    Dated: September 4, 2024

34