No. 24-11996

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

*Jane Doe et al.*,
Plaintiffs-Appellees,

v.

*Surgeon General, State of Florida et al.*,
Defendants-Appellants.

U.S. District Court for the Northern District of Florida, No. 4:23-cv-114
(Hinkle, J.)

## ANSWER BRIEF OF PLAINTIFFS-APPELLEES

Christopher F. Stoll
Kelly Jo Popkin
NATIONAL CENTER FOR
LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
(415) 365-1320
cstoll@nclrights.org

*Counsel for Plaintiffs-Appellees*

Thomas E. Redburn, Jr.
Maya Ginsburg
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 262-6700
tredburn@lowenstein.com

(Additional counsel listed on inside cover)

Simone Chriss
Chelsea Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890

Chris Erchull
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
(617) 426-1350

Sarah Warbelow
Cynthia Cheng-Wun Weaver
HUMAN RIGHTS CAMPAIGN
FOUNDATION
1640 Rhode Island Avenue NW
Washington, D.C. 20036
(202) 993-4180

*Counsel for Plaintiffs-Appellees*

*Jane Doe et al., v. Surgeon General, State of Florida et al.,*
No. 24-11996

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Per Rule 26.1 and Circuit Rule 26.1, Plaintiffs-Appellees certify that the following have an interest in the outcome of this case:

1. Abdul-Latif, Hussein, *Amicus*

2. Academic Pediatric Association, *Amicus*

3. Ackerman, Scot, *Defendant*

4. Ahmed, Aziza, *Amicus*

5. Alstott, Anne, *Amicus*

6. American Academy of Child and Adolescent Psychiatry, *Amicus*

7. American Academy of Family Physicians, *Amicus*

8. American Academy of Nursing, *Amicus*

9. American Academy of Pediatrics, *Amicus*

10. American Association of Physicians for Human Rights, Inc., *Amicus*

11. American College of Obstetricians and Gynecologists, *Amicus*

12. American College of Osteopathic Pediatricians, *Amicus*

13. American College of Physicians, *Amicus*

14. American Medical Association, *Amicus*

15.   American Pediatric Society, *Amicus*

16.   Andersen, Alison, *Counsel for Amicus*

17.   Antommaria, Armand, *Dekker Witness*[1]Archer, Phil, *Former Defendant*

18.   Archer, Phil, *Former Defendant*

19.   Aronberg, Dave, *Former Defendant*

20.   Association of American Medical Colleges, *Amicus*

21.   Association of Medical School Pediatric Department Chairs, Inc., *Amicus*

22.   Baker, Kellan, *Dekker Witness*

23.   Bakkedahl, Thomas, *Former Defendant*

24.   Barsoum, Wael, *Defendant*

25.   Bartlett, Bruce, *Former Defendant*

26.   Basford, Larry, *Former Defendant*

27.   Beato, Michael, *Counsel for Defendants*

---

[1] Pursuant to the District Court Final Order (Doc.223 at 2-3), the record in this case also relies on the "evidence presented during the trial of a separate case in this court with overlapping issues, *Dekker v. Weida,* No. 4:22cv325-RH-MAF." The *Dekker* case is on appeal in this Court, No. 23-12155.

28.   Bell, Daniel, *Former Counsel for Defendants*

29.   Benson, Matthew, *Defendant*

30.   Biggs, Michael, *Dekker Witness*

31.   Blickenstaff, David, *Counsel for Amicus*

32.   Boe, Bennett, *Former Plaintiff*

33.   Boe, Brenda, *Former Plaintiff*

34.   Brackett, John Matthew, *Dekker Witness*

35.   Bridges, Khiara, *Amicus*

36.   Brodsky, Ed, *Former Defendant*

37.   Bruggeman, Brittany, *Witness*

38.   Bruno, Nichole, *Plaintiff Gavin Goe's Doctor*

39.   Campbell, Jack, *Former Defendant*

40.   Cantor, James, *Dekker Witness*

41.   Chriss, Simone, *Counsel for Plaintiffs*

42.   Clemens, Jonathan, *Witness*

43.   Coe, Carla, *Former Plaintiff*

44.   Coe, Christina, *Former Plaintiff*

45.   Coffman, Gregory, *Defendant*

46.   Cohen, David, *Amicus*

47. Cohen, I. Glenn, *Amicus*

48. Creegan, Chris, *Defendant*

49. Cruz Evia, Rebecca, *Former Plaintiff*

50. Cryan, Michael, *Counsel for Amicus*

51. Dalton, Ann, *Dekker Witness*

52. Dandeneau, Debra, *Counsel for Amicus*

53. Dekker, August, *Dekker Plaintiff*

54. Derick, Amy, *Defendant*

55. Di Pietro, Tiffany, *Defendant*

56. Diamond, David, *Defendant*

57. Doe, Jane, *Plaintiff*

58. Doe, Susan, *Plaintiff*

59. Doe, Jane, *Dekker Plaintiff*

60. Doe, John, *Dekker Plaintiff*

61. Doe, Susan, *Dekker Plaintiff*

62. Donovan, Kevin, *Dekker Witness*

63. Ducatel, Watson, *Defendant*

64. Dunn, Chelsea, *Counsel for Plaintiffs*

65. Durrett, John, *Former Defendant*

66.  Edmiston, Kale, *Dekker Witness*

67.  Endocrine Society, *Amicus*

68.  English, Jeffrey, *Dekker Witness*

69.  Erchull, Christopher, *Counsel for Plaintiffs*

70.  Florida Agency for Healthcare Administration, *Dekker Defendant*

71.  Florida Board of Medicine, *Former Defendant*

72.  Florida Board of Osteopathic Medicine, *Former Defendant*

73.  Florida Chapter of the American Academy of Pediatrics, *Amicus*

74.  Foe, Fiona, *Former Plaintiff*

75.  Foe, Freya, *Former Plaintiff*

76.  Fox, Amira, *Former Defendant*

77.  Galarneau, Charlene, *Amicus*

78.  Garcia, Maria, *Defendant*

79.  Ginsburg, Maya, *Counsel for Plaintiffs*

80.  Gladson, William, *Defendant*

81.  Goe, Gavin, *Plaintiff*

82.  Goe, Gloria, *Plaintiff*

83.  Goldberg, Noah, *Counsel for Amicus*

84.  Goodman, Kenneth, *Witness*

85.  Grossman, Joanna, *Amicus*

86.  Grossman, Miriam, *Dekker Witness / Third-party*

87.  Haas, Brian, *Former Defendant*

88.  Hamel, Lucien, *Plaintiff*

89.  Hart, Joseph, *Former Counsel for Defendants*

90.  Hartnett, Kathleen*, Counsel for Amicus*

91.  Helstrom, Zoe, *Counsel for Amicus*

92.  Hinkle, Robert, *U.S. District Court Judge*

93.  Hruz, Paul William, *Dekker Witness*

94.  Hunter, Patrick, *Defendant*

95.  Hutton, Kim, *Dekker Witness*

96.  Ikemoto, Lisa, *Amicus*

97.  Isasi, William, *Counsel for Amicus*

98.  Jackson, Valerie, *Defendant*

99.  Jacobs, Arthur, *Counsel for Former Defendants & Defendant*

100.  Janssen, Aron Christopher, *Dekker Witness & Witness*

101.  Jazil, Mohammad, *Counsel for Defendants*

102.  Justice, Nicole, *Defendant*

103. K.F., *Dekker Plaintiff*

104. Kaliebe, Kristopher Edward, *Dekker Witness*

105. Kamody, Rebecca, *Amicus*

106. Kang, Katelyn, *Counsel for Amicus*

107. Karasic, Dan, *Dekker Witness & Witness*

108. Kirsh, William, *Defendant*

109. Kramer, Brian, *Former Defendant*

110. Kuper, Laura, *Amicus*

111. Ladapo, Joseph, *Defendant*

112. Ladue, Jade, *Dekker Plaintiff*

113. Langford, Vernon, *Witness*

114. Lannin, Cortlin, *Counsel for Amicus*

115. Laidlaw, Michael, *Dekker Witness*

116. Lappert, Patrick, *Dekker Witness*

117. Larizza, R.J., *Former Defendant*

118. Levi, Jennifer, *Counsel for Plaintiffs*

119. Levine, Stephen, *Dekker Witness & Witness*

120. Loe, Linda, *Former Plaintiff*

121. Loe, Lisa, *Former Plaintiff*

122.  Lopez, Susan, *Former Defendant*

123.  Lynch, Myles S., *Counsel for Defendants*

124.  Madden, Ginger, *Former Defendant*

125.  Mandelbaum, Sara, *Counsel for Plaintiffs*

126.  Manian, Maya, *Amicus*

127.  Marstiller, Simone, *Dekker Former Defendant*

128.  McNamara, Meredithe, *Amicus*

129.  Minter, Shannon, *Counsel for Plaintiffs*

130.  Mondry, Emily, *Counsel for Amicus*

131.  Moody, Ashley, *Former Defendant*

132.  Mor, Yuval, *Counsel for Amicus*

133.  Mortensen, Monica, *Defendant*

134.  Nangia, Geeta, *Dekker Witness*

135.  National Association of Pediatric Nurse Practitioners, *Amicus*

136.  Nelson, Melissa, *Former Defendant*

137.  Noel, Olivia, *Former Plaintiff*

138.  Oberman, Michelle, *Amicus*

139.  Olson-Kennedy, Johanna, *Dekker Witness*

140. Pages, Luz, *Defendant*

141. Patel, Ami, *Counsel for Plaintiffs*

142. Pediatric Endocrine Society, *Amicus*

143. Peral, Stephanie, *Former Counsel for Plaintiffs*

144. Percival, James, II, *Counsel for Defendants*

145. Perko, Gary, *Counsel for Defendants*

146. Pimentel, Eleonor, *Defendant*

147. Poe, Patricia, *Former Plaintiff*

148. Poe, Paul, *Former Plaintiff*

149. Pope, Kai, *Former Plaintiff*

150. Popkin, Kelly Jo, *Counsel for Plaintiffs*

151. Pratt, Joshua, *Former Counsel for Defendants*

152. Pryor, Harold, *Former Defendant*

153. Purvis, Dara, *Amicus*

154. Rebouche, Rachel, *Amicus*

155. Redburn, Thomas, Jr., *Counsel for Plaintiffs*

156. Roman, Sven, *Witness*

157. Romanello, Nicholas, *Defendant*

158. Rothstein, Brit, *Dekker Plaintiff*

159.  Rundle, Katherine, *Former Defendant*

160.  Schechter, Loren, *Dekker Witness & Witness*

161.  Scott, Sophie, *Dekker Witness*

162.  Shumer, Daniel, *Dekker Witness & Witness*

163.  Silbey, Jessica, *Amicus*

164.  Silverman, Lawrence, *Counsel for Plaintiffs*

165.  Societies for Pediatric Urology, *Amicus*

166.  Society for Adolescent Health and Medicine, *Amicus*

167.  Society for Pediatric Research, *Amicus*

168.  Society of Pediatric Nurses, *Amicus*

169.  Spektrum Health, Inc., *Amicus*

170.  Stafford, William, III, *Counsel for Defendants*

171.  Starr, Jason, *Counsel for Plaintiffs*

172.  Stoll, Christopher, *Counsel for Plaintiffs*

173.  SunServe, *Amicus*

174.  Szilagyi, Nathalie, *Amicus*

175.  Transgender Health Education Network, *Amicus*

176.  TransSocial, *Amicus*

177.  Ulrich, Michael, *Amicus*

178. Van Meter, Quentin, *Dekker Witness*

179. Van Mol, Andre, *Dekker Witness*

180. Vazquez, Paul, *Witness*

181. Veroff, Julie, *Counsel for Amicus*

182. Veta, D. Jean, *Counsel for Amicus*

183. Vigil, Anegla, *Counsel for Amicus*

184. Vila, Hector, *Defendant*

185. Ward, Dennis, *Former Defendant*

186. Wasylik, Michael, *Defendant*

187. Weaver, Cynthia, *Counsel for Plaintiffs*

188. Weida, Jason, *Dekker Defendant*

189. Whitaker, Henry, *Counsel for Defendants*

190. Williams, Gregory, *Defendant*

191. Witthoeft, Emily, *Counsel for Defendants*

192. World Professional Association for Transgender Health, *Amicus*

193. Worrell, Monique, *Former Defendant*

194. Zachariah, Zachariah, *Defendant*

195. Zanga, Joseph, *Dekker Witness*

*Jane Doe et al., v. Surgeon General, State of Florida et al.,*
No. 24-11996

Per Circuit Rule 26.1-2(c), Plaintiffs-Appellees certify that the CIP

contained herein is complete.

