No. 24-11996-J

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

*Jane Doe et al.*,
Plaintiffs-Appellees,

v.

*Surgeon General, State of Florida et al.*,
Defendants-Appellants.

U.S. District Court for the Northern District of Florida, No. 4:23-cv-114
(Hinkle, J.)

## DEFENDANTS-APPELLANTS' REPLY BRIEF

Mohammad O. Jazil
Michael Beato
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 274-1690

*Counsel for Defendants-Appellants Surgeon General and the Board Members*

Ashley Moody
   *Attorney General of Florida*
Henry C. Whitaker
   *Solicitor General*
Daniel W. Bell
   *Chief Deputy Solicitor General*
Myles S. Lynch
   *Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300

*Counsel for Defendants-Appellants Surgeon General, State Attorney Gladson, and the Board Members*

*Jane Doe et al. v. Surgeon General, State of Florida et al.*

24-11996-J

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 and Circuit Rule 26.1, Defendants-Appellants Surgeon General, State Attorney Gladson, and the Board Members certify that the certificates in the initial and answer briefs are complete.

Dated: October 16, 2024

/s/ Mohammad O. Jazil
*Counsel for Defendants-Appellants Surgeon General and the Board Members*

/s/Henry C. Whitaker
*Counsel for Defendants-Appellants Surgeon General, State Attorney Gladson, and the Board Members*

## TABLE OF CONTENTS

Table of Authorities ....................................................................................................ii

Argument ................................................................................................................ 1

Conclusion .............................................................................................................. 8

Certificate of Compliance ..................................................................................... 11

Certificate of Service ............................................................................................ 11

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. South Carolina State Conference of the NAACP*,
 602 U.S. 1 (2024) ..................................................................................... 1-3

*Bray v. Alexandria Women's Health Clinic*,
 506 U.S. 263 (1993) ..................................................................................... 3

*Eknes-Tucker v. Governor of Alabama*,
 80 F.4th 1205 (11th Cir. 2023) ................................................................ 1, 3-4

*Hall v. Holder*,
 117 F.3d 1222 (11th Cir. 1997) ................................................................... 7

*League of Women Voters of Florida, Inc. v. Florida Secretary of State*,
 66 F.4th 905 (11th Cir. 2023) .................................................................... 2-3

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*,
 429 U.S. 252 (1977) ................................................................................. 1, 3

**ARGUMENT**

Plaintiffs tread no new ground. They raise the same arguments that the stay panel considered and rejected. Plaintiffs insist, for example, that the clearly erroneous standard of review applies to every issue on appeal. It doesn't. They say that the district court correctly applied the presumption of legislative good faith. It didn't. They continue to use gender dysphoria as a proxy for transgender status. It isn't. They take liberties with the record to pin discriminatory intent onto the Florida Legislature and the State's two, independent boards of medicine. They shouldn't. At bottom, the district court applied a faulty animus framework and then erred in finding animus. Plaintiffs offer nothing to conclude otherwise.

**I.** Start with the standard of review. "If a trial court bases its findings upon a mistaken impression of applicable legal principles," then "the reviewing court is not bound by the clearly erroneous standard." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 18 (2024) (cleaned up). The State maintains that the trial court misapplied *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), the presumption of legislative good faith, and the framework from *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977). Those are legal errors to which a *de novo* standard of review must apply. Plaintiffs cite no contrary legal authority. They

1

simply repeat the mantra that the clearly erroneous standard of review applies. *E.g.*, Ans. Br. at 50-51.[1]

Regardless, the clearly erroneous standard of review isn't a "rubber stamp." *Alexander*, 602 U.S. at 18. And drawing the worst possible inferences from the record to find discriminatory intent, as the district court did here, is still clear error. *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 918-19 (11th Cir. 2023) ("we hold that the findings of intentional racial discrimination rest on both legal errors and *clearly erroneous findings of fact*" (emphasis added)).

**II.** Drawing the worst possible inferences also runs headlong into the presumption of legislative good faith. The State focuses on the Supreme Court's recent decision in *Alexander v. South Carolina State Conference of the NAACP* when discussing this starting, evidentiary presumption. Int. Br. at 49-51. Plaintiffs continue to misstate the presumption of legislative good faith and never meaningfully engage with the State's concerns. Ans. Br. at 56-59. In fact, Plaintiffs don't even cite or acknowledge *Alexander*'s existence in their brief.

The presumption's misapplication here is obvious. Take the district court's reliance on the statements of seven or so legislators. *See* Int. Br. at 50-51. It's from the

---

[1] In this reply brief, the State's initial brief is referred to as "Int. Br.", and Plaintiffs' answer brief is referred to as "Ans. Br." The State's motion for stay is referred to as "Stay Mot.", and the stay order is referred to as "Stay Order." The State's motion for reconsideration response is referred to as "Recon. Resp." The same record and page conventions that applied in the initial brief apply here. References to the *Dekker* appeal will include appellate docket numbers and filing dates.

seven that the district court inferred that a "significant" number of legislators shared an animosity towards transgender individuals. Doc.223 at 9-10, 47. The district court made that inference even though there's a competing inference that the other legislators don't agree with or didn't hear those statements. And the district court made that inference even though the presumption of good faith "direct[ed]" the court to "draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10.