Date: October 2, 2024

*s/ Thomas E. Redburn, Jr.*
Thomas E. Redburn, Jr.
Counsel for Plaintiffs-Appellees

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........................................ C-1

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ................................................................................. 1

COUNTERSTATEMENT OF THE ISSUES ............................................. 4

STATEMENT OF THE CASE AND FACTS ............................................ 5

I.    SB 254 AND THE BOARD RULES ................................................. 6

II.   THE DISTRICT COURT FOUND THAT THE STATE OF FLORIDA RADICALLY DEPARTED FROM ITS ORDINARY PROCESS AND SOUGHT A PREDETERMINED OUTCOME IN CREATING THE GAPMS REPORT ................................................................... 8

III.  THE DISTRICT COURT FOUND THAT THE MEDICAL BOARDS ALSO SIGNIFICANTLY DEPARTED FROM THEIR ORDINARY PROCESS AND WERE IMPROPERLY MOTIVATED BY PREJUDICE IN PROMULGATING THE CHALLENGED RULES ........................ 13

IV.   THE DISTRICT COURT FOUND THAT THE LEGISLATIVE PROCESS WAS SIGNIFICANTLY MOTIVATED BY ANTI-TRANSGENDER PREJUDICE ............. 15

V.    THE DISTRICT COURT FOUND THAT THE INFORMED CONSENT FORMS ARE INACCURATE AND MISLEADING AND WERE DESIGNED TO DETER TRANSGENDER PEOPLE FROM OBTAINING HEALTHCARE, NOT TO FURTHER INFORMED CONSENT ................................................................. 19

VI.   THE DISTRICT COURT FOUND THAT THE MEDICAL CARE PROVIDED TO TRANSENDER ADOLESCENTS

AND ADULTS IS SAFE AND EFFECTIVE, WIDELY ACCEPTED BY THE MEDICAL COMMUNITY, SUPPORTED BY EVIDENCE GREATER THAN OR COMPARABLE TO THAT SUPPORTING MOST OTHER MEDICAL TREATMENTS, AND RESULTS IN EXTREMELY LOW RATES OF REGRET ................................... 23

    A.    The District Court Found that Transgender Identity Is Innate ........................................................................ 23

    B.    The District Court Found that Gender Dysphoria Is A Serious But Highly Treatable Medical Condition ............. 24

    C.    The District Court Found That The Quality Of Evidence Supporting Treatment For Gender Transition Meets or Exceeds that Supporting Most Other Medical Care ................................................................ 26

    D.    The District Court Found That The Protocols for Diagnosing And Treating Gender Dysphoria Are Comparable to Other Well-Established Medical Protocols ................................................................... 27

    E.    The District Court Found That Regret Following Gender Transition Is Rare ........................................... 28

STANDARD OF REVIEW .................................................................. 29

SUMMARY OF ARGUMENT ............................................................. 30

ARGUMENT ..................................................................................... 32

I.    THE DISTRICT COURT FOLLOWED EKNES-TUCKER'S DIRECTIVE TO DETERMINE WHETHER PURPOSEFUL DISCRIMINATION WAS A MOTIVATING FACTOR FOR FLORIDA'S STATUTE AND RULES ...................................................................... 32

II.    THE DISTRICT COURT'S ANIMUS FINDINGS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE ............................ 35

A. The District Court Correctly Applied the Presumption of Legislative Good Faith, and Its Finding that the Presumption Was Overcome Was Not Clearly Erroneous ................................................................ 35

B. The District Court's Finding that the Impact of the Statute and Rules Falls Disproportionately on Transgender Floridians Was Clearly Correct ...................... 38

C. The District Court's Conclusion that the Arlington Heights Factors Supported a Finding of Animus Is Supported by Substantial Evidence ..................................... 42

    1. Impact, Foreseeability, and Knowledge ................................. 43

    2. Historical Background ........................................................... 44

    3. Sequence of Events Leading to Passage ................................ 46

    4. Procedural And Substantive Irregularities ........................... 51

    5. Contemporary Statements and Actions of Key Legislators .......................................................................... 53

    6. Less Discriminatory Alternatives .......................................... 59

III. The District Court Properly Held That The Challenged Measures Fail Both Heightened Scrutiny And, Because They Are Based On Animus, Even Rational Basis Review ........... 61

IV. The District Court Properly Held That The Challenged Measures Violate Plaintiff Parents' Right to Due Process ............ 65

CONCLUSION ........................................................................... 66

CERTIFICATE OF COMPLIANCE ........................................... 68

CERTIFICATE OF SERVICE .................................................... 69

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. St. Johns County,*
   57 F.4th 791 (11th Cir. 2022) (en banc) ............................................. 33

*Bellitto v. Snipes,*
   935 F.3d 1192 (11th Cir. 2019) ............................................................ 30

*Brnovich v. Democratic Nat'l Comm.,*
   594 U.S. 647 (2021) ............................................................................. 56

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ........................................................................ 58, 59

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985) ........................................................................ 44, 64

*Dekker v. Weida,*
   679 F. Supp. 3d 1271 (N.D. Fla. 2023) ...................................... *passim*

*Dobbs v. Jackson Women's Health Organization,*
   597 U.S. 215 (2022) ........................................................................ 40, 41

*Doe v. Ladapo,*
   Case No. 4:23cv114-RH-MAF ...................................................... *passim*

*Eknes-Tucker v. Governor of Ala.,*
   80 F.4th 1205 (11th Cir. 2023) ................................................... *passim*

*Fellowship of Christian Athletes v. San Jose Unified Sch.*
   *Dist. Bd. of Educ.,*
   82 F.4th 664 (9th Cir. 2023) (en banc) ............................................... 59

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.,*
   830 F.3d 1242 (11th Cir. 2016) ............................................................ 29

*Geduldig v. Aiello,*
   417 U.S. 484, 496, n. 20 (1974) ........................................................... 41

iv

*Greater Birmingham Ministries v. Sec'y for State of Alabama,*
    992 F.3d 1299 (11th Cir. 2021) .................................................... *passim*

*Hodges v. United States,*
    78 F.4th 1365 (11th Cir. 2023) ................................................. 3, 29, 30

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) ...................................................................... 29, 55

*Hunter v. Underwood,*
    471 U.S. 222, 227-28 (1985) ......................................................... 37, 61

*Jacksonville Branch of NAACP v. City of Jacksonville,*
    No. 22-13544, 2022 WL 16754389 (11th Cir. Nov. 7, 2022) .............. 55

*Johnson v. Governor of Florida,*
    405 F.3d 1214 (11th Cir. 2005) (en banc) ........................................ 33

*L.W. v. Skrmetti,*
    73 F.4th 408 (6th Cir 2023), *cert. granted*, 144 S. Ct. 2679
    (June 24, 2024) ............................................................................... 34

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State,*
    66 F.4th 905 (11th Cir. 2023) .................................................. 2, 29, 56

*Masterpiece Cakeshop v. Colorado C.R. Comm'n,*
    584 U.S. 617 (2018) ...................................................................... 57, 59

*Morrissette-Brown v. Mobile Infirmary Med. Ctr.,*
    506 F.3d 1317 (11th Cir. 2007) ......................................................... 30

*North Carolina State Conf. of NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016) ............................................................. 37

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) .......................................................................... 33

*Pullman-Standard v. Swint,*
    456 U.S. 273 (1982) .......................................................................... 29

*Reno v. Bossier Par. Sch. Bd.*,
   520 U.S. 471 (1997) ............................................................... 39

*Romer v. Evans*,
   517 U.S. 620, 631 (1996) ...................................................... 63

*Sessions v. Morales-Santana*,
   582 U.S. 47 (2017) ................................................................. 62

*Thompson v. Sec'y of State for Ala.*,
   65 F.4th 1288 (11th Cir. 2023) ............................................ 61

*United States Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973) ............................................................... 64

*United States v. O'Brien*,
   391 U.S. 367 (1968) ............................................................... 57

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ...................................................... *passim*

*Washington v. Davis*,
   426 U.S. 229 (1976) ...................................................... 34, 39

*Young Apartments, Inc. v. Town of Jupiter*,
   529 F.3d 1027 (11th Cir. 2008) .......................................... 33

**Statutes**

2023 Fla. Laws ch. 2023-90 .......................................................... 7

Fla. Stat. § 61.517(1)(c) .............................................................. 51

Fla. Stat. § 61.534(1) .................................................................. 51

Fla. Stat. § 286.311 .................................................................... 50

Fla. Stat. § 456.001(9) ................................................................ 41

Fla. Stat. § 456.52(2) .................................................................. 19

Fla. Stat. § 1000.071(1) .............................................................. 47

**Other Authorities**

2021 Leg., 123rd Reg. Sess. (Fla. 2021)..................................50

2022 Leg., 124th Reg. Sess. (Fla. 2022)..................................50

2023 Leg., 125th Reg. Sess. (Fla. 2023)..................................50

Fourteenth Amendment....................................................4, 32

Equal Protection Clause.............................................*passim*

Fla. Admin. Code r. 64..............................................*passim*

House Bill 1069..........................................................50

House Bill 1557..........................................................50

Senate Bill 254........................................................7, 8

Senate Bill 1028.........................................................50

Senate Bill 1438.........................................................50

**INTRODUCTION**

This appeal comes before the Court on a full record established after two plenary trials. Based on that record, the District Court issued 105 pages of detailed factual findings and legal conclusions. The District Court cited item after item of evidence establishing that the process that led to the adoption of medical board rules and, later, a statute banning or restricting medical care for transgender Floridians was infected from the outset by discriminatory animus against transgender persons.

The record included evidence reflecting anti-transgender bias by decisionmakers at every relevant level of Florida's government—the Governor, the Surgeon General, the Legislature and the Boards of Medicine and Osteopathic Medicine (the "Boards"). Much of that evidence came from officials' own publicly-uttered words, but it also included the manufacturing of a scientifically flawed and biased report specifically engineered to justify a ban, the flouting of normal rulemaking procedures to elevate voices opposed to medical care for transgender people, and the adoption of some of the most extreme restrictions on medical care for transgender people that have been enacted in any state—going so far as to impose limitations on the ability of competent adults to seek

established, widely accepted medical care for no reason other than the fact that they are transgender.

In granting a permanent injunction against the statute and rules, the District Court faithfully applied the presumption of legislative good faith and found, based on the evidence before it, that the presumption was overcome in spades. The District Court scrupulously followed this Court's directive to examine the record to determine whether the challenged statute and rules were "a pretext for invidious discrimination" against transgender Floridians. *Eknes-Tucker v. Governor of Ala.,* 80 F.4th 1205, 1230 (11th Cir. 2023). In so doing, the District Court considered each of the relevant factors and determined that the evidence strongly supported a finding that an improper discriminatory purpose was "a motivating factor" in the adoption of the statute and rules, requiring application of heightened scrutiny. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 922 (11th Cir. 2023). The District Court then determined, based on the evidence, that the ban and restrictions failed intermediate scrutiny because Defendants' proffered justifications were "largely pretextual" and offered

no "rational basis for denying properly screened patients the option to choose this treatment." *Doe* Order at 83, 88.