**III.** It's also important to distinguish transgender individuals from those with gender dysphoria, a psychiatric diagnosis that afflicts only some transgender individuals. Even assuming that transgender individuals comprise a suspect or quasi-suspect class—a proposition this Court has never embraced and about which this Court has repeatedly expressed "grave doubt," *Eknes-Tucker*, 80 F.4th at 1230—the district court erred in treating gender dysphoria as a proxy for transgender status. Int. Br. at 21-23.

Proxy analysis works only in the "rare" case where "a clear pattern, unexplainable on grounds other than" discrimination is apparent. *Arlington Heights*, 429 U.S. at 266. This isn't that rare case. Treatments for gender dysphoria are *not* for transgender individuals what a tax on yarmulkes is for Jews. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). This Court said as much in *Eknes-Tucker* when recognizing the risks and uncertainty associated with the use of puberty blockers and cross-sex hormones to treat a diagnosis of gender dysphoria. 80 F.4th at 1225; *see also* Stay Order at 5-6.

3

Even the district court acknowledged that the State's actions were animated, at least in part, by "a belief—whether or not correct—that the treatments at issue are harmful, should be banned for minors, and should be prescribed with greater care for adults." Doc.223 at 41. "That should have been the end of it." Stay Order at 6. It wasn't.

Although a persistent theme of Plaintiffs' answer brief is an assumed, but false, equivalence between regulating the treatment of gender dysphoria and discriminating against transgender individuals as a class, *e.g.*, Ans. Br. at 28-29, Plaintiffs appear to have abandoned any defense of the district court's flawed proxy analysis. Ans. Br. at 61. Instead, they predicate their claim of animus on a purported application of *Arlington Heights* and its multi-factor test. Given the presumption of legislative good faith, that is a very tall task. And in their efforts to gin up evidence of animus under *Arlington Heights*, Plaintiffs repeatedly mischaracterize the record.

Plaintiffs' retelling of the Agency for Health Care Administration's GAPMS drafting process is particularly tendentious. Ans. Br. at 29-33. Put aside that that process and its attendant issues are before this Court in another pending appeal. 23-12155. Put aside that the report's conclusion—that puberty blockers and cross-sex hormones come with significant health risks—mirrors this Court's conclusion in *Eknes-Tucker*. 80 F.4th at 1225; *Dekker* DX6 (report). Put aside that the agency that issued the report isn't the state house, the state senate, or the two, independent boards of medicine. Put aside, too, that Plaintiffs fail to identify a single representative, senator, or board member who read and relied on the report to vote for the at-issue statute or rules. Even ignoring all

4

these shortcomings, Plaintiffs still fail to show that there is anything wrong or unusual about the GAPMS drafting process. As the State already explained in the *Dekker* appeal, the report didn't have a "predetermined outcome," as its author testified at the *Dekker* trial; the report cited studies that Plaintiffs' own experts rely on and support; the agency hires outside consultants to assist with its activities; the most important contributor to the report, Dr. Brignardello-Petersen, doesn't "personally oppose" the at-issue treatments; and Plaintiffs never point to a statute or rule that the Agency for Health Care Administration violated when putting together its report. Doc.29 at 24-32, 40, 23-12155 (11th Cir. Oct. 6, 2023) (*Dekker* initial brief); Doc.73 at 26-34, 23-12155 (11th Cir. Jan. 18, 2024) (*Dekker* reply brief). Simply put, the evidence concerning the report doesn't prove intentional discrimination. References to this report from another agency are a distraction, at best.

　　Plaintiffs' retelling of the medical boards' rulemaking processes repeats the same distortions they trotted out in opposition to the State's stay motion. Plaintiffs assert that the processes were unusual, that the boards were biased and organized opposition against the gender-dysphoria treatments, and that the informed consent forms were dense. *E.g.*, Ans. Br. at 34-36, 40-44; Recon. Resp. at 6. None of these contentions holds water. As the State already explained, the processes weren't unusual, proponents and opponents of the treatments were invited to speak (including Dr. Janssen, Plaintiffs' own expert witness), the informed consent forms were modeled on existing gender-

5

dysphoria forms and mirror the State's medical-marijuana forms, and, again, no statute or rule was violated. Int. Br. at 28-34, 37-40.

Plaintiffs devote a footnote to Dr. Mortensen, the principal author of the informed consent forms. Ans. Br. at 41 n.3. Plaintiffs attack her credentials, but they don't respond to her explanation of how and why she drafted the forms. That's a telling omission because the central issue in the case is whether the boards acted with animus—not whether the boards came to a conclusion that Plaintiffs' preferred medical associations support. The forms thus fail to establish intentional discrimination.