Defendants largely treat the trial record, and the District Court's meticulous findings, as if they did not exist. They present their own version of the statute's and rules' adoption without noting that the District Court found, at every turn, that the evidence was contrary to Defendants' narrative. Defendants fall far short of demonstrating that the District Court's findings fail the clear error standard—their burden on this appeal. *See Hodges v. United States*, 78 F.4th 1365, 1374 (11th Cir. 2023). This burden is a heavy one, and Defendants make no genuine attempt to meet it.

A review of the actual record from the two trials, as opposed to Defendants' invented narrative, demonstrates that the District Court's findings are supported by substantial evidence. The challenged statute and rules have a stark and obvious disparate impact on transgender individuals, an impact that was both foreseeable and known to the relevant decisionmakers. The record demonstrates that the banned or restricted treatments are safe, effective, and evidence-based, comparable to other widely accepted medical care. Florida's ban and restrictions

represent an abrupt reversal from the State's prior determination that these medications are well-established and widely accepted treatments. The trial evidence established that, at each stage, the rulemaking and legislative processes were politically motivated, not driven by consumer complaints or adverse patient impacts, and that the Board processes that preceded promulgation of the rules involved unprecedented departures from ordinary administrative practices. The adoption of the challenged statute and rules was further punctuated by statements from decisionmakers reflecting overt hostility toward transgender individuals and false, sensational claims about transgender healthcare, and took place within a broader context of numerous other laws targeting transgender people.

The District Court's findings are comprehensive, fully supported by the record, and firmly establish that the challenged statute and rules reflect an improper discriminatory purpose in violation of the Fourteenth Amendment. This Court should affirm.

## COUNTERSTATEMENT OF THE ISSUES

1.    Did the District Court clearly err in finding, based on the evidence at trial, that a discriminatory purpose was a motivating factor

in the enactment of Florida's statute and rules banning medical care for transgender adolescents and restricting it for adults?

2.     Did the District Court clearly err in finding that Florida's ban and restrictions failed heightened scrutiny and even rational basis review where the evidence showed the challenged laws undermine rather than protect the health of transgender people, cause serious suffering and harm and, absent animus, would not have been enacted?

3.     Did the District Court clearly err in finding that Florida's ban and restrictions violate the requirement of due process where the evidence showed that they are based on animus and thus fail even rational basis review?

## STATEMENT OF THE CASE AND FACTS

This case concerns rules promulgated by the Boards and a law passed by the Legislature banning medical care for transgender adolescents and restricting medical care for transgender adults. By stipulation of the parties, the record in this case includes the entire record from a seven-day trial in *Dekker v. Weida*, 679 F. Supp. 3d 1271 (N.D. Fla. 2023), which included testimony from thirteen experts, eight fact witnesses, and more than 380 trial exhibits. The record additionally

includes a three-day trial in this case, *Doe v. Ladapo*, Case No. 4:23cv114-RH-MAF, consisting of testimony from nine expert witnesses, four fact witnesses, and more than 130 additional trial exhibits.

Based on this record, the District Court made detailed findings—including findings about the credibility of experts and witnesses—to support its determination that the barred treatments are safe and effective and that bias against transgender people was a motivating factor in the enactment of the challenged rules and law. As the District Court found: "The State of Florida can regulate as needed but cannot flatly deny transgender individuals safe and effective medical treatment—treatment with medications routinely provided to others with the state's full approval so long as the purpose is not to support the patient's transgender identity." *Doe* Doc.223 at 10 [hereinafter "*Doe* Order"]. The following summarizes the court's findings.

## I.    SB 254 AND THE BOARD RULES

The initial Board rules prohibited medical providers in Florida from prescribing puberty blockers and hormones for transgender adolescents. *See* Fla. Admin. Code r. 64B8-9.019(1)(b) (March 16, 2023); r. 64B15-14.014(1)(b) (March 28, 2023). After Plaintiffs filed this action

challenging those rules, the Florida legislature enacted Senate Bill 254 ("SB 254"), which was signed into law on May 17, 2023. Plaintiffs then amended their complaint to challenge SB 254 and the additional emergency rules and informed consent forms subsequently adopted by the Boards to implement SB 254. *See* Fla. Admin. Code r. 64B8ER23-7, 64B15ER23-9, r. 64B8ER23-11, r. 64B15ER23-12 ("emergency rules").

SB 254 prohibits certain medications when prescribed or administered to transgender adolescents and restricts these treatments for transgender adults. Specifically, the law:

1. Prohibits the use of puberty blockers and hormones to treat transgender adolescents, with a limited exception for those already receiving these medications prior to the effective date of the law;

2. Restricts the provision of these treatments to transgender adults, including: a) prohibiting treatment by healthcare providers other than physicians; and b) requiring transgender patients to sign government-generated written informed consent forms in the presence of a physician;

3. Directs the Boards to create informed consent forms through emergency rulemaking;

4. Prohibits the use of telehealth to initiate transgender health care; and

5. Imposes civil and criminal penalties for violations of these provisions.

2023 Fla. Laws ch. 2023-90 (S.B. 254).

The emergency rules that the Boards adopted to implement SB 254 prohibit licensed practitioners from treating transgender adolescents with puberty blockers or hormone therapies. For transgender adolescents already receiving these medications, the emergency rules mandate numerous requirements, such as x-rays and DEXA scans, that serve no medical purpose. The emergency rules also require patients and parents to sign lengthy consent forms with government-prescribed language and impose significant and unprecedented restrictions on the provision of healthcare to transgender adults.

## II. THE DISTRICT COURT FOUND THAT THE STATE OF FLORIDA RADICALLY DEPARTED FROM ITS ORDINARY PROCESS AND SOUGHT A PREDETERMINED OUTCOME IN CREATING THE GAPMS REPORT

The District Court found that the legislative and administrative actions challenged in this case were tainted by impermissible prejudice against transgender individuals, including significant deviations from normal procedure. The procedural deviations began well before SB 254 passed, with the creation of the generally accepted professional medical standards ("GAPMS") report prepared in 2022 by the Florida Agency for Health Care Administration ("AHCA") at the direction of the Executive Office of the Governor. *Doe* Order at 48, 52–53.

The District Court made detailed findings about the history and development of this report, which provided the foundation for the Boards' regulations as well as the Legislature's enactment of SB 254. *See Dekker* Order at 8–10. The State departed from its ordinary process and practice in developing this report, including—for the first time in its history— commissioning a new GAPMS report for treatments that were already covered by Florida Medicaid and that prior GAPMS reports had deemed to be consistent with generally accepted medical standards. Ordinarily, AHCA prepares a GAPMS report only when first considering Medicaid coverage of a new treatment. *See Dekker* Doc.246 at 8 [hereinafter "*Dekker* Order"]; *Dekker* Pls.' Ex. 238, *Dekker* Doc.181-2; *see also Dekker* Trial Tr., Doc. 227 at 165. In this case, AHCA had already performed this analysis and issued a GAPMS report in 2016, concluding that Medicaid should cover puberty blockers for transgender adolescents, *Dekker* Order at 8; *Dekker* Pl.'s Ex. 240, Doc. 181-4 at 9, and completed a draft GAPMS report in 2017, reaching the same conclusion with respect to hormone therapy. *Dekker* Order at 8–9. *Dekker* Pl.'s Ex. 243, Doc.181-7 at 1, 11.

Notwithstanding these existing reports and AHCA's longstanding coverage of these treatments, the Executive Office of the Governor

directed AHCA to conduct a new GAPMS analysis of puberty blockers and hormones for transgender patients. *Doe* Order at 68; *Dekker* Order at 9. For the first time ever, AHCA elected to prepare another report for already-approved treatments in order to exclude coverage for those treatments. *Dekker* Trial Tr., Doc.227 at 183–84.

The District Court identified several other, equally significant departures from the ordinary process. Ordinarily, requests for GAPMS reports come from providers or manufacturers seeking to obtain Medicaid coverage for treatments they provide, not from state officials. *Id.* at 169-71. In this case, for the first time, the request came from the Office of the Governor seeking to exclude coverage. *Id.* at 169–71.

Similarly, in all prior cases, AHCA prepared GAPMS reports internally. In this case, for the first time, AHCA retained external consultants to do so. *Doe* Order at 68; *Dekker* Order at 9; *Dekker* Trial Tr., Doc.227 at 178–79. In addition, rather than retaining neutral experts, AHCA deliberately sought out and retained consultants who were known in advance to have strong views opposing medical care for

transgender adolescents.[2] Jeff English, the AHCA staff person who ordinarily would have been the person to draft such a report, testified that this was a radical departure from past practices and that he left his position rather than collaborate in what he believed to be an unfair and unprincipled process. *Dekker* Trial Tr., Doc. 227 at 162–65; *Doe* Order at 68 ("The person who routinely prepares GAPMS reports was bypassed and a new, specially selected person was inserted."). In yet another departure from ordinary practice, these consultants were also retained to attend AHCA's public hearing to rebut comments from members of the public opposing the State's actions, which the agency had never done before. *Dekker* Doc.120-6, at 177:14–20, 180:12-25; *Dekker* Doc.120-9, at 120:13-121:10, *Dekker* Pls' Ex. 290, *Dekker* Doc.182-29 at 3–4. *See also Dekker* Pls.' Ex. 296, *Dekker* Doc.182-36; *Doe* Doc. 215-1, at 10.

The District Court further found that the report's conclusions were not supported by the evidence and were contrary to generally accepted medical standards. *Doe* Order at 68. Based on the medical evidence and

---

[2] For example, three of those consultants had authored an amicus brief opposing such care in another proceeding. *Dekker* Doc.100, Ex.10. Another consultant had publicly stated that transgender healthcare is a "lie," a "moral violation," a "huge evil," and "diabolical." *Dekker* Order at 4–5; *Dekker* Trial Tr., Doc.239, at 129–30.

expert testimony presented in both *Dekker* and this case, the District Court found that the "overwhelming weight of medical authority supports treating transgender patients" with the treatments in question. *Dekker* Order at 18. The court noted that the State had failed to identify "a single reputable medical association [that] has taken a contrary position." *Id.* The GAPMS report led to AHCA passing a rule banning coverage of these treatments for Florida Medicaid beneficiaries. *See* Fla. Admin. Code r. 59G-1.050(7). The District Court concluded that the rule was adopted after a "well-choreographed public-hearing that was an effort not to gather facts but to support the predetermined outcome." *Dekker* Order at 10.

Based on these and other relevant facts, the District Court found that the new GAPMS process was infected by bias and improperly designed to reach a predetermined outcome of banning medical treatments for transgender adolescents, not to undertake a neutral analysis of the evidence. *Doe* Order at 68; *Dekker* Order at 9; *see also Dekker* Pls.' Ex. 296, *Doe* Doc.215-1, at 10.