Plaintiffs' summary of the legislative process is even worse. Ans. Br. at 36-40. Most egregiously, they rely on statements from "multiple legislators." *E.g.*, Ans. Br. at 38. But by failing to identify which legislator made what statement, Plaintiffs misleadingly imply that many legislators made the quoted statements. The reality is that only seven or so did (without any evidence that others shared those sentiments). Int. Br. at 51. Plaintiffs never dispute the State's count.

Plaintiffs go on to devote several pages to explaining gender identity and transgender status, and defending puberty blockers and cross-sex hormones as treatments for gender dysphoria. Ans. Br. at 44-50. Suffice to say, the State disagrees with these contentions, for the reasons explained in its initial brief. Int. Br. at 21-27.

One point bears noting, though. Plaintiffs state that the "District Court found that being transgender is innate, not a choice," and "Defendants admit this." Ans. Br. at 44 (citing Doc.223 at 8). Yet the district court didn't state this, and the State didn't

6

admit this. The district court said that "[g]ender identity is real." Doc.223 at 8. That's not the same as saying that being transgender is innate. The State maintains (as do Plaintiffs' own experts) that gender identity is mutable. It's a non-biological construct, a deeply held sense of self—and the existence of detransitioners proves as much. Int. Br. at 21-22, 31, 34. If gender identity can change, then so can transgender status; being transgender isn't innate.

All told then, Plaintiffs get a lot wrong. They confuse fundamental concepts about transgender status, gender identity, and gender dysphoria. They never acknowledge that their own expert testified before the medical boards. And they continue to gloss over the number of legislators making certain comments.

Plaintiffs' effort to fog up the record thus results in a deeply flawed *Arlington Heights* analysis. Ans. Br. at 63-82. There's no meaningful response to the State's analysis of the applicable factors: that only a few legislators made certain statements; that the scope of the rules' and legislation's impact was unknown; that Senate Bill 254 was a reasonable alternative to House Bill 1421; or that Plaintiffs still fail to identify a single "statute, a rule, or a procedure that the legislature or the boards of medicine violated when taking their respective actions." Int. Br. at 54-55; *Hall v. Holder*, 117 F.3d 1222, 1230 (11th Cir. 1997) ("Appellants also point to no procedural departures from the ordinary policy-making process in the decision to maintain the system; that is, they do not argue that the referendum was somehow deficient.").

7

Tellingly, while Plaintiffs tout the "105 pages of detailed factual findings and legal conclusions" of the district court, Ans. Br. at 22, they find it necessary to rely on hearsay non-evidence in their answer brief, Ans. Br at 70 n.8, 72 n.9 (hearsay, non-evidence newspaper articles). They further reference a handful of other state laws and conclude—without any legislative transcripts in the record, without any mention of procedural departures from the legislative process, without any reasonable justifications for the laws, or anything of the sort—that these other laws were also intended to discriminate against transgender individuals. Ans. Br. at 69-73. This slipshod attempt to establish guilt by association is plainly insufficient to show animus in the enactment of SB254, much less animus against any suspect or quasi-suspect class. This attempt only highlights Plaintiffs' positional inconsistencies in relying on non-record hearsay while claiming the record is robust, and leaning into an *Arlington Heights* analysis for some laws while forgoing it for others.

## CONCLUSION

In the end, Plaintiffs (and their amici) attempt to constitutionalize WPATH's standards of care through a faulty animus analysis that falsely assumes that transgender status is a suspect or quasi-suspect class. They have failed. State policymakers underwent a reasonable, thoughtful, and legal decisionmaking process and landed on the obvious: that certain treatments need better guardrails, especially considering the treatments' health consequences and considering examples of medical-profession slipups. Int. Br. at 21-40. This Court reached a similar conclusion in *Eknes-Tucker*. The

8

State's gender-dysphoria rules and legislation are backed by compelling and legitimate governmental interests and should stand; the district court's final order and judgment should be reversed.

Dated: October 16, 2024

/s/ Mohammad O. Jazil
Mohammad O. Jazil
mjazil@holtzmanvogel.com
Michael Beato
mbeato@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 274-1690

*Counsel for Defendants-Appellants Surgeon General and the Board Members*

Ashley Moody
   *Attorney General of Florida*

/s/ Henry C. Whitaker
Henry C. Whitaker
henry.whitaker@myfloridalegal.com
   *Solicitor General*
Daniel W. Bell
daniel.bell@myfloridalegal.com
   *Chief Deputy Solicitor General*
Myles S. Lynch
myles.lynch@myfloridalegal.com
   *Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300

*Counsel for Defendants-Appellants Surgeon General, State Attorney Gladson, and the Board Members*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing complies with the typeface and type-style requirements of Rule 32. I also certify that this brief contains 2,103 words.

Dated: October 16, 2024 /s/ Mohammad O. Jazil
Mohammad O. Jazil

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing certificate was filed on ECF.

Dated: October 16, 2024 /s/ Mohammad O. Jazil
Mohammad O. Jazil