## III. THE DISTRICT COURT FOUND THAT THE MEDICAL BOARDS ALSO SIGNIFICANTLY DEPARTED FROM THEIR ORDINARY PROCESS AND WERE IMPROPERLY MOTIVATED BY PREJUDICE IN PROMULGATING THE CHALLENGED RULES

The District Court made detailed findings regarding the significant extent to the which the Boards departed from their ordinary processes and were motivated by prejudice against transgender people in promulgating the challenged rules. Following the issuance of the GAPMS report, the Surgeon General—whom the District Court found had, "[f]rom the outset, . . . manifested his opposition to transgender identity"— directed the Boards to initiate rulemaking to ban healthcare for transgender adolescents and to restrict it for transgender adults, even appearing in person at Board meetings to present the petition. *Doe* Order at 52–53; *Doe* Pls.' Ex. 15, *Doe* Doc.177-5; *Doe* Pls.' Ex. 16, *Doe* Doc.177-6 at 5–7; *Doe* Doc.178-1 at 11, 17–18. As the District Court found, "this was a departure from the usual procedure. So far as this record reflects, rulemaking had never been initiated this way." *Doe* Order at 52–53.

The District Court found that the Boards' processes, similarly, significantly deviated from their ordinary practices. *Id.* In "another departure from usual procedure," a Board member and the Boards'

Executive Directors "arranged for speakers to oppose gender-affirming care at the required public hearings." *Doe* Order at 53 & n.112 (listing email communications between Board members and staff arranging for testimony). The Board even invited several known opponents of transgender healthcare to participate on the hearing panel to respond to any commenters who opposed the rule. *Dekker* Trial Tr., Doc. 240 at 62. In sum, the District Court found that "the Boards departed from their usual procedures, orchestrated public hearings, and single-mindedly pursued the predetermined outcome sought by the Governor and Surgeon General." *Doe* Order at 52.

The Boards subsequently issued rules barring licensed practitioners from providing "[p]uberty blocking, hormone, or hormone antagonist therapies" to adolescent transgender patients. Fla. Admin. Code r. 64B8-9.019(1)(b); Fla. Admin Code r. 64B15-14.014(1)(b). Later, following the enactment of SB 254, the Boards promulgated emergency rules and informed consent forms as required by the statute. The emergency rules included additional requirements for transgender adolescents already receiving these medications that, the District Court found, "have no medical justification and were plainly intended to

prevent or impede patients from receiving gender-affirming care." *Doe Order* at 53. These included requirements of unnecessary annual hand x-rays, Fla. Admin. Code r. 64B8ER23-7(4)(f), r. 64B15ER23-9(4)(f), and annual bone density scans that "no competent provider trained in this field would prescribe," *Doe* Order at 78 (analyzing Fla. Admin. Code r. 64B8ER23-7(4)(g), r. 64B15ER23-9(4)(g)). The Boards also dramatically restricted the mental health professionals authorized to provide annual mental health assessments to transgender adolescents, excluding licensed clinical social workers and other previously qualified mental health providers. Fla. Admin. Code r. 64B8ER23-7(4)(h), r. 64B15ER23-9(4)(h). The court found that this exclusion "makes no sense," "departs from the accepted standard of care," and appeared designed to "reduce[] the ability of patients to receive gender-affirming care." *Doe* Order at 80.

## IV. THE DISTRICT COURT FOUND THAT THE LEGISLATIVE PROCESS WAS SIGNIFICANTLY MOTIVATED BY ANTI-TRANSGENDER PREJUDICE

Based on a careful review of the entire legislative history and record, the District Court found the "greater weight of the evidence" supports a conclusion that a *majority* of legislators in both houses were motivated, at least in part, by anti-transgender animus. *Id.* at 51.

The District Court found that just as the administrative proceedings were shot through with anti-transgender animus, so too were the legislative proceedings rife with expressions of explicit anti-transgender bias from the early stages of the legislative process through passage and beyond. *See generally Doe* Order at 42–47.

During legislative hearings on a related bill, one House member referred to transgender witnesses as "mutants living among us on Planet Earth." *Doe* Order at 42 n. 84. He continued,

> [T]he Lord rebuke you Satan and all of your demons and imps that come and parade before us. That's right, I called you demons and imps who come and parade before us and pretend that you are part of this world.

*Id.*

The District Court found that legislators also repeatedly made patently false and highly sensationalized claims about "castration," "mutilation," and "sterilization" of children. *Doe* Order at 45–46. One House co-sponsor of the bill declared: "[W]e're talking about taking little children and they put them to sleep on a gurney. They cut off their breasts. They sever their genitalia. They throw them in the trash." *Doe* Order at 46. No legislator who voted in favor of the bill expressed disagreement with this gross mischaracterization, despite it being, in the

District Court's words, "about as far removed from reality as any statement by any legislator ever." *Doe* Order at 46.

The Governor echoed these false and sensational claims, stating that transgender health care means "castrating a young boy, you're sterilizing a young girl, and you're doing mastectomies for these very young girls." *Doe* Order at 45. Before a joint session of the Florida legislature, he referred to healthcare for transgender adolescents as "mutilating" children. *Id*. Defendants' attorney acknowledged at trial that there was no factual basis for these false claims. *Doe* Trial Tr., Doc. 212 at 272.

Multiple legislators—including bill sponsors—stated there is no such thing as transgender identity, calling it "made up," and repeatedly indicated that the purpose of the bill was to prevent or discourage people from being transgender. *Doe* Order at 43 n.86 (collecting statements). For example, the House sponsor of HB 1421, referred to transgender healthcare as "play[ing] 'choose your own adventure'" and voiced his belief that transgender identity is delusional, stating, "I can say I'm a porcupine, but that doesn't make it so." *Doe* Order at 43. Other legislators voiced similar beliefs, stating, for example, "[W]e cannot speak something

into existence that doesn't exist. We cannot change our sex." *Id*. Yet another: "[Y]ou are either male or female. This is not subject to one's opinion." *Id*. Another statement referred to transgender people as "mistakes." *Id*.

After the bill passed, a sponsor made clear transgender persons and their parents are not welcome in the State of Florida, stating: "Just got a media call for comment on people leaving FL because of my bill making child castration illegal. My reply? Good riddance. Take your evil elsewhere. I hear they love mutilating kids in the woke paradise of CA." *Id*. at 46.

The District Court also noted the Legislature's simultaneous enactment of another measure targeting transgender people, which declared it to be the "policy" of Florida schools that "a person's sex is an immutable biological trait" and prohibiting transgender teachers from using pronouns consistent with their gender identity. *Doe* Order at 51.

In sum, based on the entire legislative record, history, and context leading up to the statute, the District Court found: "This record includes overwhelming evidence that the House sponsors and a significant number of other House members were motivated by anti-transgender

animus. This is clear from their own animus-based statements and from the failure of other members to call them out. . . . [T]he record also shows, by the greater weight of the evidence, that a majority of legislators in both houses and the Governor were so motivated, at least in part." *Id.*

## V. THE DISTRICT COURT FOUND THAT THE INFORMED CONSENT FORMS ARE INACCURATE AND MISLEADING AND WERE DESIGNED TO DETER TRANSGENDER PEOPLE FROM OBTAINING HEALTHCARE, NOT TO FURTHER INFORMED CONSENT

Once enacted, SB 254 required the Boards to adopt, on an emergency basis, informed consent forms for transgender health care. Fla. Stat. § 456.52(2). The District Court found that the grossly distorted, inaccurate, and misleading nature of these forms constituted clear "evidence of the Boards' animus—of a goal to prevent or impede individuals from pursuing their transgender identities." *Doe* Order at 54. Relying on the extensive expert testimony at trial, the court found that the forms were

> untrue and misleading in substantial respects, omit any discussion of benefits, address not only risks of treatments a patient will receive but also of treatments the patient will *not* receive, include incomprehensible provisions no patient could be expected to understand, and are plainly intended to dissuade patients from obtaining gender-affirming care, not to ensure that patients are fully informed of the relevant risks and benefits.

*Id.* (emphasis in original).

The Boards created three forms for adults (one each for masculinizing medications, feminizing medications, and surgery) and three forms for adolescents (one each for puberty blockers, masculinizing medications, and feminizing medications). *Id.* at 54. The court found that each of these forms suffered from "similar flaws." *Id.* at 55. Rather than serve as part of an "honest, open [process] intended to convey accurate information so that the patient can make a fully informed, voluntary decision," the forms were "advocacy document[s]—the very antithesis of what an informed-consent process should be." *Id.* at 55–56. For example, the board member who served as principal drafter[3] of the forms deleted a section from the puberty blockers form that explained the benefits of these medications, *id.* at 55, and omitted discussion of the risks of forgoing treatment. *Doe* Trial Tr., *Doe* Doc.212 at 101–02. At trial, she could not explain her actions. *Doe* Order at 55 (citing *Doe* Trial Tr., *Doe*

---

[3] The principal drafter, Dr. Mortensen, is a member of the Florida Board of Osteopathic Medicine. She does not provide care to patients with gender dysphoria; has conducted no research and authored no publications about gender dysphoria treatment; received no training in medical school, her residency, or her fellowship related to gender dysphoria treatment; and has never diagnosed a patient with gender dysphoria. *Doe* Trial Tr., Doc.212 at 87–89.

Doc.212 at 99). The District Court found that, although the purpose of an informed-consent form is not "to push the patient toward the physician's viewpoint—or the state's," the forms make clear the State's "disapproval of the proposed treatment[s]." *Id.*[4]

The court found that in addition to pushing this slanted viewpoint on patients, the forms also contained numerous false statements. For example, the forms on feminizing medications falsely assert that "[u]se of these medications," such as estrogen, "does not have U.S. Food and Drug Administration (FDA) approval." *Doe* Order at 57. The court found that this statement is simply false, as the FDA has approved these medications; otherwise, their use would be illegal. *Id.* Similarly, the form on feminizing hormone treatments for adults falsely stated that the patient must be under the care of a licensed mental health care professional while undergoing treatment. *Doe* Order at 58; Defs.' Ex. 6, *Doe* Doc.175-6 at 2.

---

[4] The District Court found numerous examples of the forms presenting a similarly one-sided narrative. *See, e.g., Doe* Order at 55–56 (identifying form provision characterizing research supporting treatments as very limited and of poor quality without explaining existence of "well-established standards of care and consensus among all the reputable medical associations with relevant expertise").

The forms also included passages that, the court concluded, "could have no purpose other than to discourage patients from proceeding with gender-affirming care." *Id.* at 58. This included a paragraph on cyproterone acetate—a medication with frightening side effects, such as tumors and hepatitis—that is neither used nor available in the U.S. and had no chance of ever being part of a treatment plan for a Florida patient. *Id.* (citing *Doe* Trial Tr., *Doe* Doc.206 at 181). A similar paragraph on an alopecia treatment is drafted in "impenetrable language" and requires the patient to read and consent to a "complex discussion" of a treatment that the person "is unlikely to receive for a side effect [they] are unlikely to suffer." *Id.* at 59–60.

The court also found that the unusual length of the forms and the requirement that patients (or in the case of minors, parents) sign and initial them upwards of 35 times was further evidence that they were designed to discourage patients from obtaining care. Defs.' Exs. 2–7, *Doe* Docs.175-2–175-7; *Doe* Order at 60.

In sum, the District Court found that these forms "are plainly designed to discourage gender-affirming care, not to provide accurate information," *Doe* Order at 60, and "were motivated by anti-transgender

animus," *id.* at 61. *See also id.* at 82 ("[T]he forms are replete with provisions that serve no valid medical purpose, that interfere with rather than promote an appropriate informed-consent process, that impose burdens and costs on patients, and that could have had no purpose other than to prevent or discourage patients from adhering to their gender identities.").

## VI. THE DISTRICT COURT FOUND THAT THE MEDICAL CARE PROVIDED TO TRANSENDER ADOLESCENTS AND ADULTS IS SAFE AND EFFECTIVE, WIDELY ACCEPTED BY THE MEDICAL COMMUNITY, SUPPORTED BY EVIDENCE GREATER THAN OR COMPARABLE TO THAT SUPPORTING MOST OTHER MEDICAL TREATMENTS, AND RESULTS IN EXTREMELY LOW RATES OF REGRET

### A. The District Court Found that Transgender Identity Is Innate

The District Court found that being transgender is innate, not a choice. *Doe* Order at 8. Defendants admit this, as did their only expert who has treated a significant number of transgender patients. *Id.*

The court found that for more than 99% of people, their external sex characteristics and chromosomes—the determinants of what the District Court referred to as the person's natal sex—match the person's gender identity. *Id.* at 7. For less than 1%, the natal sex and gender identity do

not align, *i.e.*, a person identified as male at birth may have a gender identity that is female or vice versa. *Id.* at 8.

The court credited expert testimony that gender identity is a deeply felt internal sense of being male or female, not a choice or a product of external influences. *Id.* at 7 (citing *Dekker* Trial Tr., *Dekker* Doc.226 at 23–24; *Dekker* Doc.238 at 72–73).

### B.   The District Court Found that Gender Dysphoria Is A Serious But Highly Treatable Medical Condition

The District Court recognized gender dysphoria as a real and serious medical condition that can develop when transgender individuals are unable to live consistently with their gender identity. *Doe* Order at 11, 99; *Dekker* Order at 16. The diagnosis applies when specific criteria are met, including a marked incongruence between one's experienced gender identity and natal sex for at least six months, manifested in specified ways, and clinically significant distress or impairment. *Doe* Order at 11 (citing Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition); *Dekker* Pls.' Ex. 33, *Dekker* Doc.175-33 at 2–3); *Dekker* Order at 16.

The court found that gender dysphoria presents substantial health risks, and failure to treat it can lead to increased anxiety, depression, and

risk of suicide. *Doe* Order at 16; *Dekker* Order at 21. Gender dysphoria is, however, treatable through an established course of care and treatment that is widely accepted. *Doe* Order at 16, 90; *Dekker* Order at 21; *see also Doe* Order at 13 ("The overwhelming weight of medical authority supports treatment of transgender patients with GnRH agonists and cross-sex hormones in appropriate circumstances.").

For some patients, puberty blockers and hormones are appropriate treatments, even though, just as with their use to treat other conditions, these medications have attendant risks. *Doe* Order at 86–87; *Dekker* Order at 19–20. The District Court found that the benefits of treatment administered in accordance with these well-established standards far outweighed any of the ordinary range of risks posed by these medications for the great majority of patients. *Doe* Order at 15; *Dekker* Order at 20, 42. The court found these medications "have been used for decades to treat other conditions," and "[t]heir safety records and overall effects are well known." *Doe* Order at 14. In addition, the court found that failing to treat gender dysphoria can lead to anxiety, depression, and suicidal ideation. *Doe* Order at 87; *Dekker* Order at 42.

## C. The District Court Found That The Quality Of Evidence Supporting Treatment For Gender Transition Meets or Exceeds that Supporting Most Other Medical Care

The District Court rejected as "largely pretextual" Defendants' argument that the evidence supporting transgender health care is of low quality and therefore insufficient to justify treatment. *Doe* Order at 83; *Dekker* Order at 38. The court found that there is extensive clinical evidence showing excellent results from treatment with puberty blockers and hormones. *Doe* Order at 15, 85. *Dekker* Order at 40. Even Defendants' expert acknowledged their efficacy. *Dekker* Trial Tr., *Dekker* Doc.239 at 81–83.

The District Court noted that it is commonplace for medical treatments to be provided even when supported only by research producing evidence classified as "low" or "very low" on the Grading of Recommendations, Assessment, Development, and Evaluation ("GRADE") scale. *Doe* Order at 84; *Dekker* Order at 39. Research-generated evidence classified as "low" or "very low" may nevertheless be persuasive, and even "the best available, research-generated evidence for a particular treatment." *Doe* Order at 83–84, *Dekker* Order at 38–39. Moreover, the court found that evidence on the other side (*i.e.*, showing

that the transgender treatments at issue here are ineffective or unsafe) is far weaker than "low" or "very low" quality and, "in fact, is nonexistent." *Doe* Order at 84; *see also Dekker* Order at 39.

The record includes unrebutted testimony that only about 13.5% of accepted medical treatments across all disciplines are supported by "high" quality evidence on the GRADE scale. *Doe* Order at 84–85; *Dekker* Order at 39–40 (citing *Dekker* Trial Tr., *Dekker* Doc.226 at 68–69). In short, the District Court found that any attempt to ban treatment "based on the supporting research's GRADE score is a misuse of the GRADE system." *Doe* Order at 85; *Dekker* Order at 40.

### D. The District Court Found That The Protocols for Diagnosing And Treating Gender Dysphoria Are Comparable to Other Well-Established Medical Protocols

The District Court found that the Endocrine Society Clinical Practice Guidelines for the Treatment of Gender Dysphoria and the World Professional Association for Transgender Health ("WPATH") Standards of Care are well-established standards for treatment of gender dysphoria that are widely followed by well-trained clinicians, used by insurers, and have been endorsed by the United States Department of Health and Human Services. *Doe* Order at 11–12; *Dekker* Order at 16–

17. Their use was supported by what the court characterized as "abundant testimony" in both trials. *See Doe* Order at 11 & n.25 (citing testimony from multiple experts).

The District Court rejected Defendants' assertion that gender dysphoria is uniquely difficult to diagnose accurately. *Doe* Order at 92; *Dekker* Order at 47–48. The District Court found that the absence of a physical test for gender dysphoria "does not set [gender dysphoria] apart from many other mental-health conditions that are routinely diagnosed without objective tests and treated with powerful medications." *Doe* Order at 92; *Dekker* Order at 47–48.

### E. The District Court Found That Regret Following Gender Transition Is Rare

The District Court found that regret following gender transition treatment is rare. Doe Order at 92; *see also Dekker* Order at 47; *Dekker* Trial Tr., *Dekker* Doc.238 at 44 ("We also know that the rate of regret— we know from the scientific literature that the rate of regret for these sorts of interventions is very small."); *Dekker* Trial Tr., *Dekker* Doc.228 at 56 (identifying, in expert testimony credited by the court, that the rate of regret among those receiving transgender health care to be 1%). Despite Defendants' assertions about the risks of "detransition," at trial

"Defendants offered no evidence of any Florida resident who regrets being treated with GnRH agonists or cross-sex hormones." *Doe* Order at 92. "With all the resources available to the State of Florida and the full range of discovery under the Federal Rules of Civil Procedure, the defendants could find not a one." *Id.*

## STANDARD OF REVIEW

Following a bench trial, this Court reviews the District Court's conclusions of law de novo and its factual findings for clear error. *See Hodges*, 78 F.4th at 1374 (citations omitted). This standard applies to the ultimate factual question of whether a law reflects a discriminatory motivation. *See League of Women Voters,* 66 F.4th at 921, 930; *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Pullman-Standard v. Swint*, 456 U.S. 273, 287–88 (1982).

The clear error standard is "decidedly more deferential" than the standard applicable to review of a summary judgment order. *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1253 (11th Cir. 2016). In reviewing the District Court's findings of fact, this Court must "draw[] all inferences in favor of the District Court's decision." *Id.* "Where there are two permissible views of the evidence, the factfinder's

choice between them cannot be clearly erroneous." *Hodges*, 78 F.4th at 1374–75 (quoting *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007)). Whether a trial court's findings rest on fact evidence, expert testimony or a combination of the two, it is not the role of appellate courts—"indeed, [they] are not permitted—to reweigh or examine the evidence anew." *Bellitto v. Snipes*, 935 F.3d 1192, 1208 (11th Cir. 2019).

## SUMMARY OF ARGUMENT

Defendants have failed to establish that the District Court's detailed, comprehensive factual findings are clearly erroneous. The District Court carefully followed precedent and correctly determined that each of the relevant factors supported a finding that Florida's statute and rules were motivated in substantial part by an improper discriminatory purpose.

In reaching these findings, the District Court gave proper deference to the presumption of legislative good faith, finding that, on the present record, the presumption was overcome. The court considered the evidence on each of the *Arlington Heights* factors, determining that each of those factors "squarely" support a finding of improper animus. *Doe* Order at 67.

These factors included the clear disparate impact of Florida's ban and restrictions, which affect only transgender Floridians. That disparate impact was both foreseeable and known to decisionmakers. The factors also included the historical background and specific sequence of events leading up to the ban and restrictions, which were abruptly adopted after Florida had, for many years, permitted these treatments and paid for them with state Medicaid funds based on its determination that they were established and medically appropriate care for transgender people. The adoption of the Board rules was marked by substantive and procedural departures from past rulemaking practices and reliance on a flawed and biased GAPMS report designed to justify the predetermined goal of banning or restricting access to this care. The passage of the statute and rules was also accompanied by overt expressions of hostility toward transgender people by officials at every relevant level of government, and the State elected to bypass many less restrictive alternatives in the service of enacting some of the most extreme possible restrictions: a complete ban for adolescents and unprecedented restrictions on access to care for adults. Each of the District Court's findings was supported by substantial evidence.

Applying heightened scrutiny based on its finding of a discriminatory purpose, the District Court correctly determined that Florida's ban and restrictions do not substantially advance an important governmental objective because they undermine, rather than advance, the health of transgender people. Indeed, Defendants' justifications for the statute and rules were "largely pretextual," *Doe* Order at 83, and, absent animus, would not have been enacted. As such, the District Court found that they lack even a rational basis. Because the challenged laws fail even rational basis review, the District Court held that they also violate the requirement of due process. The Court should affirm the thoroughly documented findings and judgment of the District Court.

## ARGUMENT

## I. THE DISTRICT COURT FOLLOWED EKNES-TUCKER'S DIRECTIVE TO DETERMINE WHETHER PURPOSEFUL DISCRIMINATION WAS A MOTIVATING FACTOR FOR FLORIDA'S STATUTE AND RULES

In *Eknes-Tucker*, this Court recognized that under the Fourteenth Amendment's Equal Protection Clause, "the regulation of a course of treatment that only gender nonconforming individuals can undergo would not trigger heightened scrutiny unless the regulation were a pretext for discrimination against such individuals." 80 F.4th at 1229–

30. Consistent with longstanding Supreme Court precedent, this Court has repeatedly held that a "facially-neutral law violates the Equal Protection Clause if adopted with the intent to discriminate." *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1044 (11th Cir. 2008) (quoting *Johnson v. Governor of Florida*, 405 F.3d 1214, 1222 (11th Cir. 2005) (en banc)).

In determining that Florida's statute and rules violate the requirement of equal protection because they have both a discriminatory impact and purpose, the District Court followed these binding precedents, examining the extensive record before it to conclude that there was "substantial evidence of animus in the adoption of the statute and rules at issue here." *Doe* Order at 38. *See also Adams v. St. Johns County*, 57 F.4th 791, 810 (11th Cir. 2022) (en banc) ("[A] disparate impact on a group offends the Constitution when an otherwise neutral policy is motivated by 'purposeful discrimination.'") (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979)).[5]

---

[5] Though Defendants assert otherwise, the District Court's order was based on application of *Eknes-Tucker* "as the currently binding law of the circuit," notwithstanding its discussion of other relevant equal protection principles. *Doe* Order at 29. Surveying other pending challenges, the District Court also correctly noted that *Eknes-Tucker* "might not be the

Defendants argue that the District Court suggested it could find animus "without troubling itself" with an *Arlington Heights* analysis, Br. at 30, but the order makes crystal clear that is not what the court did. To the contrary, the District Court carefully reviewed the evidence presented, making the "sensitive inquiry into such circumstantial and direct evidence of intent" that is required by *Arlington Heights*. *Doe* Order at 39–40 (citing *Arlington Heights*, 429 U.S. at 268); *see also Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts . . . ."). Based on its painstaking review of the record, the court found that each of the *Arlington Heights* factors "squarely favor the

_____

federal judiciary's last word" on the issue. *Id.* at 29. For this reason, the court also considered several alternative grounds on which restrictions on transgender medical care could be subject to heightened scrutiny under the Equal Protection Clause, including Plaintiffs' claim that such restrictions facially discriminate based on sex and transgender status. Although this Court has now denied rehearing *en banc* in *Eknes-Tucker,* the District Court was prudent to acknowledge that further guidance on the standard of review applicable to these claims will likely be forthcoming. *See L.W. v. Skrmetti*, 73 F.4th 408 (6th Cir 2023), *cert. granted*, 144 S. Ct. 2679 (June 24, 2024). Regardless, the District Court's judgment in this case rests on its detailed findings that the restrictions at issue were the product of discriminatory animus against transgender persons, even if the restrictions themselves are not facially discriminatory.

plaintiffs." *Doe* Order at 67. Defendants cannot meet their high burden of showing that these findings were so thoroughly lacking in evidentiary support as to be clearly erroneous.

## II. THE DISTRICT COURT'S ANIMUS FINDINGS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

### A. The District Court Correctly Applied the Presumption of Legislative Good Faith, and Its Finding that the Presumption Was Overcome Was Not Clearly Erroneous

Defendants wrongly accuse the District Court of reversing the presumption of legislative good faith. The District Court began its analysis with the presumption. *Doe* Order at 38–39. But, as the District Court recognized, a presumption is just that: a baseline against which the evidentiary record is assessed. *Arlington Heights* makes clear that when the evidence shows that "a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." 429 U.S. at 265–66. Whether the presumption of good faith holds in a particular case depends on the facts revealed by "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266.

The District Court undertook the required inquiry, carefully examining the origins and history of Florida's efforts to ban or restrict medical care for its transgender residents, the flawed and biased process that led to the adoption of the Boards' medical care ban, the openly discriminatory statements of legislators and other officials involved in passage of the statutory ban and other restrictions, and the failure to adopt less restrictive alternatives that would have advanced Defendants' asserted policy objectives. Assessing this record as a whole, and with appropriate regard for the legislative role, the District Court concluded that the presumption of good faith was overcome. The record did not plausibly support multiple conclusions, as Defendants would have it. Br. at 32. It supported only one: discriminatory purpose was a motivating factor.

However strong the presumption of good faith may be, it is not effectively irrebuttable, as Defendants appear to contend. When a careful review of the relevant facts reveals that a discriminatory purpose has been "a motivating factor" for legislation—even if not the only motivating factor—the presumption is overcome, and deference is no longer warranted. *Arlington Heights*, 429 U.S. at 265–66. At that point,

"discriminatory intent and effect are established," and "'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without'" the discriminatory purpose. *Greater Birmingham Ministries v. Sec'y for State of Alabama*, 992 F.3d 1299, 1321 (11th Cir. 2021) (quoting *Hunter v. Underwood*, 471 U.S. 222, 227–28 (1985)).

Once the burden shifts, a court must scrutinize any non-invidious motivations to determine whether "they alone" can explain enactment of the challenged law. *North Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016) (citing *Arlington Heights*, 429 U.S. at 265–66). Having found that animus is a motivating factor, judicial deference is "no longer justified," *Arlington Heights*, 429 U.S. at 265–66, and the court must inquire into the actual purposes underlying a statutory or regulatory scheme, *McCrory*, 831 F.3d at 233. To assess whether a law would have been enacted without an invidious purpose, the court must consider any non-invidious interest and "how well the law furthers that interest." *McCrory* at 233 (citing *Hunter*, 471 U.S. at 228–33).

The District Court did just that. It carefully analyzed whether a majority of legislators with a non-invidious motivation to "ensure that

37

patients receive only proper medical care" would have made the same decision. *Doe* Order at 63. It rightly concluded they would not. Based on substantial evidence, the Court found that an unbiased majority of legislators could not have found that banning care furthered that goal. *Id.* at 63–64 (finding that "defendants have not shown that a majority, if not motivated also by anti-transgender animus, would have made the same decision" to ban medical treatments "across the board for all transgender adolescents without regard to their own circumstances, without regard to the views of their own parents and treating professionals, and contrary to the widely accepted professional standards of care").

## B. The District Court's Finding that the Impact of the Statute and Rules Falls Disproportionately on Transgender Floridians Was Clearly Correct

Citing *Eknes-Tucker*'s holding that a statute banning medical treatment for gender transition does not facially discriminate based on sex or transgender status, Defendants argue that the District Court erred in relying on the fact that "the impact of the challenged law falls only on transgender[] [Floridians]. Nobody else." *Doe* Order at 68; *see* Br. at 30–31. Defendants' argument misunderstands the *Arlington Heights* inquiry

and ignores this Court's identical determination when analyzing a substantively similar law in *Eknes-Tucker*, 80 F.4th at 1229 (noting that Alabama's law affects "only gender nonconforming individuals").

By its nature, analysis of any government action under *Arlington Heights* presumes that the challenged action is facially neutral. The purpose of the *Arlington Heights* framework is to determine whether, notwithstanding that facial neutrality, heightened scrutiny is warranted because there is "proof that a discriminatory purpose has been a motivating factor in the decision." *Arlington Heights,* 429 U.S. at 265–66. While "official action will not be held unconstitutional solely because it results in a . . . disproportionate impact," the Supreme Court has instructed that whether official action "bears more heavily on" a particular group is "an important starting point." *Id.* at 264–65, 266 (quoting *Washington v. Davis,* 429 U.S. 229, 242 (1976)); *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 489 (1997) (same). Consistent with that precedent, this Court's summary of the *Arlington Heights* factors begins with "the impact of the challenged law." *Greater Birmingham Ministries*, 992 F.3d at 1322. The District Court's *Arlington Heights* analysis, therefore, correctly began with the simple, and plainly accurate,

observation that Florida's law and rules affect only transgender individuals and thus have a severely disparate impact on them.

This is not, as Defendants assert, a form of "proxy discrimination" analysis in which no further evidence of discriminatory intent is required. Br. at 31. To the contrary, and as the District Court made clear, determining whether a law or policy, as a factual matter, has a disproportionate impact on an identified group is merely a first step. *Doe* Order at 41. Having made that threshold determination here, the District Court was required to undertake an "inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. The District Court undertook that inquiry and determined that each of the *Arlington Heights* factors strongly supported a finding of discriminatory purpose. *Doe* Order at 67–70.

Likewise, nothing in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), holds that the District Court was precluded from considering the simple and obvious fact that the law and rules affect only transgender Floridians as one element of its *Arlington Heights* discriminatory-purpose analysis. Contrary to Defendants' assertions, *Dobbs* reaffirmed that regulations of medical care are subject

to heightened scrutiny when the evidence shows they are a "pretex[t] designed to effect an invidious discrimination . . . ." *Dobbs,* 597 U.S. at 236 (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496, n. 20 (1974)). The Supreme Court found no basis for a finding of discriminatory purpose in the case of the abortion regulations before it in *Dobbs,* but it did not hold, as Defendants suggest, that all health care regulations are immune from careful scrutiny under the Equal Protection Clause when the record includes abundant evidence of discriminatory purpose, as it does here.

There is no credible argument that the District Court clearly erred in finding that the impact of Florida's statute and rules falls disproportionately on transgender Floridians. The targeted nature of these regulations is readily apparent from the fact that they prohibit or restrict medical care that only transgender people need, as Defendants concede. *See* Br. at 36 (stating that "only transgender individuals can be diagnosed with gender dysphoria"). Florida's statute bans or restricts puberty blockers and hormones *only* when used "in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex" assigned at birth, Fla. Stat. § 456.001(9), and Florida's rules ban or restrict those medications only "for the treatment of gender

dysphoria," Fla. Admin. Code r. 64B8-9.019(1)(b), r. 64B15-14.014(1)(b).

As this Court stated in *Eknes-Tucker*, the only people affected by such restrictions are transgender. *Eknes-Tucker*, 80 F.4th at 1229 (stating that a law that bars medical treatments for gender transition "restricts a specific course of medical treatment that, by the nature of things, only gender nonconforming individuals may receive"). When a prohibition falls exclusively on individuals in a particular group, it has—at the least—a disparate impact on that group.

### C. The District Court's Conclusion that the Arlington Heights Factors Supported a Finding of Animus Is Supported by Substantial Evidence

Contrary to Defendants' contention, the District Court's finding of discriminatory purpose was based on far more than a few statements by several legislators. The District Court carefully analyzed all the relevant evidence in light of the *Arlington Heights* factors and concluded, based on the entire record, that the challenged law and rules were motivated by purposeful discrimination. In drawing its conclusion, the District Court faithfully applied each factor as articulated by this Court in

*Greater Birmingham Ministries*, 992 F.3d at 1321–22.[6] Substantial evidence supports the District Court's finding that "these factors squarely favor Plaintiffs." *Doe* Order at 67.

### 1. Impact, Foreseeability, and Knowledge

The first, sixth, and seventh of the *Arlington Heights* factors are closely intertwined and can be addressed together. In this case, as the District Court explained, the impact of these laws falls solely on transgender people, and that impact was both foreseeable and known to the legislature and Boards. *Id*. at 40–41, 68–69.

Defendants complain that there was no evidence about "the number of people who'll be diagnosed with gender dysphoria." Br. at 36. But neither equal protection nor an assessment under *Arlington Heights* depends on the number of persons singled out for invidious discrimination. If anything, discrimination against a small and marginalized group that has been a frequent target of hostile government

_____

[6] Defendants' unsupported claim that the District Court failed to apply the presumption of good faith to the evidence supporting each factor has no merit. Defendants provide no example nor explanation, nor could they. As the decision below demonstrates, the court examined each *Arlington Heights* factor on its own merits and carefully weighed the evidence relating to each, finding in each case that the evidence supported a finding of purposeful discrimination. *Doe* Order at 67.

action requires more vigilance from courts, not less. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 444–47 (1985). More to the point, the evidence demonstrated that the Legislature and Boards were far less concerned with how many transgender persons would be denied or restricted from obtaining care than with ensuring that care would be denied to, or restricted for, transgender persons in general.

As shown above, there is no credible basis to claim that the burden of Florida's statute and rules falls on anyone other than transgender Floridians, and this impact plainly was both foreseeable and known to the legislators and Boards. The ban and restrictions originated with calls by the Governor and Surgeon General to ban medical care specifically for transgender Floridians. *Doe* Order at 56–57. The District Court's conclusion about the impact of the rules and statutes was supported by ample evidence.

## 2. Historical Background

The District Court's analysis next appropriately considered the history of Florida's regulation of medical care for transgender people. It found, based on substantial evidence, that the banned or restricted medical treatments are supported by well-established, evidence-based

standards of care that are grounded in decades of clinical experience. *Doe* Order at 11 (citing *Dekker* Defs.' Exs. 16, 24, *Dekker* Doc.193-16, 193-24). The District Court "credited the abundant testimony in this record that these standards are widely followed by well-trained clinicians." *Id.* (citing *Dekker* Trial Tr., *Dekker* Doc.226, at 31; *id.* at 198; *Dekker* Trial Tr., *Dekker* Doc.227, at 50–52; *id.* at 106, 112–14; *Dekker* Trial Tr., *Dekker* Doc.228, at 15; *Doe* Trial Tr., Doc.206, at 114; *Doe* Trial Tr., Doc.207, at 133).

The District Court further found that for many years, Florida permitted use of these medications and paid for them under the State's Medicaid program. *Doe* Order at 4, 68 (citing *Dekker*, 679 F. Supp. 3d at 1280–81; *Doe* Trial Tr., Doc.207, at 131; *Dekker* Pls.' Ex. 240, *Dekker* Doc.181-4, at 9; *Dekker* Pls.' Ex. 243, *Dekker* Doc.181-7, at 1). Defendants offered no evidence of any flaw or deficiency in the medical evidence supporting Florida's previous approval of these treatments. The record also included no evidence that these treatments had resulted in a single complaint from any patient or adverse results for any individual in Florida during the many years they had been available. *Id.* at 68. Despite

that, "the Governor and Surgeon General initiated a process that led to adoption of the rules at issue." *Doe* Order at 52.

This evidence stands in stark contradiction to Defendants' claim that there was no evidence concerning "Florida's history of addressing gender dysphoria or transgender individuals." Br. at 36.[7] Rather, as the evidence plainly showed, "these treatments were allowed in Florida for many years until the political winds changed" and transgender people became the object of nationwide opprobrium. *Doe* Order at 68. The State's about-face came in response to animus-driven statements and actions by political officials amid a wave of increasing government hostility toward transgender individuals nationwide.

---

[7] The contemporary history described by the District Court is a far cry from the kind of history of discrimination rejected by this Court in *Greater Birmingham*. In *Greater Birmingham*, the plaintiffs' reliance on "the racist history of Alabama" was insufficient to establish discriminatory intent because "the old, outdated intentions of previous generations" could not "taint Alabama's legislative action forevermore on certain topics." *Greater Birmingham Ministries*, 992 F.3d at 1325. Far from relying on events from long ago, the evidence here demonstrated that the Florida Governor, Surgeon General, Legislature and Boards acted abruptly, beginning in April 2022, to radically alter the status quo concerning medical care for transgender persons that had prevailed in Florida in the immediate past.

### 3. Sequence of Events Leading to Passage

The sequence of events leading to the passage of the challenged law and rules support the District Court's conclusions. As the District Court found, the Boards did not undertake rulemaking because of any complaints from patients or concern from medical professionals about the safety or efficacy of these established treatments. Instead, the District Court found, based on the evidence, that the Boards initiated rulemaking due to political pressure from state officials set on banning or restricting medical care for transgender people. "There were no complaints from patients, no adverse results in Florida, just a political issue." *Doe* Order at 68. That conclusion is amply supported by the record. *Id*.

By way of analyzing the relevant background and context, the District Court also properly pointed to another statute that passed on the same day as SB 254. *Id*. at 51. Florida Statutes section 1000.071(1) establishes a "policy" that "a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's [natal] sex," effectively codifying  as official state policy the view repeatedly expressed by the sponsors of the statute

(and other legislators), by the Governor, and by the Surgeon General that transgender identity is false. *Id.* at 51–52.

Defendants find fault with the District Court's reliance on other contemporaneous legislation demonstrating Florida officials' disapproval of transgender people, but the Supreme Court has counseled that "a series of official actions taken for invidious purposes" and "[t]he specific sequence of events leading up to the challenged decision" are important factors indicating the presence of an improper discriminatory purpose. *Arlington Heights*, 429 U.S. at 267. The fact that other legislation enshrining the same negative views of transgender Floridians was passed on the very same day as the ban and restrictions on medical care is powerful evidence that anti-transgender sentiment was a motivating factor for both bills. The trial record established exactly the sort of contemporary climate of discrimination and disapproval that the Supreme Court has held probative of discriminatory purpose.

Here, the evidence of a contemporaneous discriminatory and biased climate was overwhelming. As Florida and national media outlets have reported, transgender people were "the subject of intense focus for state lawmakers" in the past two years, with lawmakers in 2023 filing "at least

18 bills that directly or indirectly target transgender Floridians."[8] In addition to restricting access to health care, Florida enacted multiple laws and administrative policies that single out transgender people for adverse treatment in many areas of their lives.

---

[8] Kathryn Varn, *A rundown of Florida bills causing 'massive panic' in transgender, LGBTQ communities*, Tallahassee Democrat (Mar. 15, 2023, 5:07 AM), https://www.tallahassee.com/story/news/politics/2023/03/15/florida-legislature-18-bills-targeting-transgender-lgbtq-community/70002777007/; Brett Wilkins, *DeSantis Signs 'Most Extreme Slate of Anti-Trans Laws in Modern History*, Common Dreams (May 17, 2023), https://www.commondreams.org/news/desantis-transgender; Brandon Girod, *Four new Florida laws target transgender, broader LGBTQ community. Here's what they do*, Pensacola News J., (May 17, 2023, 12:38 PM), https://www.pnj.com/story/news/politics/2023/05/17/desantis-signs-3-bills-targeting-transgender-gender-affirming-care-bathrooms-drag-shows/70227878007/; Steve Contorno, *Florida bills that will alter the lives of transgender people await DeSantis' signature*, CNN (May 4, 2023, 4:27 PM), https://www.cnn.com/2023/05/04/politics/ron-desantis-transgender-bills-florida/; *Florida Gov. DeSantis signs bills targeting drag shows, trans rights, and care for transgender children*, PBS (May 17, 2023, 2:09 PM), https://www.pbs.org/newshour/politics/florida-gov-desantis-signs-bills-targeting-drag-shows-trans-rights-and-care-for-transgender-children; Carlos Suarez and Denise Royal, *Florida's private colleges and universities must comply with rule requiring people to use bathrooms aligning with their sex assigned at birth*, CNN (Oct. 19, 2023, 11:46 PM), https://www.cnn.com/2023/10/19/us/florida-private-college-trans-bathroom-restriction; Tori Otten, Florida Passes Bill Allowing Trans Kids to Be Taken From Their Families, The New Republic (May 4, 2023, 1:39 PM), https://newrepublic.com/post/172444/florida-passes-bill-allowing-trans-kids-taken-families.

The first of these laws was Senate Bill 1028, signed into law on May 28, 2021, banning transgender girls and women from playing on female sports teams. *See* S.B. 1028, 2021 Leg., 123rd Reg. Sess. (Fla. 2021). The following year, on March 28, 2022, the Legislature enacted House Bill 1557, banning instruction about gay or transgender people or issues from Florida's public schools. *See* H.B. 1557, 2022 Leg., 124th Reg. Sess. (Fla. 2022). On May 17, 2023, House Bill 1069 was signed into law, expanding the scope of House Bill 1557 to include instruction up to eighth grade, authorizing removal of books from school libraries, and prohibiting transgender public school teachers and staff from using pronouns that match who they are. *See* H.B. 1069, 2023 Leg., 125th Reg. Sess. (Fla. 2023). Senate Bill 1438, also signed into law on May 17, 2023, penalizes drag shows. *See* S.B. 1438, 2023 Leg., 125th Reg. Sess. (Fla. 2023).

The statute challenged in this action not only bans medical care for transgender adolescents and restricts it for adults, but also bans any public funding for such care. Fla. Stat. § 286.311. It also gives Florida judges the power to take emergency jurisdiction over the custody of an out-of-state child and award custody to a noncustodial parent if the child

receives medical care for gender dysphoria. Fla. Stat. §§ 61.517(1)(c), 61.534(1).

Taken together, these measures constitute a clear expression of governmental hostility toward transgender Floridians and establish an official public policy of disapproval of permitting transgender people to live consistently with their gender identities—to the point of making it official Florida policy that transgender identity is "false." Yet, the Defendants in this case, when forced to account for their actions before a federal court, admitted that transgender identity is real, see *Doe* Order at 8, thereby highlighting that the true purpose of these measures is to harm transgender people. Few if any other states have enacted as many anti-transgender measures as Florida, and none has enacted measures as extreme as some of Florida's new laws, including its unprecedented imposition of restrictions on medical care even for transgender adults.[9] This extraordinary context strongly supports the District Court's

---

[9] C.A. Bridges, *What can I do if I'm a transgender person living in Florida? State erasing trans options,* Tallahassee Democrat, May 18, 2023, https://www.tallahassee.com/story/news/politics/2023/04/25/floridas-trans-people-parents-of-trans-kids-see-options-steadily-banned/70132161007/.

conclusion that Florida's statute and rules were the product of purposeful discrimination.

### 4. Procedural And Substantive Irregularities

The rulemaking process included significant departures from the procedures ordinarily followed by the Boards. The procedural irregularities included reliance on a rigged and unprecedented GAPMS report, a Board rulemaking process initiated in an unprecedentedly top-down and political manner, and Board members and staff marshalling evidence and speakers in opposition to transgender health care for public workshops and hearings. *Doe* Order at 53. The Boards' implementation of SB 254 also resulted in an emergency rulemaking process to create informed-consent forms; even though emergency rules ordinarily remain in effect for no more than six months, the statute abrogates that limit, and so the forms that were rushed through the regulatory process have remained in place for more than a year. *Doe* Order at 7 n.10, 54.

As the Supreme Court has noted, in addition to procedural irregularities, "[s]ubstantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."

*Arlington Heights*, 429 U.S. at 267. Here, there were a number of substantive departures from past norms: the flawed GAPMS report which was commissioned despite the fact that the medical treatments at issue had already been determined to be generally accepted and covered by Medicaid, *Doe* Order at 68; the retention of outside consultants with predetermined views to author the GAPMS report, *id.*; the Boards' decision to move forward with rulemaking despite the absence of evidence of complaints or adverse impacts on patients in Florida, *id.* at 64; and the Boards' initial promulgation of informed consent forms which purported to impose substantive restrictions on medical care for transgender adults, despite the Boards' lack of any authority to do so, *id.* at 7 n.10.

The result of this biased process was not only a ban on care for transgender adolescents but the promulgation of informed-consent forms that are

> untrue and misleading in substantial respects, omit any
> discussion of benefits, address not only risks of treatments a
> patient will receive but also of treatments the patient will *not*
> receive, include incomprehensible provisions no patient could
> be expected to understand, and are plainly intended to
> dissuade patients from obtaining gender-affirming care, not
> to ensure that patients are fully informed of the relevant risks
> and benefits.

*Id.* at 54. Defendants have identified no case law holding that only a violation of a statute or rule can serve as the basis for finding procedural and substantive departures from practice when such departures are thoroughly documented in the record, as they are here.

### 5. Contemporary Statements and Actions of Key Legislators

Defendants do not and cannot contest that the record is replete with statements made by legislators and key decisionmakers that express negative views of transgender people and that even the Defendants must admit are "sensational." Br. at 37. Based on the entire record and its analysis of all *Arlington Heights* factors, including this extraordinary legislative history, the Court found that "by the greater weight of the evidence, . . . a majority of legislators in both houses and the Governor" were motivated by animus. *Doe* Order at 55. The evidence was so strong that the Court repeated several times throughout the opinion that "[a] significant number of legislators—more likely than not a majority—were motivated" by animus. *Doe* Order at 63; *see also id.* at 51, 65.

Plainly, these statements were properly considered. *Greater Birmingham Ministries*, 992 F.3d at 1322 (listing as the fifth *Arlington*

*Heights* factors "the contemporary statements and actions of key legislators"); *see also Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389, at *4 (11th Cir. Nov. 7, 2022) ("Because relevant, contemporaneous statements of key legislators are to be assessed . . . we find no clear error in the court's weighing of that evidence.")

As described in detail above, the administrative and legislative record cited by the District Court included repeated statements expressing unvarnished hostility toward transgender people. These included legislators' references to transgender individuals as "mutants," "demons," and "imps" and statements by the Governor, the Surgeon General, and the House sponsors of the statute that "there's no such thing as someone being able to change their sex," *Doe* Order at 43–44 (citing Pls.' Ex. 30, Doc.178-8 at 36, 93; Pls.' Ex. 36, Doc.179-5 at 17–18; Pls.' Ex. 57, Doc.181-7 at 6; Pls.' Ex. 50, Doc.180-10 at 14–15; Pls.' Ex. 15, Doc.177-5; Pls.' Ex. 69, Doc.182-9 at 3).

As the Supreme Court has noted: "Outright admissions of impermissible [discriminatory] motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt*, 526 U.S. at 553. Here, in

contrast, as the District Court correctly noted, the legislative record is riddled with such outright admissions—*i.e.*, with overt expressions both of "old-fashioned discriminatory animus" and of the view that transgender people do not or should not exist. *Doe* Order at 42–45.

In arguing that these statements are not indicative of legislative intent, Defendant cites to cases such as *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) and *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023), which are inapposite. In *Brnovich*, a single legislator made "unfounded and far-fetched allegations of ballot collection fraud," 594 U.S. at 688–89; in *League of Women Voters*, this Court determined that one legislator's observation about a law's potentially disparate impact was insufficient to demonstrate the legislature's discriminatory intent, 66 F.4th at 931–32. In neither case, both of which alleged a discriminatory racial purpose, did the legislator reference race. In stark contrast here, the record includes multiple statements—by numerous, distinct legislators and key decisionmakers—that refer to transgender people in overt and openly

hostile terms or make wildly false claims about transgender medical care.[10]

In an effort to distract from the obvious, Defendants also criticize the District Court for including in its analysis the "failure of other members to call the[ir colleagues] out." Br. at 51. As noted above, the record was replete with biased statements that could hardly be fairly characterized as "minimal." *Id.* In addition, the fact that these statements went unchecked by other legislators is significant and was properly considered by the District Court. In other cases implicating constitutional rights, the Supreme Court has made clear that a failure of decisionmakers to counter such overt bias can be important evidence that a constitutional infringement has occurred. *See, e.g., Masterpiece*

---

[10] *United States v. O'Brien,* 391 U.S. 367 (1968), is also inapt. There, because the Supreme Court found that the law prohibiting the burning of a draft certificate was directed at noncommunicative conduct, there was no unconstitutional "effect" and thus no basis to inquire into legislative intent. *Id.* at 384–85 (distinguishing *O'Brien* from an equal protection case). In contrast, this is an equal protection case in which both the discriminatory impact and motivation for the challenged provisions are relevant. It also bears emphasis that there is a vast difference between the multiple expressions of overt bias by decisionmakers here and the brief statements of three members of Congress in *O'Brien. Id.* at 385 (noting there was "little floor debate . . . in either House.").

*Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 635 (2018) (citing comments of decisionmakers reflecting "clear and impermissible hostility toward . . . sincere religious beliefs," noting that "[t]he record shows no objection to these comments from other commissioners," and holding that "[t]he official expressions of hostility . . . that were not disavowed . . . were inconsistent with what the Free Exercise Clause requires"); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 541 (1993) ("find[ing] guidance" in *Arlington Heights* equal protection framework and holding that "contemporaneous statements made by members of the decisionmaking body" as well as "significant hostility exhibited by residents, members of the city council, and other city officials toward the Santeria religion" established that local ordinances were enacted to suppress religious practice).

For similar reasons, there was no error in the District Court's reliance on statements by the Governor, the Surgeon General, and other officials as evidence of an improper discriminatory purpose underlying Florida's statute and rules. The Supreme Court has found similar contemporaneous statements by officials other than legislators or agency decisionmakers to be significant evidence of animus; such statements

"bear on the question of discriminatory object" when they establish that official action was undertaken amid a climate of hostility toward a particular group. *See Lukumi*, 508 U.S. at 540–41 (relying on statements of "members of the city council," the "chaplain of the Hialeah Police Department," the "city attorney," and "cheers" and "taunts" by the "public crowd that attended the . . . meetings" as evidence of anti-religious animus); *Masterpiece*, 584 U.S. at 639 (relying on State of Colorado's failure to disavow hostile comments "at any point in the proceedings"); *see also Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 692 (9th Cir. 2023) (en banc) (relying on statements and actions of "students and teachers" as evidence of school district's anti-religious animus).

### 6. **Less Discriminatory Alternatives**

As to the last *Arlington Heights* factor, Defendants assert that the District Court should have given them credit for not implementing even more extreme measures. Florida could have gone further, they argue, by adopting a total ban on medical care for adolescents with no "grandfather" provision for those previously receiving treatment, or the state could have banned private insurance coverage for gender transition

medical care. Br. at 36. As the District Court correctly found, however, the adolescent ban and adult restrictions go far beyond what was necessary to address any genuine concern with the quality of care available from providers in Florida. *Doe* Order at 64 (observing that Legislature could have "limited care for minors to suitable facilities," "established prerequisites to gender-affirming care," or "allowed such care only as part of a properly conducted clinical trial," rather than adopting a ban). "If the Legislature or Boards truly believed gender-affirming care was being or might be provided improperly in Florida—despite the absence of complaints and despite the state's inability, even now, to find a single adversely affected Florida patient—the Legislature and Boards could have restricted the care without banning it." *Doe* Order at 64.

The Legislature rejected proposed amendments that would have narrowed the scope of the restrictions and reduced their harm. *See, e.g.,* Pls.' Exs. 117, 122, Docs.186-2, 186-7 (failed amendments that would have permitted provision of care in research settings or where deemed essential to prevent serious harm).

Defendants have not shown, nor could they, that the District Court clearly erred in its analysis of this factor. Where, as here, a Legislature ignores readily available alternatives that would address its stated concerns and opts instead for the most severe and restrictive measure, its failure to adopt less restrictive options is strong evidence of discriminatory purpose. The District Court properly concluded that this factor supports Plaintiffs' claim.

## III. THE DISTRICT COURT PROPERLY HELD THAT THE CHALLENGED MEASURES FAIL BOTH HEIGHTENED SCRUTINY AND, BECAUSE THEY ARE BASED ON ANIMUS, EVEN RATIONAL BASIS REVIEW

Having determined that substantial evidence supported a finding of discriminatory purpose, the District Court properly placed the burden on Defendants to show that Florida's statute and rules would have been adopted even in the absence of that purpose. *Doe* Order at 61 (citing *Hunter*, 471 U.S. at 228 and *Thompson v. Sec'y of State for Ala.*, 65 F.4th 1288, 1297 (11th Cir. 2023)). The District Court correctly found that they failed to do so. Accordingly, the District Court correctly held that Florida's statutory and administrative ban on the challenged measures were subject to, and failed, heightened scrutiny under the Equal Protection Clause. *Doe* Order 70–82.

Defendants do not even attempt to argue, nor on this record could they, that the law and Board rules survive heightened scrutiny. Under that standard, the state must show "at least that the challenged classification serves important government objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 582 U.S. 47, 59 (2017) (brackets and internal quotation marks omitted). Here, as the District Court found, the challenged measures fail this test because rather than furthering the state's asserted interest in protecting public health and wellbeing, they undermine it, serving only to ban or impede safe and effective medical care and exposing transgender patients to serious harms.[11] *Doe* Order at 71 74, 78. Rather than protecting transgender people, these measures "cause needless suffering for a substantial number of patients." *Id.* at 71; *see also id.* at 74 (finding that

---

[11] Defendants similarly make no effort to challenge, nor is there any basis to do so, the Court's rejection of other potential interests as being illegitimate including (1) protecting other people from transgender people; (2) moral opposition to transgender people; and (3) prohibiting or impeding a person from living consistent with their gender identity. *Doe* Order at 74.

the statute and rules include requirements that "diminish" rather than improve "the quality of care").

In addition, the District Court also correctly held that most of the restrictions on care for transgender adults and "grandfathered" adolescents fail even rational basis review. *Id.* at 71–82 (citing *Romer v. Evans*, 517 U.S. 620, 631 (1996)). As the District Court found, most of these restrictions are so irrational—imposing significant burdens and harms while serving no valid medical purpose—that absent animus they would not have been enacted. *Id.* at 77 (excluding qualified providers from providing care to adults "does not improve the quality of care" and instead "limits the availability of care and increases its cost"); *id.* (precluding other professionals from providing care under a treating physician's direction "is either extraordinarily poor statutory craftsmanship or an animus-based roadblock intended to reduce access to care"); *id* at 78 (requiring annual hand x-rays for all adolescent patients serves no medical purpose, "pose[s] a health risk" and "increases the patient's out of-pocket costs"); *id.* at 79 (same true of requiring annual bone density scans); *id.* at 80 (rule excluding qualified mental health professionals from performing annual mental health exams serves no

medical purpose, "departs from the accepted standard of care," and serves only to "reduce[] the ability of patients to receive gender-affirming care"); *id.* at 80–81 ("no medical reason" for rules requiring various examinations and tests for transgender adolescents); *id.* at 82 (state-mandated consent forms "serve no valid medical purpose," "interfere with rather than promote an appropriate informed consent process," impose burdens and costs on patients," and have "no other purpose than to prevent or discourage patients from adhering to their gender identities").

Based on these findings, the District Court correctly held that these measures violate the requirement of equal protection even under rational basis review. *Id.* at 71–82. As the Supreme Court has repeatedly held, a policy or law that serves no purpose other than to harm a particular group violates the Equal Protection Clause under any standard of review. See, e.g., *Cleburne,* 473 U.S. at 450 (invalidating zoning decision based on "irrational prejudice" against persons with developmental disabilities under rational basis review); *United States Dep't of Agric. v. Moreno,* 413 U.S. 528 (1973) (invalidating statutory provision motivated by animosity toward "hippies" under rational basis review).

As the District Court correctly held, that is the case with the challenged restrictions here. Rather than improving the quality of care, they diminish it; rather than benefitting transgender patients, they expose them to increased medical risks and other serious harms caused by foregoing "what is, for many, the most effective available treatment of gender dysphoria." *Doe* Order at 87.

## IV. THE DISTRICT COURT PROPERLY HELD THAT THE CHALLENGED MEASURES VIOLATE PLAINTIFF PARENTS' RIGHT TO DUE PROCESS

The District Court recognized that *Eknes-Tucker* forecloses any argument that the plaintiff parents in this case have a fundamental right to make medical decisions for their children and that plaintiffs' due process claim therefore "neither adds to nor detracts from the equal-protection challenge to the ban on these treatments." *Doe* Order at 83. Accordingly, the District Court correctly held that the due process "claim succeeds only because . . . the equal protection claim succeeds." *Id.* For the same reasons explained above, including that the statute and rules are rooted in animus and therefore fail even rational basis review, the District Court's ruling should be affirmed. *See Eknes-Tucker*, 80 F. 4th at 1220 (holding that, under the Due Process Clause, laws that do not

implicate a fundamental right must be rationally related to a legitimate state interest).

## CONCLUSION

For the foregoing reasons, the District Court's judgment should be affirmed.

Respectfully submitted,

*s/Thomas E. Redburn. Jr.*

Christopher F. Stoll
Kelly Jo Popkin
NATIONAL CENTER FOR LESBIAN
RIGHTS
870 Market Street
Suite 370
San Francisco, CA 94102
(415) 365-1320

Simone Chriss
Chelsea Dunn
SOUTHERN LEGAL COUNSEL
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890

Chris Erchull
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
(617) 426-1350

Thomas E. Redburn, Jr.
Maya Ginsburg
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 262-6700

Sarah Warbelow
Cynthia Cheng-Wun Weaver
HUMAN RIGHTS CAMPAIGN
FOUNDATION
1640 Rhode Island Avenue NW
Washington, D.C. 20036
(202) 993-4180

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,933 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Century Schoolbook size 14-point font with Microsoft Word.

Dated: October 2, 2024

*s/ Thomas E. Redburn, Jr.*
Thomas E. Redburn, Jr.
*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Thomas E. Redburn. Jr.*
Thomas E. Redburn, Jr.
*Counsel for Plaintiffs-Appellees*